**CA Nos. 19-10163, 19-10250**

District Court No. 2:16-cr-00216-KJD-VCF

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LONNY DITIRRO, JR.,

Defendant-Appellant.

————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEVADA

**GOVERNMENT'S SUPPLEMENTAL EXCERPTS OF RECORD**

NICHOLAS A. TRUTANICH
United States Attorney

ELIZABETH O. WHITE
Appellate Chief

ELHAM ROOHANI
Assistant United States Attorney
District of Nevada
501 Las Vegas Blvd S., Suite 1100
Las Vegas, Nevada 89101
(702) 388–6336
*Attorneys for the United States*

Date submitted: September 21, 2020

# SUPPLEMENTAL EXCERPTS OF
# RECORD INDEX

| CR No. | | SER No. |
|---|---|---|
| 139 | Government Sentencing Memorandum (4/24/19) | 0001 |
| | Trial Transcript: Day 3 (10/17/18) | 0027 |
| 80 | Superseding Indictment (4/24/18) | 0093 |
| 74 | Supplement to Defendant's Objections to Magistrate's Report and Recommendation (10/30/17) | 0098 |
| 67 | Defendant's Objections to Magistrate's Report and Recommendation (9/21/17) | 0109 |
| 23 | Defendant's Motion to Suppress (10/24/16) | 0124 |

NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar No. 13644
ELHAM ROOHANI
Nevada Bar No. 12080
CHRISTOPHER BURTON
Nevada Bar No. 12940
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
elham.roohani@usdoj.gov
christopher.burton4@usdoj.gov

Attorneys for United States of America

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America,       ) | Case No.: 2:16-cr-216-KJD-CWH |
|     Plaintiff,            ) | |
|                    ) | |
|     vs.                 ) | **Government's Sentencing Memorandum** |
|                    ) | |
| Lonny Joseph Ditirro,      ) | |
|                    ) | |
|     Defendant.       ) | |
|                    ) | |

**I.     Introduction**

<u>Five</u>. The number of identified minors who showed up at trial to testify against Lonny Ditirro – girls who he raped and recorded their sexual exploitation.

<u>Forty-eight</u>. The total number of minor girls whose photos and videos Ditirro meticulously organized into folders on his SD card bearing their first names and ages between 13 and 17 years old; folders that contained child pornography files consistent with the sexually exploitative images and videos of identified victims that Ditirro produced.

254 and 42. The number of images and videos of child pornography Ditirro possessed – depictions that included infants and toddlers being sadistically and violently sexually assaulted by adult men in ways designed to humiliate the children.

140. The bare minimum number of years Ditirro should spend in prison – to provide just punishment, to protect the community, and to give some measure of safety to his victims.

Ditirro is sexual predator who is deserving of a substantial sentence that will naturally produce community safety for the longest period of time available, which is the remainder of his natural life. His patterned actions in this case, his utter lack of remorse, his repeated efforts to justify, deflect, explain away, and otherwise excuse his crimes, all prescribe a statutory maximum sentence for each count to run consecutive. This is especially true given that all of the evidence before the Court suggests Ditirro will not change; but instead will continue to present a significant danger to the community. A 140-year sentence is therefore sufficient but not greater than necessary to further the goals of sentencing. The government also requests a lifetime term of supervised release.

## II.     Factual Background

On September 10, 2015, Las Vegas Metropolitan Police Department (LVMPD) Task Force Officer Shannon Tooley received a police report from Patrol Officers Nicholas Bianco and Garrett Wilson referencing a child exploitation call for service. Officers contacted Rachel Saito, who was previously in a relationship with Ditirro. Saito reported that she found a SanDisk Micro SD card in her bed that belonged to Ditirro. Saito stated she viewed the contents of the SD card and found what she believed to be child pornographic images. Officers viewed contents of the SD card and observed several images

2

1   of females who appeared to be between 13 and 15 years of age engaged in sexual acts.

2   Officers impounded the SD card into evidence and notified Detective Tooley.

3        On November 30, 2015, Detective Tooley conducted an interview with Saito. Saito

4   described that she and Ditirro had begun dating in early 2015. Saito stated that Ditirro

5   moved into her apartment to live with her shortly after that they began dating. Around

6   September 9, 2015, while in bed, Saito discovered the SD card stuck to her leg. Saito stated

7   that she believed the SD card belonged to Ditirro as he had been asking her if she had seen

8   his SD card. Saito viewed the contents of the SD card and found images of Ditirro, both

9   clothed and nude, images of child pornography, and other photos of Ditirro engaged in

10   sexual acts with a female who appeared to be under 16 years of age.

11        On December 2, 2015, Detective Tooley obtained a search warrant to seize and

12   perform a full forensic examination on the SD card. On March 7, 2016, LVMPD Forensic

13   Analyst Matt Trafford completed a forensic examination on the SD card. He found 235

14   images/videos of Ditirro on the SD card, in folders titled "Me," which included "selfies" of

15   Ditirro, and "Me Restricted," which included naked "selfies" of Ditirro. Forensic

16   Examiner Trafford also found Ditirro's resume and birth certificate, showing ownership.

17        Forensic Examiner Trafford bookmarked 254 images and 42 videos of child

18   pornography saved on the SD card in carefully curated folders. 56 of the images depicted

19   infants and toddlers and five images depicted sadomasochism and violence. For example,

20   one image depicted a nude pre-pubescent female child lying on her back, with an image of

21   a playboy bunny drawn above her vagina and the words "Fuck Me" written on her pelvis.

22   An adult male's erect penis is seen above the child dripping with ejaculate onto her chest

23   and stomach. Another adult male's erect penis is penetrating her anus. Another photo

24   depicts an adult male with an erect penis ejaculating into the mouth of a female child. Yet

3

SER 0003

another video shows a nude adult male lying on his back with an erect penis while a nude pre-pubescent female child is straddling the adult male. The male is penetrating the child's vagina with his penis as he has vaginal sex with the female child.

In addition to these images of child pornography, Ditirro had organized and catalogued dozens of folders titled with the name and age of nearly 50 girls. For example: one folder was titled "T.H. 13" and another was titled "R.B. 14." There were 48 folders titled with the names of girls and ages ranging from 13-17 years of age. These folders included photos of the girls, videos of Ditirro having sex with/raping the girls, and letters and text messages about how some of the girls were in love with Ditirro. The number after each girl's name in the folder title appeared to be the age of the girl depicted in the folder.

Upon his arrest, Ditirro was *Mirandized* and voluntarily spoke with law enforcement. Ditirro admitted that he did not have a computer, but rather that he used his cell phone and SD cards to save information and data. Ditirro admitted that he only had two cell phones in the past, both Android smartphones – a Samsung S6 and an earlier model S4. Samsung phones are not manufactured in the State of Nevada. The SD card was also not manufactured in Nevada.

Law enforcement subsequently identified four of Ditirro's victims from the SD card. Ditirro's convictions on the first four counts in the Superseding Indictment relate to those four victims – R.B., C.A., S.M., and T.H.

**R.B.**

R.B. told officers, this Court, and the jury, a harrowing story. When she was 14, she met Ditirro through a social media chat application called Meet Me. The application allows individuals to get in touch with other people nearby and arrange to meet. R.B. began talking to Ditirro but eventually ended the conversation. Ditirro located R.B. on

4

Facebook, found out where she lived, and then showed up at her house uninvited. R.B. stated that Ditirro forcibly raped her both vaginally and anally on her back porch. A video in the "R.B. 14" folder on Ditirro's SD card corroborated R.B.'s story, as the backyard porch furniture was still present at the home years later. The Court and jurors saw videos of this rape that took R.B.'s virginity.

R.B. told law enforcement that Ditirro continued to contact R.B. after this rape, sending her naked photos of himself, and used extortion and threats (to disclose the video he made of the rape to her religious family and physically harm her family) to get R.B. to send more naked photos of herself to him. These photos are also in the "R.B. 14" folder. R.B. further related that Ditirro raped her a second time, again on her back porch. R.B. stated that Ditirro recorded the rapes with a black smartphone, which corresponds to Ditirro's statement that he had Android/Samsung smartphones.

R.B.'s trial testimony was consistent with her statement to law enforcement.[1] As the Court and jurors saw, R.B. continues to be visibly impacted by the rape at the hands of Ditirro years later.[2] Over the course of the past few years, R.B. has suffered from social

---

[1] Ditirro's most recent claim that R.B. was lying because she allegedly told Ditirro over text that she was raped prior to being raped by him is factually unsupported and just another attempt to detract from his unquestionable guilt. Aside from the fact that it is irrelevant who else may have sexually assaulted R.B. before or after Ditirro, in reality, the text to which Ditirro is referring is R.B.'s text *to a later actual boyfriend that she had been raped by Ditirro*. To be abundantly clear, R.B. has been raped by only one person –Ditirro. He stole her virginity, her childhood, her innocence, her sense of security in her own home, and her mental well-being. His most recent fabrications are nothing more than a continued attempt to harass and humiliate R.B. The government, for one, is not distracted by Ditirro's reprehensible attempts, and this Court should not be either.

[2] In preparing this sentencing memorandum, R.B. noted to the prosecutor that her pre-trial meeting was particularly traumatic because she had a vivid flashback to the rape. Government counsel remembered this pre-trial meeting where R.B. recounted the rape. The prosecutor was particularly troubled when R.B. spoke about Ditirro touching her neck, as he is seen to do on one of the videos. As R.B. was speaking, it seemed that she was having

SER 0005

anxiety, depression, and suicidal ideations due to these rapes. Her relationship with her

family suffered, and she suffered post-traumatic stress due to returning each day to the

place she was raped – her own home. R.B. began self-harming, cutting herself to ease the

pain from the constant reminders of the rape and mental anguish from Ditirro's extortion.

In her own words, R.B. had "her childhood ripped out of her by a predator who can only

think of one thing, hurting the people who he sees as weak and easy prey." Last year, as

the trial date was approaching, R.B.'s anxiety and fear caught up to her when she

attempted suicide and was almost successful in overdosing on drugs. This resulted in a

hospital stay and substantial medical bills.

R.B. continues to fear for her safety <u>to this day</u> – now that she has testified against

Ditirro, she fears that he will come find her and "do everything all over again." All of this

terror stems from one person – Lonny Ditirro.[3]

R.B.'s mother and father recount that R.B. used to be a happy child but just before

her 15th birthday – because of Ditirro – R.B. became suddenly sullen and secretive. When

her parents took away her phone, R.B. acted like an addict looking for her next fix. But, in

reality, the root of R.B.'s extreme anxiety over the loss of her phone was her terror that

Ditirro would follow through on threats to physically harm her family and disseminate the

sexual exploitation videos he had created of R.B. to her family, friends, school, and church,

unless she timely complied with his demands to send still more images and videos of sexual

exploitation. As a result of Ditirro's rape and extortion, R.B. obsessively changes her cell

phone number, i.e. a total of five times just this year. R.B.'s mother is concerned because

---

an out of body experience. R.B. was clawing at her neck to the point of drawing blood,
reenacting the disgust she felt at having Ditirro's hands on her virgin body.

[3]      R.B. has completed a victim impact statement, which is filed under seal as
Government's Exhibit 1.

SER 0006

R.B. is unable to maintain healthy relationships and friendships and R.B. has never

processed the harm caused by Ditirro. It is heartbreaking for a parent to watch their child

live in mental anguish and express suicidal thoughts. To help R.B., her parents have put

their house (the place R.B. was victimized) up for sale to rebuild their family. Ditirro did

not just destroy R.B., he destroyed her parents' happiness and security as well.[4]

**C.A.**

In 2014, C.A. was 15 years old when Ditirro initiated contact with her via Meet Me.

He initially told her he was 15, but later told her he had graduated high school in 2014.

C.A. told Ditirro she was a minor. He asked her to send nude images and videos to him

and said if she did, he would buy her an iPhone. He sent her pictures of himself

masturbating. The exchange of nude pictures and videos was done via Kik Messenger.

C.A. said she felt forced to send the nude images. Like with R.B., Ditirro extorted and

blackmailed C.A. to obtain her photos.

At one point, C.A. broke her iPod and could no longer have any contact with

Ditirro; she felt happy to not have to communicate with him. During their conversations,

Ditirro told her he wanted to marry her and that he was going to buy her an engagement

ring. In classic grooming behavior, Ditirro said if C.A. would have sex with him, he would

buy her other things.

C.A. was shown pictures taken from Ditirro's SD card folder with her name. C.A.

identified the images as being of her in her bedroom. As she identified the photos, C.A.

broke down crying, saying that on one occasion Ditirro asked if he could come over to her

house in Las Vegas, Nevada to "hang out." Ditirro told C.A. they would just hang out

---

[4]     R.B.'s parents have completed a victim impact statement, which is filed under seal
as Government's Exhibit 2.

SER 0007

outside in the front of her house, so she gave him her address. C.A. said at the time he came over, her mom was out of town and her dad was at work. C.A. was on the upstairs balcony when she saw him get off a bus and walk to her house. When she opened the door, Ditirro, who is more than a foot taller and close to 200 pounds heavier than C.A., pushed his way in the house and shoved C.A. down on the couch. He then carried her upstairs to her bedroom, shut the door, and forced her onto her bed. C.A. asked him to leave. Instead, he removed her clothing and his own.

C.A. remembered just wanting to call 911, but not having a phone. C.A. then said he did "sexual stuff" to her; he made her suck his penis by pushing her head down on him. He tried to have anal sex with her at one point. She then said he raped her. While Ditirro was raping her, he had his white cell phone in his hand, recording the sexual assault. C.A. asked him to stop and tried to push him away. He told her he wanted to get her pregnant at 15 years old. At one point he instructed her to call him "daddy." At the conclusion of the interview (while crying), C.A. said he traumatized her. This was the rape C.A. testified to during trial.

In the C.A. folder, there are 56 images files, 8 of which depict C.A. nude. There are 10 videos in the C.A. folder, six of which depict Ditirro raping C.A. in her bedroom. These six videos depict Ditirro orally and vaginally assaulting C.A. In one video, C.A. is kneeling on her bed with her buttocks raised. Ditirro is kneeling behind her with his penis inserted into her vagina. As he holds her down, Ditirro can be heard saying "You like that big dick, baby?," "Say 'I love that big dick'," "See, I told you, you couldn't keep quiet with my big dick."

///

///

8

SER 0008

**S.M.**

S.M. met Ditirro when she was 15 years old on Meet Me. His profile said he was 17 years old and had picture of himself. S.M. said Ditirro showed her a driver's license, Social Security card, and birth certificate, all stating he was 17 years old. Some of these falsified documents were found on Ditirro's S.D. card. They chatted for couple of months. After two weeks, Ditirro asked for nude pictures of S.M. and sent her nude pictures of himself via Kik. He sent her a picture of his penis and asked if she "liked that." They chatted about sex.

Just before Christmas, while in her freshman year in high school, S.M. asked her mother if Ditirro could come visit for Christmas. Prior to his arrival, S.M.'s mother looked online and found information that Ditirro was 34 years old. S.M. confronted Ditirro about his age and he denied being 34 years old. This was one of the times Ditirro sent S.M. a falsified document showing he was 17.

Ditirro traveled to Texas twice to have sex with S.M. The first trip, they had sex two or three times. During the second trip, S.M. was 16 years old. They had sex two times during that trip. Once during this visit, Ditirro began to forcibly rape S.M. and would not stop. S.M. tried to kick her legs up to get Ditirro off her body but Ditirro pushed her down and S.M. hit her head on the headboard. Unbeknownst to S.M., Ditirro recorded one of these rapes.

In May 2016, S.M. was contacted by a girl on Facebook, later identified as A.P., who told S.M. if she is contacted by the police, she is to say she does not know Ditirro. S.M. asked A.P. why she contacted S.M. and A.P. told S.M. there was an "SD card that had a bunch of nudes on it." A.P. told S.M. about a video showing S.M. and Ditirro having sex. Because S.M. did not know about the video, S.M. did not believe Ditirro

9

SER 0009

1  would record her. A.P. then called S.M. and Ditirro got on the phone and told S.M. he was

2  in trouble with the cops and told her that "she doesn't know him if something were to

3  happen." Ditirro's actions amounted to witness tampering and obstruction.

4        S.M. was shown pictures printed from Ditirro's SD card. One picture was a screen

5  shot taken during a Skype chat between Ditirro and S.M. and depicts S.M. nude in her

6  bedroom and Ditirro's face in the corner of the photograph. S.M. testified she did not know

7  he had captured screen shots of these chats. She said she was 15 years old in that picture,

8  and was certain of her age based on her bedroom décor.[5]

9        Inside the S.M. folder on Ditirro's S.D. card are three subfolders: (1) "S" – which

10  contains 66 images of S.M. clothed, one being a picture of S.M. and Ditirro together; (2) "S

11  naked" – which contains 121 images, 91 of which depict S.M. nude or partially nude ; and

12  (3) "S skype" – which contains 156 screen shots of Skype communications, 65 of which

13  depict S.M. nude or partially nude and most showing Ditirro's face.

14        While S.M. puts on a brave face, her victim impact statement shows her continued

15  turmoil over her "relationship" with Ditirro. S.M. recognizes that she was one of the first

16  girls victimized by Ditirro, and for that, she blames herself for not speaking up sooner. It is

17  also telling that *before* S.M. talks about her own distress, she remembers the pain shown on

18  the other victim's faces and cares for their well-being. S.M. is particularly reflective as she

19  remembers seeing the photo of C.A. in the exhibit book: "She was tan with black hair with

20  a hand around her neck. Being forced to endure the pain of what he put her through was

21  written all over her face." In fact, S.M. rightfully took solace in the fact that her face was

22  

---

23  [5]    S.M. has completed a victim impact statement, which is filed under seal as
Government's Exhibit 3. Additionally, S.M. also provided the government with medical
documentation stating her need for therapy as a result of Ditirro's sexual exploitation of her.

24  That document has been filed under seal as Government's Exhibit 4.

10

SER 0010

not shown in the videos found in her folder. While she could clear identify herself, no one else will know it was her, in the event that Ditirro distributed these videos.[6] The lingering effects of Ditirro's abuse continue to haunt S.M. – she crashed her brand new car after being distraught from her trial testimony, she needs mental health counseling, and her doctor has recommended a therapy animal to alleviate the anxiety she feels as she copes with her exploitation. S.M's mother is saddened that she "can't fix the hole in [her] daughter's heart and soul."[7]

These are the kind, caring, compassionate girls that Ditirro targeted, victimized, and destroyed. And, to this day, these girls have unanswered questions: "All I could think was, why would he have taken advantage of us? Was there a reason for all of this? Was this a sick game? Why did he lie? Why fake so many emotions? Just FUCKING WHY?" They know they will never get answers to these questions, but they already saw during their testimony what Ditirro thought of himself written all over his face: "looking very smug with himself," as if to say "what are you doing here? Didn't you like what I did to you?"

**T.H.**

In early 2013, when T.H. was 13 years old, she met Ditirro on Meet Me. Ditirro claimed he was 18 and the two began messaging back and forth. Ditirro quickly initiated sexual conversations with T.H. and ultimately asked to trade nude photographs over Kik. T.H. complied and sent nude photographs of herself to Ditirro over Kik at his request. During this time, T.H. lived in Arizona but she visited her relatives in Las Vegas in June 2013. Throughout that month, Ditirro and T.H. met up every day and had sex. On at least

---

[6]     The same cannot be said for the nude photos depicting S.M.
[7]     S.M.'s mother has completed a victim impact statement, which is filed under seal as Government's Exhibit 5.

11

SER 0011

two occasions to T.H.'s knowledge, Ditirro recorded having sex with her. Although T.H.

was aware of the recording, she can be seen in the videos covering her face and otherwise

looking away from the camera. The videos were recorded with Ditirro's phone.

On November 4, 2016, T.H. appeared at a family advocacy center in Arizona for an

interview with law enforcement. T.H. did not want to participate in the interview. T.H.

was told the interview was regarding Lonny Ditirro. T.H. said she knew the name but did

not want to provide any further information which would add charges or increase the

length of a prison term for Ditirro. T.H. ended the interview by saying she would like to

never be bothered about this situation again. In her victim impact letter, filed under seal as

Government's Exhibit 6, T.H. explains her reluctance to cooperate.

> I was just one of his countless victims but coincidentally I was also one of the few who were uprooted from our everyday lives and called to testify in October 2018. I was first contacted by the FBI in 2016. I declined to speak about this uncomfortable situation and I remained silent until October 2018 when I was served a subpoena outlining my mandatory appearance at the trial that was set to commence a few weeks later. I remained silent until trial for many reasons.
>
> One of the main reasons being my lack of knowledge about who Lonny was, even six years after he had victimized me. Up until October of 2018 I was unaware that Lonny had preyed on me solely because he is a child predator. I had no idea that he kept videos of me as a child, in his possession for years. I was unaware of all of the gruesome facts that were presented at trial, and I was unaware that Lonny is aged well into his 30's. Had I known that Lonny is a child predator, I would have participated in the case much sooner than I did.

As T.H. explains, when she met Ditirro online, she never had a boyfriend or even

her first kiss. She "was a child." He manipulated her. What they had "was not a

relationship, it was a way for him to sexually abuse" her. At trial, T.H. testified that Ditirro

12

SER 0012

took her virginity when she was just 13 years old, and recorded these rapes against T.H.'s will. According to T.H.,

> In the moment, I felt very confused. I didn't know why he was recording me, all I knew is that I did not want to be recorded. I covered my face, shied away from the camera, I did everything I thought might make him stop, but he didn't stop. He recorded several different sexual acts involving me when I was only 13 years old, and then he kept them only for them to be discovered by law enforcement years later.

> As an adult, it is hard for me to comprehend that there are videos of myself as a child having sex with a man in his 30's. Lonny recorded these videos without my consent and then he tried to pressure me into watching them. I was completely disgusted at the fact that he recorded the videos, so I refused to watch them. I never actually saw any portion of the videos until they were played at trial.

Contents of the T.H. folder on Ditirro's SD card include 584 files – 579 images and 5 videos. Approximately 95 image files are of T.H. nude or partially nude. Four of the five videos depict Ditirro and T.H. in what appears to be a girl's bedroom engaged in various sex acts. During her testimony, T.H. identified this room as the place she stayed during her trip to Las Vegas in June 2013. The videos show Ditirro having oral and vaginal sex with T.H. Throughout the videos, T.H. can be seen covering her face and otherwise avoiding the camera recording her.

**A.P.**

In July 2015, when A.P. was 15 years old, she met Ditirro on Meet Me. A.P. put her accurate age on her Meet Me profile and Ditirro's profile stated that he was 15. The two began messaging each other. Ditirro then encouraged A.P. to have Skype chats with him. During some Skype chats, Ditirro asked A.P. to send him nude photographs and also directed A.P. to take her clothes off and pose for him. Unbeknownst to A.P., Ditirro took

13

SER 0013

screen shots of these Skype conversations which depicted A.P.'s nude body.[8] During the course of their contact, A.P. began doubting Ditirro's claimed age. When she confronted him, Ditirro provided his driver's license, but covered his date of birth. Ditirro also directed A.P. to look at his Facebook profile, which stated his birthday was in 1992, making him approximately 23 years old.

Subsequently, A.P. and Ditirro met in person. The sexual conversations continued and, on one occasion, Ditirro tried to show A.P. the video he had recorded of raping R.B.[9] Ditirro also showed A.P. a video he took when he raped C.A., who he said was 15 at the time of the video.

After Ditirro's arrest in this case, he contacted A.P. and asked her to reach out to "a girl in Texas." Ditirro told A.P. that he had traveled to Texas and had sex with a 15-year-old girl and there were pornographic photographs and videos of her on his device. At Ditirro's request, A.P. contacted the girl from Texas and asked her to lie to the FBI if they came and asked her questions about Ditirro.

**Other Relevant Conduct and Considerations**

As stated above and shown at trial, Ditirro methodically organized and catalogued his collection of photographs and videos of child exploitation. As the below screen shot of a small portion of the folders contained on Ditirro's SD card demonstrates, the charged victims are hardly the only victims of Ditirro's sexual exploitation. Rather, the charged victims are simply those who have been identified by law enforcement at this time.

---

[8]     The nude screen shots of A.P., which were subsequently found on the SD card, supported the charge of possession of child pornography.

[9]     Although A.P. did not know R.B., she testified the video was of "R" and was taken outside at night. A.P. also testified that Ditirro told her the video was taken at R.'s house when R. was 14. This description is consistent with the video depicting Ditirro's rape of R.B.

SER 0014



SER 0015

Aside from the charged victims, and the more than 30 other girls similarly sexually exploited by Ditirro and catalogued in folders on the SD card that have not yet been identified, Ditirro also victimized complete strangers. In a series of particularly disturbing videos, Ditirro recorded "upskirt" videos of women walking on the Las Vegas Strip. These images are contained in the government's trial exhibits, but were not published to the jury.

Finally, the Court has seen some of the images of child pornography saved on Ditirro's SD card. What the Court cannot compare without seeing all the images is the average age of the children depicted in those videos. Ditirro's preferred age range is under eight years old. Moreover, Ditirro's preference is images and videos that depict sexual humiliation of children, including adults ejaculating on children's faces and adult men penetrating female children's vaginas with an erect penis.

### III.  Discussion

#### A.  Application of Sentencing Guidelines

    i.  <u>The enhancement for committing an offense involving a minor between 12-16 years of age is appropriate under U.S.S.G. § 2G2.1(b)(1)(B).</u>

A two-level increase is appropriate under U.S.S.G. § 2G2.1(b)(1)(B) if the sexual exploitation involved a minor between the age of 12 and 16. Here, all four of the charged sexual exploitation victims were between the age of 12 and 16 when they were exploited. As such, this enhancement is appropriate and should be applied.

In his sentencing memorandum, Ditirro contends that the evidence concerning the age of S.M. is insufficient to support this enhancement as to her. ECF No. 138, p. 6-7. He contends that the enhancement should therefore be stricken and his total offense level should be reduced to 41. *Id.* Ditirro is incorrect on a number of levels. First, S.M.'s testimony is sufficient for this Court to find, as a matter at sentencing, that this

16

enhancement applies. Second, and perhaps more importantly, even if this Court agrees and strikes the recommended enhancement, it does not change Ditirro's total offense level. The challenged two-point enhancement concerns Count Three/Group Three. That group results in an adjusted offense level of 44 and is the greatest of the adjusted offense levels. However, even if the adjusted offense level was a 42 as a result of eliminating the challenged enhancement, there would still be a four-point increase under U.S.S.G. 3D1.4 and a five-point increase under U.S.S.G. 4B1.5(b)(1). As such, the total offense level would be 51, which would then be reduced to level 43 under the Guidelines. As such, Ditirro's challenge is a distinction without a difference.

        ii.  <u>The enhancement for commission of a sexual act is appropriate under U.S.S.G. § 2G2.1(b)(1)(B)(i) and (ii).</u>

A four-level enhancement is applied to the commission of a sexual exploitation offense if it includes a sexual act prohibited under 18 U.S.C. 2241(a). That statute proscribes a person from knowingly engaging in a sexual act with another person by force or threat of death, substantial bodily injury, or kidnapping. Here, the four-level enhancement is applicable to all four of the charged sexual exploitation victims. R.B. and C.A. testified that Ditirro had sex with them through use of force. S.M. also testified that, at least on one occasion, Ditirro had sex with her through use of force. Finally, T.H. has also indicated to this Court, through her written letter, that she was manipulated and forced to have sex with Ditirro. As such, this four-level enhancement is appropriate and should be applied.

///

///

///

17

SER 0017

   iii.   <u>The enhancement for sadistic and masochistic depictions is appropriate under § 2G2.1(b)(4).</u>

Ditirro's production of child pornography included the vaginal rapes of his victims. As such, and on that basis alone, this enhancement properly applies. Further, Ditirro's child pornography collection included multiple files depicting the anal and vaginal rape of prepubescent minors, as well as additional acts of humiliation as described above. The nature of these files also supports a finding that this enhancement applies.

   iv.   <u>The enhancement for obstruction of justice is appropriate under U.S.S.G. § 3C1.1.</u>

An enhancement for obstruction as to Count 3 is supported by Ditirro's efforts to tamper with S.M. At his direction, A.P. contacted S.M. and told her to deny knowing Ditirro if law enforcement spoke to her. When S.M. questioned why, A.P. stated that Ditirro had nude photographs of S.M. taken when she was a minor and that law enforcement had discovered the photos. Ditirro also directly contacted S.M. in an effort to obstruct law enforcement's efforts to investigate the case. These efforts to obstruct justice and the investigation into Ditirro's sexual exploitation of S.M. warrant the obstruction of justice enhancement.

   v.   <u>The enhancement for material depicting prepubescent children is appropriate under U.S.S.G. § 2G2.2(b)(2).</u>

Ditirro's collection of child pornography included photos and videos depicting prepubescent minors engaged in sexual acts. Some of these files are described in the Presentence Investigation Report and some of the images were admitted as evidence during trial. As such, this enhancement is appropriate.

///

///

18

SER 0018

      vi.  <u>The enhancement for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor is appropriate under U.S.S.G. § § 2G2.2(b)(5) and 4B1.5(b)(1).</u>

An enhancement under U.S.S.G. § § 2G2.2(b)(5) and 4B1.5(b)(1) is appropriate when the defendant engaged in at least two separate instances of sexual abuse of exploitation of a minor. A pattern of conduct can be established whether or not it involved charged offenses or different victims. Here, there are four charged sexual exploitation victims. Each of those victims testified to being exploited multiple times and the contents of Ditirro's SD card confirm the testimony of the charged victims. Additionally, although A.P.'s sexual exploitation is not a charged offense,[10] there is no dispute that she was also sexually exploited. Finally, there are countless other unknown victims whose exploitation at the hands of Ditirro was documented in the same manner as the charged victims. As such, the enhancements for engaging in a pattern of sexual abuse should apply.

      vii.  <u>The enhancement for use of a computer is appropriate under U.S.S.G. 2G2.2(b)(6).</u>

The testimony at trial established that Ditirro used a smart phone to commit the charged offenses and used an SD card to retain evidence of his offenses. Both qualify as "computers" under this enhancement.

      viii.  <u>The enhancement for 600 or more images is appropriate under U.S.S.G. 2G2.2(b)(7)(D).</u>

As calculated in the plea agreement, and based on the testimony presented at trial, Ditirro's offenses involved 3,404 images. As such, this enhancement should apply.

///

///

---

[10]    Again, Ditirro's possession of the child pornography images he produced of A.P. supported the charge of possession of child pornography.

19

SER 0019

ix. The enhancement for multiple counts is appropriate under U.S.S.G. § 3D1.4(a).

Finally, the multiple count adjustment is properly applied. The four charges of sexual exploitation do not group under the Guidelines and, as the individual offenses are properly calculated, the multiple count adjustment is also accurate. As a result, Ditirro's total offense level is properly determined to be 53. However, under the Guidelines, his offense level is properly reduced to 43.

**B. Term Of Imprisonment**

The goal of sentencing is to "'impose a sentence sufficient but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed . . . correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). The Court considers the "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," "the kinds of sentences available," the applicable sentencing guideline range, any pertinent policy statement, sentences imposed on other similarly situated defendants, and the need for victim restitution. 18 U.S.C. § 3553(a). Considering the relevant factors, the Court should impose a 140-year sentence.

A 140-year sentence is the only thing that can provide deterrence and protect the community from Ditirro, who still refuses to accept that he destroyed the lives of countless young girls. A lengthy sentence is the only thing that can impress upon Ditirro that this criminal behavior is not tolerable in society and assure a measure of safety to the community. A statutory maximum sentence is sufficient, but not greater than necessary, to

20

reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and to protect the public.

In a recent case, Thomas Goodman who pleaded guilty to producing child pornography of *only three* victims was sentenced to 260 years.[11] Goodman pleaded guilty to eight counts of production for three victims and one count of possession of child pornography. A sentence of 260-years was reached in Goodman by imposing the statutory maximum sentence of 30 years on each of the eight counts of production and the statutory maximum sentence of 20 years on the single count of possession to run consecutive. The government's requested sentence in this case mirrors the same request – statutory maximum on each count to run consecutive. The government's requested sentence in this case reflects the independent, temporally and legally distinguishable acts that support each count of conviction, and to give adequate consideration to the need to reflect the seriousness of each offense against each victim separately, to promote respect for the law, and to provide just punishment.

Comparing Goodman's case to Ditirro's shows the reasonableness of the government's request. In *Goodman*, the videos and photos depicted two six-year-old children as well as images and videos of Goodman molesting a toddler-aged child. In sentencing Goodman, the district court accurately described the behavior in creating the child pornography as a "level of depravity [that] is beyond comprehension." Here, similarly, Ditirro's actions have gone well beyond the possession of child pornography and

---

[11]    Rhode Island Man Gets 260 Years for Making Child Porn, available at https://www.usnews.com/news/best-states/rhode-island/articles/2019-03-22/rhode-island-man-gets-260-years-for-making-child-porn; *see also* Rhode Island man sentenced to 260 years in federal prison in ICE HSI Boston child exploitation case, available at https://www.ice.gov/news/releases/rhode-island-man-sentenced-260-years-federal-prison-ice-hsi-boston-child-exploitation.

SER 0021

exhibit a level of depravity that defies comprehension. He has also escalated beyond receiving and distributing child pornography, engaging in an illicit market that re-victimizes those who have suffered sexual abuse by forcing them to not only re-live those traumatic events, but also live with the knowledge that others have seen them at their most vulnerable moments, and have received enjoyment from those images. Ditirro has taken the next egregious step and *created* new child exploitative material. He then preserved and organized his collection, to be referred to at his convenience. He has thus caused the charged victims, as well as those who have not yet been identified, to wonder when someone looks at them for a second too long, or seems to smile knowingly, whether that person has seen the images and videos documenting Ditirro's sexual exploitation. He has not only robbed the victims of their innocence, but also permanently deprived them of a sense of security.

While Goodman only had *three* victims, Ditirro has **48 victims.** Unlike Goodman, who readily admitted his guilt and accepted his punishment, Ditirro continues to obfuscate and attempt to detract from his undeniable guilt. Ditirro's "smug" arrogance caused five young girls to be re-victimized repeatedly when having to re-live and recount their sexual assaults at his hands. Although Goodman's victims were younger, Goodman's actions amounted to molestation and sexual contact rather than sexual penetration and rape. Ditirro forcibly raped two girls and used deception to groom two others into "willingly" engaging in their own sexual assaults. Ditirro is exponentially worse than a typical child molester who feels some level of guilt for the unquestionable depravity in which he engages. Ditirro takes sick joy and pleasure from forcing his victims to testify, demonstrating "his desire to remain in control of his victims." Accordingly, the government's request for a 140-year sentence for Ditirro's convictions is consistent with the

22

SER 0022

sentences imposed on similarly situated defendants across the country, and it is substantively reasonable and warranted. A sentence of 140-years serves a strong deterrent purpose to Ditirro and other pedophiles and child molesters like him who believe they can "remain in control" by watching their victims reliving the worst horrors of their lives.

Further, it is important for this Court to consider Ditirro's repeated refusal to admit any wrongdoing and accept responsibility for his actions. Notwithstanding the overwhelming testimonial and forensic evidence facing Ditirro, he refused to admit the truth. To be clear, the government is not asking for a trial tax, or for the Court to punish Ditirro exercising his constitutional rights to a trial. But, as the Ninth Circuit has noted, exercising a constitutional right is very different than putting forward a factually unsupported and frivolous defense to distract from guilt. Ditirro's attempt at trial to claim that the forensic evidence was somehow manufactured or altered is nothing more than a delusion of grandeur.[12] Before trial Ditirro ridiculously claimed he was innocent because the girls were his "girlfriends." Indeed, Ditirro even went so far as to claim, in a letter written directly to this Court, that he was in a legitimate relationship with R.B. after she was 16 years of age. *See* ECF No. 48. Of course, this claim was entirely false. But even if true, Ditirro's claim that he believed R.B. to be 16 when he sexually exploited here still demonstrated his undeniable guilt in producing child pornography. Still, Ditirro refused to admit the logical legal implications of his own statements and proceeded to trial, requiring the victims to testify about their graphic victimization in a room filled with strangers,

---

[12]     As government counsel argued in rebuttal, any argument regarding the chain of custody for the SD card is futile when considered in light of the incontrovertible fact that the photos and videos contained on that SD card clearly depict Ditirro having sex with underage females. Law enforcement could have found the SD card on the street with no explanation as to how it got there and the evidence would have still unequivocally established Ditirro's guilt.

23

people they met in the days before trial, this Honorable Court, and Ditirro. Of course, all of Ditirro's factually unsupportable defenses were flatly rejected by the jury. Ditirro's refusal to accept responsibility up to the present day, even in light of what is painfully obvious to any reasonable observer of the trial proceedings, should be considered by this Court with great concern. In light of Ditirro's obstinate refusal to acknowledge his crimes and accept responsibility, this Court can have no assurance that anything other than a period of incarceration spanning Ditirro's natural life will deter him from re-committing the offenses for which he has been found guilty. If Goodman was deserving of 260 years, then sentencing Ditirro to 140 years will avoid sentencing disparities and will impose a sufficient but not greater than necessary sentence.

### C. <u>Supervised Release</u>

The government concurs that Ditirro be ordered to serve a lifetime term of supervised release as to all five counts. If the Court imposes the government's requested sentence, it is unlikely that Ditirro will serve any term of supervision. However, the egregiousness and escalation of Ditirro's conduct warrants the maximum term of supervision as a matter of fact and principle. The facts of this case strongly suggest that Ditirro's rehabilitation, success, and any likelihood to re-offend will be reduced if he remains accountable for his rehabilitation under supervision.

**SER 0024**

## IV.   Conclusion

This Court should give proper weight to the significance of Ditirro's crimes, the facts of this case, and the statements of the victims and their families. Doing so will lead to the conclusion that a statutory maximum sentence is not only appropriate, but also fundamentally sufficient but not greater than necessary to meet the goals of sentencing. Ditirro robbed these girls of their childhoods and by all indications the peace and happiness of their adult lives as well. He did so for no other reason than his sick pedophilic pleasure. He is a criminal. He is a sexual predator. He is a thief who stole the innocence of at least 48 children. Society must be protected from him for as long as humanly possible, especially given his utter lack of remorse for any of his actions.

The United States requests that this Court sentence Ditirro to 140 years' custody and lifetime supervision. Any downward adjustment would negate the seriousness of this offense, fail to deter future misconduct, fail to protect the public, and result in unwarranted sentencing disparities. Based on the totality of circumstances, the requested 140-year sentence is sufficient but not greater than necessary to comply with the §3553 factors.

Dated this the 24th day of April 2019.

Respectfully Submitted,

NICHOLAS A. TRUTANICH
United States Attorney
//s//
ELHAM ROOHANI
CHRISTOPHER BURTON
Assistant United States Attorneys

25

**<u>Certificate of Service</u>**

I hereby certify that on April 24, 2019, I electronically filed the foregoing Sentencing Memorandum with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system.

*s/ Christopher Burton*
CHRISTOPHER BURTON
Assistant United States Attorney
United States Attorney's Office

SER 0026

S

E

A

L

E

D

SER 0027

1

————2:16-cr-216-KJD-VCF - October 17, 2018————

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:16-cr-216-KJD-VCF
5                 Plaintiff,         )
                                     )  Las Vegas, Nevada
6          vs.                       )  Wednesday, October 17, 2018
                                     )  Courtroom 4A, 9:18 a.m.
7   LONNY JOSEPH DITIRRO, JR.,       )
                                     )  JURY TRIAL, DAY THREE
8              Defendant.            )
    _____   )  O R I G I N A L

9

10                REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                BEFORE THE HONORABLE KENT J. DAWSON,
                  SENIOR UNITED STATES DISTRICT JUDGE

12

13

14  APPEARANCES:

15  For the Plaintiff:

16         UNITED STATES ATTORNEY'S OFFICE
           BY:  ELHAM ROOHANI, AUSA
17              CHRISTOPHER J. BURTON, AUSA
           501 Las Vegas Boulevard South, Suite 1100
18         Las Vegas, NV 89101
           (702) 388-6336
19
    (Appearances continued on Page 2)
20
    COURT REPORTER:
21
           Heather K. Newman, RPR, CRR, CCR #774
22         United States District Court
           333 Las Vegas Boulevard South, Room 1334
23         Las Vegas, Nevada 89101
           (702) 471-0002 or HN@nvd.uscourts.gov
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

2

─────2:16-cr-216-KJD-VCF - October 17, 2018─────

1 | APPEARANCES CONTINUED:

2 | For the Defendant:

3 |        LAW OFFICE OF BRIAN J. SMITH, Ltd.
         BY:  BRIAN JAMES SMITH, ESQ.
4 |        520 South Fourth Street, Suite 340
         Las Vegas, NV 89101
5 |        (702) 380-8248

6 | Also present:

7 |        Sue Flaherty, Case Agent
         Federal Bureau of Investigation
8 |
         Adrian Leon Mare, Forensic IT Expert (Defense)
9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

2:16-cr-216-KJD-VCF - October 17, 2018

1      LAS VEGAS, NEVADA; WEDNESDAY, OCTOBER 17, 2018; 9:18 A.M.

2                          --oOo--

3                P R O C E E D I N G S

4      (Outside the presence of the jury at 9:18 a.m.:)

5              COURTROOM ADMINISTRATOR:  All rise.

6              THE COURT:  Go ahead, be seated.  Continue what you

7   were doing.

8              When you finish looking at those, let me know.  We'll

9   make a record on objections, if any.

10      (Brief pause in proceedings.)

11              THE COURT:  Are you ready to go?

12              MR. SMITH:  Yes, Your Honor.

13              THE COURT:  Okay.  Objections?

14              MS. ROOHANI:  Your Honor, the government has no

15   objections to the instructions as proposed by the Court.

16              MR. SMITH:  Your Honor, I have something which I

17   neglected to bring up last night in my e-mail to Andrew and it

18   really pertains, I think, to jury Instruction No. 22, and we

19   talked about this at the very beginning of the case, that the

20   Ninth Circuit case law has limited carve-out exception for the

21   defendant if he had a good faith belief that the young women

22   were over the age of 18.  I'd like to see that added to that

23   instruction.

24              THE COURT:  Well, there has been no evidence adduced

25   that would support giving an instruction.

4

2:16-cr-216-KJD-VCF - October 17, 2018

1      MS. ROOHANI:  And, Your Honor, that is the

2  government's position.  Under the Ninth Circuit authority,

3  there has to be some evidence that came in during trial that

4  would support giving that instruction and, in fact, all the

5  evidence has been exactly to the contrary of that, so we would

6  object to that.

7      THE COURT:  Yeah.  I see no -- there is no evidence to

8  support giving that kind of an instruction, so, your objection

9  is noted.

10      MR. SMITH:  Thank you.

11      THE COURT:  Anything else?

12      MR. SMITH:  Just that this -- at this point in time,

13  Your Honor, I'm going to make a Rule 29 motion, for the record.

14      THE COURT:  Okay.  All right.

15      The Court finds that, based on the evidence adduced, a

16  reasonable jury could find beyond a reasonable doubt the

17  defendant committed the -- all of the counts of which he --

18  with which he is charged and, so, the motion is denied.

19      MR. SMITH:  Thank you, Judge.

20      MS. ROOHANI:  Your Honor, yesterday evening we

21  received ECF Number 114, which is a letter that was written by

22  the defendant to Your Honor.  It was filed under seal, but I

23  believe it was filed under seal because we were already in

24  trial.  I'm not exactly sure why it was filed under seal by the

25  Clerk of the Court, but it was provided to us by your law

5

—2:16-cr-216-KJD-VCF - October 17, 2018—

1  clerk.  If Your Honor would allow me to make a specific record

2  as to the certain arguments that the defendant has made because

3  I believe that they're baseless, but I want to make sure that

4  the record is clear once this goes up to the circuit and

5  potentially any type of collateral challenge.

6       THE COURT:  Yes.  The -- I believe the thought behind

7  the initial sealing was that trial would be underway, that it

8  could be publicly accessed and -- and really is a document the

9  Court could order stricken because it's an ex parte

10 communication and he is represented by counsel, but we did feel

11 that it needed to be disclosed to counsel because it was an

12 ex parte communication.  So you can go ahead and make whatever

13 record you wish on -- on that.

14      MS. ROOHANI:  Thank you, Your Honor.

15      And, Your Honor, and I agree with you, I believe that

16 this is filed in violation of the local rule, aside from the

17 fact that it's an ex parte communication.  It includes legal

18 argument.  Because the defendant is represented by counsel, any

19 type of legal argument that comes to the Court has to come

20 through his counsel and, so, at a bare minimum we would ask

21 that you strike or certainly disregard any type of legal

22 argument that's set forth in this particular document.

23      THE COURT:  I'll make the record clear, I didn't read

24 it.

25      MS. ROOHANI:  Okay.  Fair enough, Your Honor.

6

———2:16-cr-216-KJD-VCF - October 17, 2018———

1      And, so, in any event, there's a couple of arguments

2  that are made and I want to make clear that, first of all,

3  there's an allegation that I have not produced all the

4  discovery in this case, which is absolutely false and I -- I

5  encourage Your Honor to discuss this with Mr. Smith.

6  Mr. Ditirro alleges that we did not turn over the cell phone

7  dump of R        B         's phone.  That's false.  That was made

8  available to Mr. Smith.  The text messages that are in question

9  were also made available to Mr. Smith.

10      I'll note that Mr. Ditirro has been in custody this

11  entire time, so he has no idea what has been made available to

12  his counsel at the FBI lab where we keep contraband.  And, so,

13  I would submit, Your Honor, that at a bare minimum, it might be

14  appropriate to ask Mr. Smith whether he has -- all of this

15  information has been made available to him.

16      The second is, is that the defendant alleges that

17  because we have not produced these text messages, which I would

18  submit, Your Honor, that are -- this is vague at best, but we

19  have produced it in any event, quite frankly, Mr. Smith was

20  allowed to cross-examine R      B         about text messages.

21  He was able to cross-examine any other witnesses regarding text

22  messages, including Detective Miller.  And, so, at a bare

23  minimum, the defendant's -- to the extent that that is a theory

24  of the defense, that has been able to be probed by Mr. Smith

25  during his cross-examination of government witnesses and so

7

2:16-cr-216-KJD-VCF - October 17, 2018

1    there's no type of deficient performance or anything related to
2    that in any event.
3          Mr. Ditirro also claims that Detective Miller and
4    Special Agent Flaherty exerted undue influence on multiple
5    witnesses.  Mr. Smith was able to cross-examine
6    Detective Miller and Special Agent Flaherty as well as all of
7    the government witnesses.  This is something that he could have
8    probed.  Quite frankly, Your Honor, my personal belief is that
9    the reason he didn't get into it is because there's absolutely
10   no evidence of this.  Quite frankly, the victims testified
11   consistent, under oath, subject to cross-examination,
12   consistent with every single thing that they told Special Agent
13   Flaherty and Detective Miller and, so, I would submit,
14   Your Honor, that at a bare minimum, that has no bearing on the
15   matter at hand, but more importantly, that would also not give
16   rise to deficient performance or any type of violation --
17   constitutional violation -- because Mr. Smith was given the
18   ability to cross-examine the government witnesses regarding
19   that.
20         The defendant, again, raises arguments that
21   demonstrate a fundamental lack of understanding of Fourth
22   Amendment jurisprudence regarding inadmissibility of derivative
23   illegal searches, of search warrants and what their purposes
24   are, and inevitable discovery, and I think that Your Honor and
25   Magistrate Judge Ferenbach have clearly delineated what the

8

————2:16-cr-216-KJD-VCF - October 17, 2018————

1   nature of your understanding -- your rulings are, and, so, I

2   believe that the record is fully set forth for the

3   Ninth Circuit to consider that in any event.

4          More importantly, to the extent that he claims a

5   *Franks* violation regarding what Ms. Ismail had told

6   Detective Tooley, I'll note that Mr. Smith, when he came on

7   this case, he requested of me if he would be able to file that

8   motion, notwithstanding the fact that the motions deadline had

9   passed.  But in the interest of giving the defendant a fair

10  shot and having everything litigated before the district court

11  before we ever went to trial, Mr. Smith and I had that

12  conversation, he filed that motion.  We fully briefed it.  He

13  filed an appeal of that.  We fully briefed it before,

14  Your Honor.  And, so -- and on top of that, he had an

15  opportunity to fully cross-examine Ms. Ismail during the course

16  of trial.

17         Mr. Ditirro requested that Ms. Ismail be removed as a

18  witness because she had no personal knowledge of the card.

19  Again, Your Honor, that goes to the weight of evidence.

20  Mr. Smith was able to cross-examine her, and that is something

21  that -- certainly that the jury can consider during their

22  deliberations.

23         The last matter, Your Honor, is that Mr. Ditirro

24  alleges that there was some type of evidence that the contents

25  of the card had been tampered with after it had been impounded.

9

———2:16-cr-216-KJD-VCF - October 17, 2018———

1   That appears on Page 3 of this document, and he states in here,

2   I have more information for his forensic examiner that we have

3   not had -- discussed because I haven't had enough time with him

4   [as read].

5           I'll note, Your Honor, that the government has

6   repeatedly given Mr. Ditirro the opportunity to ask for a

7   continuance to prepare for his defense.  Just the opposite has

8   happened.  He has exercised his speedy trial rights.  He has

9   demanded to go to trial.  He forced me to file a Motion to

10  Continue when I had been preparing for trial previously.  Even

11  as much as last week he could have raised this before the

12  Court.  He chose not to.  And, so, in any event, I believe,

13  Your Honor, all of that aside, this defense was -- what I

14  surmise this defense was regarding the tampering, as best as I

15  can glean, is that this has to do with the "modified" and

16  "created" and "accessed" dates, which is a full line of

17  questioning that Mr. Smith went into with the government's

18  forensic examiner.  Again, this is fully fleshed out, so

19  notwithstanding the fact that Mr. Ditirro did not provide any

20  type of -- and, again, Your Honor, I don't blame Mr. Smith for

21  this because it's very clear that Mr. Ditirro is not taking his

22  advice and Mr. Ditirro is either not fully communicating with

23  him or is being obstreperous and not listening to anything that

24  Mr. Smith is telling him, but, it seems as though Mr. Ditirro

25  thinks that the evidence means one thing when, in fact, the

2:16-cr-216-KJD-VCF - October 17, 2018

1  experts who are looking at this evidence believe that it means
2  something else.
3          Again, I'll note, Your Honor, Mr. Ditirro has never
4  viewed the forensic evidence in this case.  He has been in
5  custody.  The forensic evidence in this case constitutes
6  contraband.  Under 3509(m), he's not entitled to have access to
7  this at the jail.  He never requested to have access to this
8  during the course of preparation for trial.  I do know that
9  Mr. Smith and Mr. Mare repeatedly went out to the FBI lab to
10 look at this evidence, and if his expert was not willing to
11 provide an expert notice and provide an expert report to the
12 Court and be -- to the government and be subject to
13 cross-examination, I don't believe that there is a basis for
14 this.  And, again, Your Honor, he was able to -- Mr. Smith did,
15 in fact, cross-examine Forensic Examiner Trafford regarding
16 this matter thoroughly and Forensic Examiner Trafford provided
17 a response that if he didn't like that response, he could have
18 called Mr. Mare, at least at a bare minimum, as a lay witness,
19 or the defendant could have elected to testify, but he elected
20 to not do that and to abide by -- wisely, in my opinion, abide
21 by the advice of counsel.
22          And, so, as to those arguments, Your Honor, I just
23 wanted to make clear that I don't believe that there's any
24 basis for the Court to reconsider anything.
25          I resent the accusation that the government has

———2:16-cr-216-KJD-VCF - October 17, 2018———

1  improperly put evidence before this Court regarding

2  Mr. Ditirro's relationship -- what he calls a consensual

3  relationship with R    B      .  Your Honor, you heard her

4  testimony yesterday.  She was 15 years old when the defendant

5  raped her, and it is rape under the state of Nevada.  He lied

6  to her about her -- his age, and therefore she could not give

7  consent legally and if, in fact, she gave factual consent, that

8  too would not be sufficient because he induced that consent by

9  lying to her about his age.  And, so, I submit, Your Honor,

10 that as a matter of law, that descriptor is correct as to

11 R    B      .  And, so, I wanted to make clear the

12 government's position on those things.

13           Thank you.

14           THE COURT:  Thank you.

15           Mr. Smith, do you agree that you were provided with

16 the production that has been represented occurred by the

17 government?

18           MR. SMITH:  Yes, I do, Your Honor.

19           THE COURT:  All right.

20           MR. SMITH:  And I also want to say that Mr. Mare has

21 worked assiduously on this case and has been in almost daily

22 contact with me regarding his examination of the evidence and

23 his opinion of it.  The decision not to call him as either a

24 lay witness or an expert witness was a strategic one, but he

25 has been here throughout the trial to assist me, and he has

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    done that because as I indicated before, my knowledge of IT

2    is -- is very minimal.  It's very scant, so. . .

3           I would point out to the Court that Ms. Roohani is

4    correct to some extent concerning whether or not my advice is

5    being followed or paid attention to.  I didn't want to go to

6    trial on this date.  I wanted more time with this.  I wanted

7    more time with Mr. Mare.  Mr. Ditirro would not consent to

8    another continuance.  So, we were put in the position where we

9    had to go to trial, and we didn't -- we couldn't do anything

10   about that.  It was his choice, his call, and it was his right

11   to demand a trial at that time.  He told me no more

12   continuances, that's it, I want to go to trial.  I said, okay,

13   that's not what I would advise you to do, but, so be it if

14   that's what you want.

15          I'd also like to point out to the Court one last

16   thing.  The letter that Ms. Roohani is talking about was seen

17   by me for the first time last night in an e-mail from -- from

18   your clerk, from Andrew.  I don't mean to be disrespectful, but

19   I don't remember your last name.  I should be calling you

20   Mr. . . .

21          THE COURT:  It's okay.  It's Mr. Clark, but. . .

22          MR. SMITH:  Clark?

23          THE COURT:  Yes.

24          MR. SMITH:  Okay.  When Mr. Clark sent me that e-mail,

25   that's the first time I saw that letter.  That's the first time

SER 0039

13

—2:16-cr-216-KJD-VCF - October 17, 2018—

1   I had any knowledge that that letter was written.

2          THE COURT:  And that is not surprising based on the

3   observations that I have made during the course of the trial,

4   and I will say that I -- the Court has observed that the

5   defendant has been communicating with Mr. Mare throughout the

6   course of the trial and that Mr. Mare was particularly

7   attentive to the testimony of the government's forensic expert,

8   making notes and communicating with the defendant throughout.

9          So, thank you.

10          MS. ROOHANI:  Thank you, Your Honor.

11          THE COURT:  We'll call in the jury.

12      (Brief pause in proceedings.)

13      (Jury returned to courtroom at 9:40 a.m.)

14          THE COURT:  Please be seated.  The record will reflect

15   the presence of the jury.

16          Now that the parties have concluded their presentation

17   of evidence, it is the duty of the Court to instruct you on the

18   law.  So, I will read the jury instructions to you.  You're

19   being handed copies, which you can follow along.

20      (Brief pause in proceedings.)

21          THE COURT:  "JURY INSTRUCTION NO. 1.

22          "Members of the jury, now that you've heard all the

23   evidence, it is my duty to instruct you on the law that applies

24   to this case.  A copy of these instructions will be available

25   in the jury room for you to consult.

14

2:16-cr-216-KJD-VCF - October 17, 2018

1       "It is your duty to weigh and to evaluate all the

2   evidence received in the case and, in that process, decide the

3   facts.  It is also your duty to apply the law as I give it to

4   you to the facts as you find them, whether you agree with the

5   law or not.  You must decide the case solely on the evidence

6   and the law and must not be influenced by any personal likes or

7   dislikes, opinions, prejudices, or sympathy.  You will recall

8   that you took an oath promising to do so at the beginning of

9   the case.

10      "You must follow all these instructions and not single

11  out some and ignore others; they are all important.  Please do

12  not read into these instructions or into anything I may have

13  said or done any suggestion as to what verdict you should

14  return.  That is a matter entirely up to you.

15      "JURY INSTRUCTION NO. 2.

16      "The Indictment is not evidence.  The defendant has

17  pled not guilty to the charges.  The defendant is presumed to

18  be innocent unless and until the government proves the

19  defendant guilty beyond a reasonable doubt.  In addition, the

20  defendant does not have to testify or present any evidence to

21  prove innocence.  The government has the burden of proving

22  every element of the charges beyond a reasonable doubt.

23      "JURY INSTRUCTION NO. 3?

24      "A defendant in a criminal case has a constitutional

25  right not to testify.  You may not draw any inference of any

15

—2:16-cr-216-KJD-VCF - October 17, 2018—

1  kind from the fact that a defendant did not testify.

2       "JURY INSTRUCTION NO. 4.

3       "Proof beyond a reasonable doubt is proof that leaves

4  you firmly convinced the defendant is guilty.  It is not

5  required that the government prove guilt beyond all possible

6  doubt.

7       "A reasonable doubt is a doubt based upon reason and

8  common sense and is not based on -- purely on speculation.  It

9  may arise from a careful and impartial consideration of all the

10 evidence, or from lack of evidence.

11      "If after a careful and impartial consideration of all

12 the evidence, you are not convinced beyond a reasonable doubt

13 that a defendant is guilty, it is your duty to find the

14 defendant not guilty.  On the other hand, if after a careful

15 and impartial consideration of all the evidence, you are

16 convinced beyond a reasonable doubt that the defendant is

17 guilty, it is your duty to find the defendant guilty.

18      "JURY INSTRUCTION NO. 5.

19      "The evidence you are to consider in deciding what the

20 facts are consists of:

21      "1.  The sworn testimony of any witness;

22      "2.  The exhibits received in evidence; and

23      "3.  Any facts to which the parties have agreed.

24      "JURY INSTRUCTION NO. 6.

25      "In reaching your verdict you may consider only the

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    testimony and exhibits received in evidence.  The following

2    things are not evidence and you may not consider them in

3    deciding what the facts are:

4          "1.  Questions, statements, objections, and arguments

5    by the lawyers are not evidence.  The lawyers are not

6    witnesses.  Although you must consider a lawyer's question to

7    understand the answers of a witness, the lawyer's questions are

8    not evidence.  Similarly, what the lawyers have said in their

9    opening statements, will say in their closing arguments, and at

10   other times is intended to help you interpret the evidence, but

11   it is not evidence.  If the facts as you remember them differ

12   from the way the lawyers state them, your memory of them

13   controls.

14         "2.  Any testimony that I have excluded, stricken, or

15   instructed you to disregard is not evidence.

16         "3.  Anything you may have seen or heard when the

17   Court was not in session is not evidence.  You are to decide

18   the case solely on the evidence received at the trial.

19         "4.  You have heard evidence that I instructed to be

20   admitted only for a limited purpose.  Therefore, you must

21   consider that evidence only for that limited purpose and for no

22   other -- and not for any other purpose.

23         "JURY INSTRUCTION NO. 7.

24         "Evidence may be direct or circumstantial.  Direct

25   evidence is direct proof of a fact, such as testimony by a

17

———2:16-cr-216-KJD-VCF - October 17, 2018———

1   witness about that witness personally saw or heard or did.

2   Circumstantial evidence is indirect evidence, that is, it is

3   proof of one or more facts from which you can find another

4   fact.

5           "You are to consider both direct and circumstantial

6   evidence.  Either can be used to prove any fact.  The law makes

7   no distinction between the weight to be given to either direct

8   or circumstantial evidence.  It is for you to decide how much

9   weight to give to any evidence.

10          "JURY INSTRUCTION NO. 8.

11          "Inferences are simply deductions or conclusions which

12  reason and common sense lead the jury to draw from the evidence

13  received in the case.

14          "JURY INSTRUCTION NO. 9.

15          "In deciding the facts in this case, you may have to

16  decide which testimony to believe and which testimony not to

17  believe.  You may believe everything a witness says, or part of

18  it, or none of it.

19          "In considering the testimony of any witness, you may

20  take into account:

21          "1.  The witness' opportunity and ability to see or

22  hear or know the things testified to;

23          "2.  The witness' memory;

24          "3.  The witness' manner while testifying;

25          "4.  The witness' interest in the outcome of the case,

18

———2:16-cr-216-KJD-VCF - October 17, 2018———

1  if any;

2           "5.  The witness' bias or prejudice, if any;

3           "6.  Whether other evidence contradicted the witness'

4  testimony;

5           "7.  The reasonableness of the witness' testimony in

6  light of all the evidence; and

7           "8.  Any other factors that bear on believability.

8           "If you decide that a witness has deliberately

9  testified untruthfully about something important, you may

10 choose not to believe anything that witness said.  On the other

11 hand, if you think the witness testified untruthfully about

12 some things but told the truth about others, you may accept the

13 part you think is true and ignore the rest.

14          "The weight of the evidence as to a fact does not

15 necessarily depend on the number of witnesses who testify.

16 What is important is how believable the witnesses were, and how

17 much weight you think their testimony deserves.

18          "JURY INSTRUCTION NO. 10.

19          "The Indictment charges that the offense alleged in

20 Count One of the Superseding Indictment was committed beginning

21 on a date unknown and continuing to on or about July 10th,

22 2014.

23          "The Indictment charges that the offense alleged in

24 Count Two of the Superseding Indictment was committed on a date

25 unknown and continuing to on or about March 3rd, 2015.

SER 0045

2:16-cr-216-KJD-VCF - October 17, 2018

1      "The Indictment charges that the offense alleged in

2  Count Three of the Superseding Indictment was committed on a

3  date unknown and continuing to on or about August 12th, 2015.

4      "The Indictment charges that the offense alleged in

5  Count Four of the Superseding Indictment was committed

6  beginning on a date unknown and continuing to on or about

7  August 14th, 2014.

8      "The Indictment charges that the offense alleged in

9  Count Five of the Superseding Indictment was committed

10  beginning on a date unknown and continuing to on or about

11  September 10th, 2015.

12      "Although it is necessary for the government to prove

13  beyond a reasonable doubt that the offenses were committed on a

14  date reasonably near the dates alleged in the Indictment, it is

15  not necessary for the government to prove that the offenses

16  were committed precisely on the dates charged.

17      "JURY INSTRUCTION NO. 11.

18      "You have heard testimony from persons who, because of

19  education or experience, were permitted to state opinions and

20  the reasons for their opinions.

21      "Such opinion testimony should be judged like any

22  other testimony.  You may accept it or reject it and give it as

23  much weight as you think it deserves, considering the witness'

24  education and experience, the reasons given for the opinion,

25  and all the other evidence in the case.

2:16-cr-216-KJD-VCF - October 17, 2018

1        "JURY INSTRUCTION NO. 12.

2        "The punishment provided by law for this crime is for

3 the Court to decide. You may not consider punishment in

4 deciding whether the government has proved its case against the

5 defendant beyond a reasonable doubt.

6        "INSTRUCTION NO. 13.

7        "Some of you have taken notes during the trial.

8 Whether or not you took notes, you should rely on your own

9 memory of what was said. Notes are only to assist your memory.

10 You should not be overly influenced by your notes or by those

11 of your fellow jurors.

12        "JURY INSTRUCTION NO. 14.

13        "The defendant is charged in the Superseding

14 Indictment with the following charges:

15        "Count One.

16        "Sexual Exploitation of Children.

17        "Beginning on a date unknown, and continuing to on or

18 about July 10th, 2014, in the State and Federal District of

19 Nevada, Lonny Joseph Ditirro, Jr., defendant herein, did

20 employ, use, persuade, induce, entice, and coerce a minor,

21 R.B., to engage in any sexually explicit conduct for the

22 purpose of producing any visual depiction of such conduct, and

23 that -- and that visual depiction was produced and transmitted

24 using materials that have been mailed, shipped, and transported

25 in and affecting interstate and foreign commerce by any means,

1   including by computer, all in violation of Title 18, United

2   States Code, Sections 2251(a) and (c) [sic].

3           "Count Two.

4           "Sexual Exploitation of Children.

5           Beginning on a date unknown, and continuing to on or

6   about March 3, 2015, in the State and Federal District of

7   Nevada, Lonny Joseph Ditirro, Jr., defendant herein, did

8   employ, use, persuade, induce, entice and coerce a minor, C.A.,

9   to engage in any sexually explicit conduct for the purpose of

10  producing any visual depiction of such conduct, and that visual

11  depiction was produced and transmitted using materials that

12  have been mailed, shaped, and transported in and affecting

13  interstate and foreign commerce by any means, including by

14  computer, all in violation of Title 18, United States Code,

15  Sections 2251(a) and (c) [sic].

16          "Count Three.

17          "Sexual Exploitation of Children.

18          "Beginning on a date unknown, and continuing to on or

19  about August 12th, 2015, in the State and Federal District of

20  Nevada, Lonny Joseph Ditirro, Jr., defendant herein, did

21  employ, use, persuade, induce, entice, and coerce a minor,

22  S.M., to engage in any sexually explicit conduct for the

23  purpose of producing any visual depiction of such conduct, and

24  that visual depiction was produced and transmitted using

25  materials that have been mailed, shipped, and transported in

———2:16-cr-216-KJD-VCF - October 17, 2018———

1    and affecting interstate and foreign commerce by any means,

2    including by computer, all in violation of Title 18, United

3    States Code, Sections 2251(a) and (c) -- (a) and (e)."  I'm

4    sorry.  (a) and (e).

5              I think I've been saying (c) rather than (e).

6              MS. ROOHANI:  You have, Your Honor, but it is (e).

7              THE COURT:  (e).  It's (e) -- Subsection (e) for all

8    of the counts.

9              "Count Four.

10             "Sexual Exploitation of Children.

11             "Beginning on a date unknown, and continuing to on or

12   about August 14th, 2014, in the State and Federal District of

13   Nevada, Lonny Joseph Ditirro, Jr., defendant herein, did

14   employ, use, persuade, induce, entice and coerce a minor, T.H.,

15   to engage in any sexually explicit conduct for the purpose of

16   producing any visual depiction of such conduct, and that visual

17   depiction was produced and transported using materials that

18   have been mailed, shipped, and transported in and affecting

19   interstate and foreign commerce by any means, including by

20   computer, all in violation of Title 18, United States Code,

21   Section 2251(a) and (e).

22             "Count Five.

23             "Possession of Child Pornography.

24             "Beginning on a date unknown and continuing to on or

25   about September 10th, 2015, in the State and Federal District

—2:16-cr-216-KJD-VCF - October 17, 2018—

1   of Nevada, Lonny Joseph Ditirro, Jr., defendant herein, did

2   knowingly possess any book, magazine, periodical, film,

3   videotape, computer disk and any other material that contained

4   an image of child pornography, as defined in Title 18, United

5   States Code, Section 2256(8), that has been mailed and shipped

6   and transported using any means and facility of interstate and

7   foreign commerce and in and affecting interstate and foreign

8   commerce by any means, including by computer, and that was

9   produced using materials that had been mailed, and shipped and

10  transported in and affecting interstate and foreign commerce by

11  any means, including by computer, all in violation of Title 18,

12  United States Code, Sections 2252A(a)(5)(B) and 2252A(b)(2).

13        "JURY INSTRUCTION NO. 15.

14        "You're here only to determine whether defendant is

15  guilty or not guilty in the charges in the Indictment.  The

16  defendant is not on trial for any conduct or offense not

17  charged in the Indictment.

18        "JURY INSTRUCTION NO. 16.

19        "The defendant is charged in Count One of the

20  Superseding Indictment with sexual exploitation of a child in

21  violation of Sections 2251(a) of Title 18 of the United States

22  Code.  In order for the defendant to be found guilty of that

23  charge, the government must prove each of the following

24  elements beyond a reasonable doubt:

25        "First, at the time, R.B. was under the age of

24

—————2:16-cr-216-KJD-VCF - October 17, 2018—————

1   18 years;

2          "Second, the defendant employed, used, persuaded,

3   induced, enticed, or coerced R.B. to take part in sexually

4   explicit conduct for the purpose of producing a visual

5   depiction of such conduct, and

6          "Third, the visual depiction of such sexually explicit

7   conduct was produced using materials that had been mailed,

8   shipped, or transported across state lines or into foreign

9   commerce.

10         "JURY INSTRUCTION NO. 17.

11         "The defendant is charged in Count Two of the

12   Superseding Indictment with sexual exploitation of a child in

13   violation of Sections 2251(a) of Title 18 of the United States

14   Code.  In order for the defendant to be found guilty of that

15   charge, the government must prove each of the following

16   elements beyond a reasonable doubt:

17         "First, at the time, C.A. was under the age of 18;

18         "Second, the defendant employed, used, persuaded,

19   induced, or coerced C.A. to take part in sexually explicit

20   conduct for the purpose of producing a visual depiction of such

21   conduct; and

22         "Third, the visual depiction of such sexually explicit

23   conduct was produced using materials that had been mailed,

24   shipped, or transported across state lines or in foreign

25   commerce.

25

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    "JURY INSTRUCTION NO. 18.

2         "The defendant is charged in Count Three of the

3    Superseding Indictment with sexual exploitation of a child in

4    violation of Sections 2251(a) of Title 18 of the United States

5    Code.  In order for the defendant to be guilty of that charge,

6    the government must prove each of the following elements beyond

7    a reasonable doubt:

8         "First, at the time, S.M. was under the age of

9    18 years;

10        "Second, the defendant employed, used, persuaded,

11   induced, enticed, or coerced S.M. to take part in sexually

12   explicit conduct for the purpose of producing a visual

13   depiction of such conduct; and

14        "Third, the visual depiction of such sexually explicit

15   conduct was produced using materials that had been mailed,

16   shipped, or transported across state lines or in foreign

17   commerce.

18        "JURY INSTRUCTION NO. 19.

19        "The defendant is charged in Count Four of the

20   Superseding Indictment with sexual exploitation of a child in

21   violation of Sections 2251(a) of Title 18 of the United States

22   Code.  In order for the defendant to be found guilty of that

23   charge, the government must prove each of the following

24   elements beyond a reasonable doubt:

25        "First, at the time, T.H. was under the age of

—2:16-cr-216-KJD-VCF - October 17, 2018—

1  18 years;

2          "Second, the defendant employed, used, persuaded,

3  induced, enticed or coerced T.H. to take part in sexually

4  explicit conduct for the purpose of producing a visual

5  depiction of such conduct; and

6          "Third, the visual depiction of such sexually explicit

7  conduct was produced using materials that had been mailed,

8  shipped, or transported across state lines or in foreign

9  commerce.

10          "JURY INSTRUCTION NO. 20.

11          "The defendant is charged in Count Five of the

12  Indictment with Possession of Child Pornography, in violation

13  of Title 18 of the United States Code, Section 2252A(a)(5)(B).

14  In order for the defendant to be found guilty of that charge,

15  the government must prove each of the following elements beyond

16  a reasonable doubt:

17          "First, that the defendant knowingly possessed

18  material that the defendant knew contained visual depictions of

19  minors engaged in sexually explicit conduct;

20          "Second, the defendant knew the visual depiction

21  contained in the material showed a minor engaging in sexually

22  explicit conduct;

23          "Third, the defendant knew that production of such a

24  visual depiction involved the use -- involved use of a minor in

25  sexually explicit conduct; and

2:16-cr-216-KJD-VCF - October 17, 2018

1          "Fourth, the -- that the visual depiction had been
2      either.
3          "a)  mailed, shipped, or transported in interstate
4      commerce -- interstate or foreign commerce by any means,
5      including by computer, or
6          "b)  produced using material that had been mailed,
7      shipped, or transported, in interstate or foreign commerce, by
8      any means, including by computer.
9          "JURY INSTRUCTION NO. 21.
10         "An act is done knowingly if the defendant is aware of
11     the act and does not act through ignorance, mistake or
12     accident.  The government is not required to prove that the
13     defendant knew that his acts or omissions were unlawful.  You
14     may consider evidence of the defendant's words, acts, or
15     omissions, along with all the other evidence, in deciding
16     whether the defendant acted knowingly.
17         "JURY INSTRUCTION NO. 22.
18         "As to Counts One, Two, Three and Four, the government
19     need not show the defendant was aware R.B., C.A., S.M., and
20     T.H. were under the age of 18 at the time he used them in
21     creating visual depictions of sexually explicit conduct.  The
22     government must prove beyond a reasonable doubt that at the
23     time of the visual depictions of sexually explicit conduct,
24     R.B., C.A., S.M., and T.H. were in fact under the age of 18.
25         "JURY INSTRUCTION NO. 23.

—2:16-cr-216-KJD-VCF - October 17, 2018—

1      "As it relates to Counts One, Two, Three and Four,

2  'interstate commerce' means commerce between different states,

3  territories, and possession of the United States, including the

4  District of Columbia.

5      "'Commerce' includes, among other things, travel,

6  trade, transportation, and communication.

7      "In determining whether the defendant's conduct was in

8  or affected interstate or foreign commerce, you may consider

9  whether the defendant used means or facilities of interstate

10  commerce, such as a telephone or the Internet, or whether his

11  conduct substantially affected interstate commerce by virtue of

12  the fact that he purchased or used items that had been moved in

13  interstate commerce.

14      "JURY INSTRUCTION NO. 24.

15      "As it relates to Count Five, the term 'facility' or

16  'means of interstate commerce' includes Internet communications

17  and telephone communications transmitted from one state or

18  foreign country, to another state.

19      "JURY INSTRUCTION NO. 25.

20      "The term 'producing' as it relates to all counts can

21  include recording, filming, photographing, directing, making,

22  creating, or manufacturing visual depictions.

23      "The act of 'producing' is not limited to the moment

24  of recording.  'Production' includes possessing, downloading,

25  copying, or transferring -- transferring the visual depictions

—————2:16-cr-216-KJD-VCF - October 17, 2018—————

1    in digital format.

2              "JURY INSTRUCTION NO. 26.

3              "'Child pornography' means any visual depiction,

4    including any photograph, film, video, picture or computer or

5    computer-generated image or picture, whether made or produced

6    by electronic, mechanical, or other means, of sexually explicit

7    conduct, where the production of such visual depiction involves

8    the use of a minor engaging in sexually explicit conduct.

9              "JURY INSTRUCTION NO. 27.

10             "'Minor' means any person under the age of 18 years.

11             "JURY INSTRUCTION NO. 28.

12             "'Sexually explicit conduct' means actual or

13   simulated:

14             "(a) sexual intercourse, including genital-genital,

15   anal-genital, or oral-anal contact, whether between persons of

16   the same or opposite sex;

17             "(b) bestiality;

18             "(c) masturbation;

19             "(d) sadistic or masochistic abuse; or

20             "(e) lascivious exhibition of the genitals or pubic

21   area of any person.

22             "JURY INSTRUCTION NO. 29.

23             "Regarding the last type of sexually explicit

24   conduct -- 'lascivious exhibition' -- not every exposure of the

25   genitals or pubic area constitutes lascivious exhibition.  In

2:16-cr-216-KJD-VCF - October 17, 2018

1  determining whether a visual depiction constitutes lascivious

2  exhibition, you should consider the context and setting in

3  which the genitalia or pubic area is being displayed.  You may

4  consider the overall content of the material.  You may also

5  consider such factors as whether the focal point of the visual

6  depictions is on the minor's genitalia or pubic area or whether

7  there is some other focal point.  You may consider whether the

8  setting of the depiction is such to make it appear to be

9  sexually inviting or suggestive; for example, in a location or

10  in a pose associated with sexual activity.  In addition, you

11  may consider whether the minor appears to be displayed in an

12  unnatural pose or in inappropriate attire.  You may also

13  consider whether the minor is partially clothed or nude.  You

14  may consider whether the depiction appears to convey sexual

15  coyness or an apparent willingness to engage in sexual

16  activity, and whether the depiction appears to have been

17  designed to elicit a sexual response in the viewer.  Of course,

18  a visual depiction not -- need not involve all of these factors

19  to be lascivious exhibition.

20          "JURY INSTRUCTION NO. 30.

21          "'Visual depiction' includes undeveloped film and

22  videotape, data stored on computer disk, or by electronic means

23  which is capable of conversion into a visual image, and data

24  which is capable of conversion into a visual image that has

25  been transmitted -- transmitted by any means, whether or not

31

—2:16-cr-216-KJD-VCF - October 17, 2018—

1   stored in a permanent format.

2           "JURY INSTRUCTION NO. 31.

3           "A verdict form has been prepared for you.  After you

4   have reached unanimous agreement on a verdict, your foreperson

5   should complete the verdict form according to your

6   deliberations, sign and date it, and advise the bailiff that

7   you're ready to return to the courtroom.

8           "JURY INSTRUCTION NO. 32.

9           "If it becomes necessary during your deliberations to

10  communicate with me, you may send a note through the bailiff,

11  signed by any one or more of you.  No member of the jury should

12  ever attempt to communicate with me except by a signed writing,

13  and I will respond to the jury concerning the case only in

14  writing or here in open court.  If you send out a question, I

15  will consult with the lawyers before answering, which may take

16  some time.  You may continue your deliberations while waiting

17  for the answer to any question.  Remember that you are not to

18  tell anyone - including me - how the jury stands, numerically

19  or otherwise, on any question submitted to you, including the

20  question of guilt of the defendant, until after you have

21  reached a unanimous verdict or have been discharged."

22          We'll now go to the summations or closing statements.

23  The government goes first.

24          MR. BURTON:  Thank you, Your Honor.

25          Ms. Saavedra, could you please go over to the HDMI?

SER 0058

——2:16-cr-216-KJD-VCF - October 17, 2018——

1   Thank you.

2       (Brief pause in proceedings.)

3       MR. BURTON:  Mr. Smith, Ms. Roohani, ladies and

4   gentlemen of the jury, in the first half of 2014, the defendant

5   had sex with R████ B██████ when he was in his thirties and

6   she was 15, on her back patio during the night, and he recorded

7   it.

8       In November 2014, the defendant, well into his

9   thirties, had sex with C██████ A███ when she was 15, in her

10  bedroom after he carried her upstairs like a child, and he

11  recorded it.

12      In September of 2014, the defendant, well into his

13  thirties, had sex with S████████ M████, in her bedroom at her

14  parents' house, and he recorded it.

15      And in June 2013, after 13-year-old T██████ H██████

16  snuck him into her grandmother's house and into her bedroom,

17  the defendant had sex with her, and he recorded it.

18      Additionally, the defendant downloaded and possessed

19  child pornography, pornography of minors engaged in sexually

20  explicit conduct, both from A████ P██████ who you heard from,

21  as well as photos and videos depicting children.

22      These are the simple facts of the case.  And when I

23  say simple, I don't mean easy.  There's nothing easy about

24  these facts.  There's nothing easy about the testimony, the

25  evidence, the photos, and the videos that you have received.

1   What I mean by simple is that they are straightforward.  They

2   are uncontroverted.  They are undeniable, and they prove the

3   defendant's guilt of the charges in this case.

4            You've just been instructed as to the fact that the

5   defendant is facing five charges.  The first four are charges

6   of sexual exploitation of children, and there are a number of

7   instructions, it's Instructions 16 through 19, that tell you

8   the facts that must be proven beyond a reasonable doubt to find

9   the defendant guilty of those charges, and they are virtually

10  identical.  The only difference between these counts is that

11  each count relates to a different girl.  Count One relates to

12  R       B        , R.B.  Count Two relates to C        A      ,

13  C.A.  Count Three relates to S        M      , S.M., and

14  Count Four, relates to T       H       , T.H.  So we're going to

15  go through this step by step and demonstrate what the evidence

16  proves beyond a reasonable doubt and what you are to consider

17  and not consider when weighing the evidence in this case.

18            First, you have to find, and the evidence shows beyond

19  a reasonable doubt, that R      , C       , S        , and T

20  were under the age of 18.

21            Simple math based on the forensic evidence of when the

22  videos and photos depicting these girls, as well as their own

23  testimony, demonstrates beyond a reasonable doubt that they

24  were under the age of 18.

25            You've also been instructed that that's what you have

2:16-cr-216-KJD-VCF - October 17, 2018

1   to find.  In other words, you have to find that these girls

2   were indeed, in fact, under the age of 18.  You do not need to

3   find, you do not need to consider whether the defendant knew

4   that at the time he created and produced this child

5   pornography.

6          Now, notwithstanding, the evidence in this case shows

7   that he did indeed know exactly how old these girls were.  He

8   knew that R████ B████████ was 14 when he met her because

9   that's what he manually entered for her folder.  He knew that

10  C████ A███ was 15.  He knew that T██████ H████ was 13.  He

11  was well aware that these girls were underage.  But these laws

12  are designed to protect children.  It's not the children's

13  responsibility to make sure they tell the defendant how old

14  they are; it's the defendant's responsibility to make sure, and

15  that's why his knowledge doesn't matter.  What matters is the

16  fact that they were under the age of 18.

17         It's also not before you concerning the age of consent

18  for sexual relationships.  The number, the age that is of

19  interest in this case is 18.  Because there's a difference --

20  and you've heard that through these girls' testimony -- there's

21  a difference between engaging in sexual relationships and

22  consenting to those sexual relationships and engaging and

23  consenting to those sexual relationships being recorded, being

24  photographed, being videotaped.  So, it doesn't matter if these

25  girls were old enough if the age of consent for sexual

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    relationships with the defendant was 16, or 17, or 18; what

2    matters is they were not old enough to be videotaped having sex

3    with the defendant.

4          Second, you must find and the evidence shows the

5    defendant employed, used, persuaded, induced, enticed, or

6    coerced R_____, C_____, S_____, and T_____ to take part in

7    sexually explicit conduct for the purpose of producing a visual

8    depiction of such conduct.

9          Important to note, it's "or."  So there's alternative

10   means that you can find were used to produce the same end.  And

11   the facts of this case illustrate that the defendant had

12   different methods.  Sometimes he persuaded, he induced, he

13   enticed.  He told these girls that he was their boyfriend.  He

14   told these girls that they were his girlfriend.  He told these

15   girls that he loved them, that he wanted to marry them, that he

16   wanted to be in a relationship with them, and these girls

17   believed him.  And they believed that they were in a legitimate

18   relationship with an 18-year-old.  Because the defendant told

19   them that.  And the defendant went as far as to alter his birth

20   certificate to show that he was much younger than he was.

21   Because he knew full well that if he told these girls that he

22   was 31, 32, 33, they would not have responded to his MeetMe

23   message.  They would not have Skyped with him.  They would have

24   not met him in person.  So he lied to them to induce them, to

25   persuade them, to entice them to engage in sexually explicit

36

2:16-cr-216-KJD-VCF - October 17, 2018

1  conduct.

2          Sometimes he simply used them.  Sometimes he recorded

3  screenshots of Skype chats of S        M      that she didn't

4  know he was capturing.  Sometimes he recorded having sex with

5  them, like S        M     , having her turn away and face away

6  from him so she doesn't know that he's recording.  Sometimes he

7  lied to them, like C        A      and said that he stopped video

8  recording when he didn't.

9          And sometimes he coerced them.  Sometimes, like when

10 R                   says no, I don't want to do this, please stop,

11 inducing, persuading, enticing and even using isn't working, so

12 he coerced         to engage in sexually explicit conduct for

13 the purpose of creating that video.

14         Physical presence of the defendant is irrelevant.  In

15 other words, it's not required for you to find that the

16 defendant was in the same room with these girls.  You can find,

17 in fact, that there are -- there's evidence to show that the

18 defendant at some points in time was in Las Vegas when

19 S      M      was in Texas and they were Skype chatting and he

20 was asking her to send him nudes or take off her clothes and he

21 was capturing screenshots of her in various stages of undress.

22         And the victims' "consent" -- and I put that in quotes

23 because as I just said, the legal age of consent to be video

24 recorded or photographed or recorded in any way in sexual

25 activity is 18, but to the extent that any of these girls came

2:16-cr-216-KJD-VCF - October 17, 2018

1   up here and said, I was -- I was all for being videotaped,

2   doesn't matter.  The evidence shows that these girls did not

3   want this.  They closed -- they covered their face.  They

4   closed their eyes.  They tried to avoid being identified during

5   the videotape.  This was the defendant's idea.  This was the

6   defendant's decision.

7           In fact, their knowledge isn't even relevant.  Just

8   like S         M    .  You can use someone to create these

9   visual depictions.  You can use someone to engage in sexually

10  explicit conduct even without their knowledge.  That's not

11  required.

12          And you were told to find sexually explicit conduct,

13  it includes sexual intercourse, like the videos that you've

14  seen.  It includes masturbation and it also includes lascivious

15  exhibition of the genital or pubic area of any person, the

16  naked selfies that we've been talking about that the girls sent

17  at the defendant's direction.  The Skype chats that were

18  screenshot and saved of girls, specifically S        M    ,

19  undressed.

20          You're also told in Instruction 25 what it means to

21  produce.  You're told production includes recording and

22  photographing.  And, so, when the defendant is holding a camera

23  phone as he's having sex with these minor girls and recording

24  that, he's producing.

25          It also includes directing.  So when the defendant is

38

———2:16-cr-216-KJD-VCF - October 17, 2018———

1   asking the girls to send him nude photographs of themselves

2   exposing their genitals, he's producing.

3           It includes creating and making.  So when the

4   defendant is making these screenshots of Skype chats depicting

5   the girls nude and exposing their genitals, he's producing.

6           It also includes copying and transferring.  So when

7   the defendant is moving files from one device to the SD card or

8   from the SD card to another device back to the SD card, as he's

9   copying and transferring those files that depict minors engaged

10  in sexually explicit conduct, he's producing child pornography.

11          And, so, the evidence shows that the second element is

12  proven beyond a reasonable doubt.

13          Finally, third, you must find the visual depiction of

14  such sexually explicit conduct was produced using materials

15  that the been mailed, shipped, or transported across straight

16  lines or in foreign commerce.  This is what we call the

17  interstate commerce element, which is just a fancy legal term

18  that means we have to show that there was some movement of the

19  material that was used to produce child pornography across

20  state lines.  That's it.  And it can be even across foreign

21  lines.  Must be in and affecting the movement of items across

22  state lines.

23          Well, the SD card itself tells you beyond a reasonable

24  doubt that the material, that SD card that was used to produce

25  child pornography, crossed state lines.  Because it was made in

1   China and it was shipped to the United States, and specifically

2   to Nevada.

3           Additionally, the evidence demonstrates that the phone

4   the defendant used and had this SD card in when he created,

5   when he produced, when he videotaped, when he screenshotted the

6   child pornography, also crossed state lines.  The defendant

7   told Detective Miller during his recorded interview that he had

8   an SD card, that he had multiple SD cards, and he used them

9   with Samsung phones, S4, S6.  And you heard from Mr. Finnegan,

10  all Samsung phones, including S4s and S6s are manufactured

11  overseas.  They're manufactured in China, southeast Asia,

12  Korea, and then they're shipped over here.  So you know beyond

13  a reasonable doubt, the evidence shows beyond a reasonable

14  doubt that the materials used to produce that child

15  pornography, that visual depiction of minors engaged in

16  sexually explicit conduct, has crossed state lines.

17          Now, how do we know, how does -- the evidence also

18  shows that it's the defendant who produced the child

19  pornography.

20          You heard from all four of these girls.  And there's

21  no indication that these girls know each other.  There's no

22  evidence that they've met.  In fact, some of them are from

23  different cities and different states.  S       lives in

24  Texas.  T       lives in Arizona.  R      and C      live here

25  in Las Vegas and Henderson, but they all tell a remarkably

2:16-cr-216-KJD-VCF - October 17, 2018

1  similar story. Almost identical. They met the defendant on

2  MeetMe. He reached out to them. They indicated on their

3  MeetMe that they were minors and the defendant claimed, on his

4  MeetMe profile, that he was 18. They started exchanging

5  messages. They quickly turned sexual at the defendant's

6  direction. They began either moving towards a different Kik or

7  Skype, a different application, and they began trading photos

8  as well as more sexual conversation and messages. The

9  defendant asks for nudes. The defendant sends nudes of himself

10 unsolicited. The girls comply with the defendant's request.

11 Eventually they meet in person. It's always at the girls'

12 house, house that they share with their parents, or their legal

13 guardians, their grandmother, and they engage in sexual -- in

14 sex with the defendant, and he records them. Sometimes they

15 know about it; sometimes they don't.

16      The other evidence in this case corroborates the

17 girls' testimony. In fact, the defendant, in what's mostly a

18 self-serving letter about R▓▓▓ B▓▓▓▓▓, acknowledges that

19 he knows her, acknowledges what he claims, that they had some

20 relationship, some relationship, that he "dated" her, and that

21 he knew that she was under the age of 18 when they dated.

22      And the SD card, a text that only two people could

23 possibly have, C▓▓▓▓ A▓▓▓ and the defendant, is a copy of

24 this text conversation between the two of them where C▓▓▓▓

25 identifies herself and the defendant saved that. So you know,

41

2:16-cr-216-KJD-VCF - October 17, 2018

1  and it's corroborated, that C      indeed had this interaction

2  with the defendant.

3         S    M   , Skype chats that only include two

4  people.  Sometimes she's clothed; sometimes she's not.

5  Sometimes the defendant saves screenshots of her clothed;

6  sometimes he saves screenshots of her naked.  And it's the

7  defendant in that bottom right corner.

8         Letters, handwritten by T     H    and

9  hand-delivered to the defendant.  Letters that no one else

10  besides T    and the defendant could possibly know about,

11  saved by the defendant to document the relationship that he had

12  with her, to document the sex that he had with her.

13         You also heard from A       , and A    P     

14  also provides evidence to you that identifies the defendant as

15  the person who produced the child pornography that you've seen

16  and the child pornography that the four charged victims

17  testified about, R     C     , S      , and T     .

18         A   told you and testified that the defendant at

19  some point showed her videos, and she described videos and gave

20  descriptions that are consistent with the videos that you've

21  seen of R    and C    .  And she told you that the

22  defendant told her that he knew they were minors at the time he

23  had sex with him and recorded the videos that he showed her,

24  and that he told her even their names, C     and R    .

25         Now, whatever you think about what A    said about

————2:16-cr-216-KJD-VCF - October 17, 2018————

1   her relationship with the defendant, with her father in the

2   room, a person that she didn't want to know about the

3   relationship she had with the defendant, she can't guess what's

4   on those videos.  It's the defendant that showed her those

5   videos.  And she can't guess that there's some girl in Texas

6   who is involved in this unless the defendant tells her that.

7   And she reaches out to him [sic] on his behalf, and we hear

8   from S███████M████ who doesn't know A████P███████ but got a

9   Facebook message from her telling her what the defendant told

10  A████ to tell her, deny that you know me because there's an SD

11  card with a bunch of nudes on it, and it's mine.

12          Even if you were to just disregard, you could set

13  aside all of these girls' testimony, there would still be proof

14  beyond a reasonable doubt that it was the defendant who

15  produced the child pornography.  Because the videos themselves

16  show it's the defendant.  It's the defendant who smiles at the

17  camera at the end of the video of R██████B████████.  It's the

18  defendant who's depicted performing oral sex on C████████A█████.

19  It's the defendant at the bottom right of Skype chat screen

20  after Skype chat screen of S███████M██████ as she undresses, and

21  it's the defendant who's depicted smiling as he's recording

22  himself and T██████H██████ having sex.

23          And so the verdict form which you'll see charges

24  Count -- excuse me -- four counts relating to four different

25  victims.  The defendant is guilty of sexually exploiting

2:16-cr-216-KJD-VCF - October 17, 2018

1   R█████ B█████████, R.B., and the defendant is guilty of sexually

2   exploiting C███████ A████, C.A., the defendant is guilty of

3   sexually exploiting S████████ M████, S.M., and the defendant is

4   guilty of sexually exploiting T███████ H██████, T.H.  The

5   straightforward simple facts demonstrate the defendant's guilt

6   as to those charges.

7         Let's talk about Count Five.  This is Instruction 20.

8   This is Possession of Child Pornography, and I want to be very

9   clear here, Count Five relates to the hundreds of images and

10  videos that the defendant downloaded and the photos of

11  A████ P█████ that the defendant possessed.  Count Five does

12  not relate to R██████ B█████████, C███████ A████, S████████ M████,

13  or T██████ H█████.  And, so, when we talk about Count Five,

14  there are four elements you can see or four facts that you must

15  find.

16        First, the defendant knowingly possessed material that

17  the defendant knew contained visual depictions of minors

18  engaged in sexually explicit conduct.

19        And you're instructed that "knowingly" means

20  intentionally, not as a result of accident or mistake.

21        So, you don't need to decide whether the defendant

22  knew it was illegal to possess images of A████ P████████ or

23  images of children ranging from four to six years old.  What we

24  need to show is that he knew that those images existed and that

25  he possessed them.

44

—2:16-cr-216-KJD-VCF - October 17, 2018—

1      You don't need to show or need to find or decide that

2  the defendant knew that those images traveled in interstate

3  commerce or that those images were produced with materials that

4  traveled in interstate commerce, and you don't need to decide

5  motive.  You don't need to figure out why it was that the

6  defendant possessed, collected, catalogued, organized and

7  retained hundreds of images of child pornography.

8      The folders that are involved are "Kik" and "Kik3" and

9  "download," and those folders demonstrate that the defendant

10  knew that he possessed images that depicted children engaged in

11  sexually explicit conduct.  Because those are folders

12  associated with downloads from the Internet and items that he

13  received from Kik.  And there are images and items that are

14  right next to -- these are folders that are visited frequently

15  because these images are right next to images of

16  T_____ H____ , S_____ M___ , and images of the defendant.

17  These aren't hidden folders.  These aren't folders that no one

18  would know existed.  These are folders that were used, folders

19  that the defendant was aware of.

20      And another folder "real lolicon" that the defendant

21  saved dozens of images of child pornography.  Lolicon, you were

22  told, being a term unique to child pornography.  Lolicon being

23  a title that the defendant manually typed in.  He knew exactly

24  what was in that folder.  He knew that it contained child

25  pornography.

1      And, additionally, the defendant knew, when he

2  captured screenshots like this (indicating), as well as

3  screenshots where A       is exposing her genitals, that she was

4  a child engaging in sexually explicit conduct.  She told him

5  she was 15.  He knew she was 15.  Captured these images, and he

6  possessed them.  He knew exactly what he was doing.

7      The second and third element go together in some

8  respects so we're going to talk about them together.  The

9  defendant knew the visual depiction contained in the material

10 showed a minor engaging in sexually explicit conduct, and the

11 defendant knew the production of such a visual depiction

12 involved use of a minor in sexually explicit conduct.

13     He knew that this was child pornography.  He knew that

14 this was produced using real children and that they were really

15 engaged in sexually explicit conduct.

16     Minor, again, is 18 years -- or -- excuse me -- under

17 the age of 18 years old, and visual depiction of sexually

18 explicit conduct has the same definition as you -- we just

19 talked about.  Lascivious exhibition of genitals, masturbation,

20 actual or simulated sexual acts.

21     The evidence shows that the defendant knew because he

22 titled folder names to include the ages of the girls depicted

23 in the images and videos that were in those folders.  You saw

24 the over hundred folders that the defendant had, including

25 dozens of folders that had ages 13, 14, 15, 16, 17.  And the

46

—2:16-cr-216-KJD-VCF - October 17, 2018—

1   evidence shows that that was indicative of their age because

2   the images inside were consistent with that age, and because

3   the defendant had other folders titled "Kat-Russian-34," which

4   contained images of a female that appeared to be in her early

5   or mid-thirties.

6        He also titled "real lolicon" and "real women,"

7   folders that were right next to each other, to demonstrate the

8   defendant knows the difference.  The evidence shows he knows

9   what a real woman is and he knows what "real lolicon" is, and

10  he likes to keep those things separate.  He likes to keep it so

11  that it's very clear where he wants to look, what he wants to

12  look at.

13       And the pictures and videos themselves, you've seen

14  these pictures.  You've seen them.  You know what they depict,

15  and any reasonable person would know within 10 seconds what

16  they depict.  They depict children.  They don't depict adults,

17  and they depict children engaged in sexually explicit conduct.

18       And the testimony as well.  The testimony of

19  A     P        .  Never lied to the defendant about her age.

20  Consistently told him she was 15.  When she had her 16th

21  birthday, she was 16.  Under the age of 18.

22       Finally, the fourth element, you must find the visual

23  depiction had been either mailed, shipped, or transported in

24  interstate or foreign commerce by any means, including by

25  computer, or produced using material that had been mailed,

47

────2:16-cr-216-KJD-VCF - October 17, 2018────

1   shipped, or transported in interstate or foreign commerce.

2          So it's "or."  One or the other.  And again, this is

3   the interstate commerce.  And in this case there's evidence as

4   to both.  There's evidence that these images were mailed,

5   shipped or transported in interstate or foreign commerce, and

6   there's evidence that they were produced using material that

7   had been mailed, shipped or transported.

8          So the folders, "Kik" and "Kik3," and "download,"

9   indicative of Internet or Internet-based applications as well

10  as Skype chats, essentially phone calls or use of phone

11  communications that the defendant used to possess and the

12  images traveled over, especially A██████ P████████, the Skype

13  images traveled over phone communications.

14         Additionally, as we've just talked about, as it

15  concerns A██████ P████████, those images were produced using

16  materials that had traveled in interstate commerce.  The SD

17  card made in China.  The Samsung phone that this SD4 or --

18  excuse me -- this SD card fit into, made outside of the

19  United States.

20         Identity.  This is the defendant's SD card.  The

21  evidence overwhelming demonstrates that.

22         Identifying documents on the SD card.  The defendant's

23  resume, the defendant's birth certificate, the defendant's

24  altered birth certificate.  There's nothing to indicate

25  Rachael Saito has identifying documents, or any documents on

48

—2:16-cr-216-KJD-VCF - October 17, 2018—

1  this SD card.  There's nothing to show Stephen Baltazar has

2  anything on this SD card.  This is the defendant's SD card, and

3  it contains items unique and identifying to him.

4          It contains photos, clothed and unclothed, and they're

5  in folders "me" and "me restricted."  He's telling you whose SD

6  card this is.  And in that "me restricted," over a hundred

7  photographs of the defendant exposing his penis.  Photos that

8  the defendant would then send to R████, S███████, C██████, and

9  T██████.

10         And there's those videos that we just talked about,

11  videos that depict the defendant having sex with underage

12  girls.  Videos that the defendant saved on this SD card because

13  it's his SD card.  The SD card that he used to possess child

14  pornography.

15         So as to Count Five, the evidence shows the defendant

16  is guilty of the offense of Possession of Child Pornography.

17         These are the simple facts.  The evidence is

18  overwhelming, and the only verdict that the evidence is

19  consistent with is the evidence [sic] we ask that you return, a

20  verdict as to guilty as to all counts.

21         Thank you.

22         THE COURT:  Mr. Smith?

23         MR. SMITH:  Thank you, Your Honor.

24         Ms. Roohani, Mr. Burton, Special Agent Flaherty,

25  ladies and gentlemen of the jury, I'm going to keep my remarks

49

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    kind of brief in this case.  What I want to remind you of,

2    first of all, is what I told you in my earlier remarks, in my

3    opening statement, is that the images that you were going to be

4    shown were very likely to elicit a visceral reaction, a gut

5    reaction from you, because that would certainly be normal.

6    However, with that being said, you have to try to detach

7    yourself from that and you have to take a look at this evidence

8    with a clinical eye.  The reason being is that you are now --

9    you have a duty and an obligation, and it's really a sacred one

10   because you're now being asked to sit in judgment over another

11   human being (indicating), and as I've said in court many times

12   in the past, the power to judge is the power to destroy.  So

13   the government -- that's the reason, that's the reason why, in

14   our system, the government has to be held to their burden of

15   proof, the burden of proof beyond a reasonable doubt.

16          Now, Mr. Burton has just given you a very effective

17   presentation.  He's a hard act to follow, I'll say that, but

18   there are certain things about this -- about this case that I

19   find troubling.  What I find troubling in the first instance is

20   the testimony of Rachael Ismail.  Rachael Ismail sat on the

21   witness stand and lied to your faces.  She said that she found

22   that SD card stuck to her leg in bed.  Lonny had spent the

23   night.  She said she was actually afraid of him, but he helped

24   her move, he spent the night in her house.  And the reason that

25   we know that she was lying to you is the testimony of

SER 0076

50

—2:16-cr-216-KJD-VCF - October 17, 2018—

1  Mr. Finnegan from Samsung, who explained to you that to get

2  that SD card out of the phone, you had to take the -- take off

3  the back of the phone.  It doesn't magically pop out by itself.

4         The reason I bring these things up, ladies and

5  gentlemen, is that it's going to be your job to evaluate the

6  credibility of the witnesses and to decide what weight to give

7  their testimony and that is going to be based on your common

8  sense and on your life experience.

9         The young officer, Police Officer Bianco, very nice

10  young man, who testified briefly.  He didn't have a whole lot

11  to say.  He was the one, I believe, who impounded the evidence.

12  Didn't put it in the envelope.  I don't know who did that, I

13  don't recall, and described the process of putting it in the

14  trunk of his car in a manila envelope and assigning an event

15  number to it.  But he didn't do any kind of investigation into

16  the person who was, at the time, in possession of this card

17  containing this material.  That -- that guy was just ignored,

18  basically.

19         Bear with me folks.  I don't have a script that I'm

20  reading to you.  I just have to, from time to time, refer to my

21  notes because I -- if I don't, I'll forget things.

22     (Brief pause in proceedings.)

23         MR. SMITH:  Concerning the numbers next to the names

24  of the files with the names of the girls, the numbers 13, 14,

25  15, 16, whatever, this is something that you're going to have

2:16-cr-216-KJD-VCF - October 17, 2018

1  to decide based on the weight and the credibility of the

2  testimony that you've heard because we don't have anything else

3  to corroborate it.  We haven't seen -- you know, we haven't

4  seen a birth certificate.  We haven't seen -- we haven't heard

5  testimony from any of the parents or anything like that; we

6  just have the statements of the girls saying, well, I was this

7  age at that time.  And some of these girls were -- at the

8  tender age that they might have been were sending nude

9  photographs of themselves out on social media.  I'm not trying

10  to portray them as villains in this play, but it is something

11  to think about, that you have to -- if you're going to find

12  Mr. Ditirro guilty of these charges, you have to take what they

13  said at face value.

14        Now, those numbers that are next to their names

15  might -- might be that, or it might be something else.  We

16  don't really know.  I mean, you would have to make an

17  assumption, but assumptions don't lead to proof beyond a

18  reasonable doubt.

19        (Brief pause in proceedings.)

20        MR. SMITH:  R      's testimony, R     B        's

21  testimony, was kept mercifully brief and my questions of her, I

22  made it real quick because something has -- has. . . affected

23  this girl very deeply.  It was obvious that she was very

24  distraught on the witness stand.  What the reason for that is,

25  is unknown to me, but it was not appropriate to -- to try and,

52

———2:16-cr-216-KJD-VCF - October 17, 2018———

1  for lack of a better word, attack her or attack her

2  credibility.  I mean, she was visibly upset.  Significantly,

3  she didn't remember meeting Lonny Ditirro, which I thought

4  was -- I thought was rather odd under the circumstances of the

5  rest of her testimony.

6           T      H      testified that she came into contact

7  with Mr. Ditirro on this website called MeetMe and she said she

8  was 13 years old at the time.  Agreed to -- agreed to have a

9  sexual and/or relational -- I'm sorry.  Agreed to have a

10  relationship with him that was sexual in nature.  Now, if she

11  was, in fact, 13 years old, she can't.  She's incapable of

12  giving consent, but, again, that's for you to determine if her

13  age is what she said it was.

14           Significantly, she said she had sex with Lonny every

15  night for a month in her grandmother's house, and there were

16  certain -- there were certain things that were said by some of

17  the witnesses in this case that -- sorry.  I have a tendency to

18  walk around and the court reporter will miss what I'm saying.

19  Usually, I'm pacing, if this were a state court case.  I guess

20  the level of adult supervision here is irrelevant.  Doesn't

21  mean anything one way or the other, but it did sort of raise my

22  eyebrows when I heard testimony like this, and also testimony

23  from S      M   .  S        , who claimed she was 15 at the

24  time, stayed in her bedroom with her mother and her stepfather

25  in the same house.

—2:16-cr-216-KJD-VCF - October 17, 2018—

1          When I was growing up, that wouldn't have happened in

2    a million years, for what it's worth.  For what it's worth is

3    you have to gauge the -- you have to gauge the credibility of

4    the witnesses and their testimony.  That's your job.  That's

5    your responsibility.

6          And the last comment that I really have to make before

7    you go off to deliberate is that A____ P____ also lied to

8    you on the witness stand.  Now, maybe she had her reasons.

9    Maybe she was embarrassed or maybe because her father was in

10   the courtroom, but she flat out, straight-up lied to your

11   faces.  Because she said that they -- you know, they just had a

12   friendly relationship and that was about all there was to it

13   until I asked some questions of her and then I believe

14   Ms. Roohani asked some follow-up questions and she admitted

15   that she had been in a sexual relationship with Mr. Ditirro.

16          So that, ladies and gentlemen, is a brief -- very

17   brief -- recap of the testimony that you heard in this case.

18   Again, it is up to you to leave your emotions at the courthouse

19   door.  This is -- this is emotional stuff, I know.  Believe me,

20   I'm not -- not trying to pull the wool over your eyes, but you

21   really have to be very clinical about this.  You have to

22   evaluate the credibility of all of the witnesses in this case

23   before you come to your ultimate conclusion.

24          And with that being said, I thank you very much for

25   your time and attention.

54

2:16-cr-216-KJD-VCF - October 17, 2018

1          THE COURT:  Ms. Roohani.

2          MS. ROOHANI:  Thank you, Your Honor.

3          And Denise, can I ask for your assistance with the

4     ELMO, please?

5          Ladies and gentlemen, I'm not as tech savvy as my

6     colleague here so I work with paper and ELMO machine, so I

7     apologize, I don't have a PowerPoint prepared, but I do have a

8     few things I'd like to say to you.

9          Mr. Smith, our esteemed colleague, has worked

10    diligently on this case.  Mr. Burton and I have worked on this

11    case.  And Mr. Smith told you about our burden of proof.  It's

12    high.  It's beyond a reasonable doubt.  We recognize that it's

13    a high burden.  It's our honor to meet that burden, and we have

14    met it in this case.  It's high because it's supposed to be.

15    And Mr. Burton and I, in presenting the evidence over the

16    course of the last few days to you, have met that burden.

17         Let's talk about that.  Let's talk about some of the

18    things that Mr. Smith talked to you about.

19         First, let's start with these girls.  Mr. Smith

20    indicated to you that they couldn't consent to this.  I want to

21    make a distinction.  There's a difference between consenting to

22    sex and consenting to be recorded when having sex.  There's no

23    indication here that these sexual acts occurred when the girls

24    were over the age of 18.  In fact, all of the evidence that

25    you've heard, from every single witness, is that these sex acts

55

—2:16-cr-216-KJD-VCF - October 17, 2018—

1    occurred when they were under the age of 18, which means that

2    none of these girls could have consented to being recorded.

3          Why?  Why is the law written that way?  Because we

4    recognize that children are vulnerable, that children make

5    really dumb decisions.  And, so, the law is written that way

6    because adults are supposed to protect children.

7          And let's be clear, those girls that testified before

8    you are children, or they were, when the defendant decided to

9    have sex with them, decided to lie to them about his age, and

10   used his lies about his love for them and his age and what he

11   was going do for them to induce them not only to have sex with

12   him, but to not fight off that recording.

13         Now, Mr. Smith talked about parents.  You might be

14   wondering, "Where are the parents in this equation?"  Let's

15   talk about the parents.  S      M    ' mom did her job.  She

16   looked up Mr. Ditirro online, and what did he do?  He falsified

17   a birth certificate and produced it to her.  She did her job.

18   But his lies worked.  That's the coercion; that's the

19   inducement; that's the enticement.  That's how Mr. Burton and I

20   have proved this case because, quite frankly, ladies and

21   gentlemen, there's nothing that Mr. Burton and I did here; it's

22   everything that the defendant did.  You heard these girls.

23         Now, Mr. Smith told you that R      B        ,

24   something had affected her.  Absolutely right.  The defendant

25   having sex with her when she asked him not to, and recording

56

————2:16-cr-216-KJD-VCF - October 17, 2018————

1  her when she was covering her face, that's what affected her.

2  She told you what affected her.  She said she had been

3  traumatized by this, and that's why it was difficult for her to

4  testify.

5          Now, the other girls, they all told you they believed

6  the defendant was 18 years old.  Every single one of them told

7  you that they would not have even spoken to him if they had

8  realized that he was double their age.

9          Mr. Smith tells you that the numbers that are next to

10  these girls' names, you can only assume -- that's just purely

11  an assumption -- as to that being an age.

12          I'd like to direct your attention to Jury Instruction

13  No. 8.  I'm going to put it up on the screen for you.

14          Mr. Smith told you there's no evidence to suggest that

15  it's anything other than a number.  You saw some of the photos

16  that were inside of these folders.  You saw -- you can use your

17  common sense, your reasoning, your common experience and

18  engaging with people in the world, and you actually have the

19  evidence.  You can go into that thumb drive, you can open up

20  those folders, you can look at the girls that are inside of

21  each of those folders, and you can decide, is that an age, or

22  is that just a random number that the defendant assigned to

23  each girl.  And if so, why did 14 happen to be the exact age

24  R        B          was when he met her?  Why was 13 the exact age

25  that T         H         was when he met her and had sex with her?

SER 0083

57

2:16-cr-216-KJD-VCF - October 17, 2018

```
1    Why was 15 the exact age that C        A      was when he had sex
2    with her?  Is it a pure coincidence?  Or did the defendant know
3    exactly how old these girls were and he was cataloguing his
4    behavior with these girls and keeping it as a record of his
5    activities?
6            Now, I want to talk a little bit about Rachael Ismail
7    and Officer Bianco and really Officer Wilson and kind of the
8    insinuation that's been made here throughout the trial, and it
9    reminds me of the end of the Wizard of Oz, so bear with me for
10   just a moment.  You remember at the end of the movie, Dorothy
11   and her friends, they get to the Emerald City, they go to see
12   the Wizard and they show up and they see the hologram of the
13   face of the Wizard and the fire and the smoke and the lights
14   and the noise and then, unsuspecting Toto goes and pulls that
15   curtain back.  And what's behind that curtain?  Just a man with
16   a bunch of lights and action.  And what does he say?  "Pay no
17   attention to the man behind the curtain."
18           That's what Mr. Ditirro's asking you to do.  Pay no
19   attention to the man behind the camera recording the sex acts
20   with these girls.  Pay attention to the fact that
21   Rachael Ismail is a flighty witness.  Pay attention to the fact
22   that Officer Bianco testified that he did, in fact, impound
23   this card the exact way that Metro had trained him to do, and
24   pay attention -- don't pay attention to all of the evidence
25   that came out once the forensic examination had been done.
```

58

2:16-cr-216-KJD-VCF - October 17, 2018

1          Now, Rachael Ismail.  She was special, wasn't she?

2     Ms. Ismail could not understand what the word "physically"

3     meant, and Mr. Burton had to ask her six times when the last

4     time was that Mr. Ditirro was physically in her apartment.

5          Do you remember that?

6          She couldn't provide a single straightforward answer

7     to any question that Mr. Burton asked, or that Mr. Smith asked.

8     She gave you a stream of consciousness response about the

9     philosophical meaning of love as opposed to answering a simple

10    straightforward question.

11         Now, ladies and gentlemen, that woman that you saw

12    testify, ask yourself, could she concentrate on a task long

13    enough to -- and Forensic Examiner Trafford told you, it would

14    have been a full-time job would to be able to do this -- to

15    collect all of the images of these girls, to create the folders

16    with the different names and the numbers that are associated

17    with it, to have ESP to figure out real dates that corresponded

18    with real human beings that the defendant met with them, change

19    the file names to correspond with that, and then repeatedly

20    change the date and time on her computer to somehow "plant"

21    evidence on the defendant.  Is that reasonable?  You get to

22    decide that.

23         And even, ladies and gentlemen, even if she could do

24    those things, where did she get videos of the defendant having

25    sex with girls who were half his age?  Where would she have

59

——2:16-cr-216-KJD-VCF - October 17, 2018——

1   gotten those videos from?

2          The defendant told you that he used his phone.  He

3   told you that he used the SD cards.  The girls told you that he

4   recorded them using that phone.  He was the person in

5   possession of those videos.  Where would she have gotten that

6   from?

7          And even if Ms. Ismail had found that SD card in the

8   middle of the wilderness, would it have changed a single thing

9   about what was on it?  And the answer to that is no, it really

10  wouldn't.

11         The fact of the matter is, is that the evidence is

12  undeniable, and you have access to all of it.  You can look at

13  it if you want to.  You can rely on the testimony of the

14  witnesses, if you want to.  But in the end, when you give

15  thoughtful consideration to this evidence, there's really only

16  one verdict that that evidence supports, and that's a verdict

17  of guilt.

18         Thank you.

19         THE COURT:  Court Security Officer will come forward

20  and take the oath.

21         COURTROOM ADMINISTRATOR:  "You do solemnly swear to

22  keep this jury together in some private and convenient place,

23  that you will not permit any person to speak or communicate

24  with them nor do so yourself unless by order of the Court or to

25  ask them whether they have agreed upon a verdict and that you

60

2:16-cr-216-KJD-VCF - October 17, 2018

1  will return them into court when they have agreed upon a

2  verdict and that you will return them into court when they have

3  so agreed or when ordered by the Court, so help you God?"

4          COURT SECURITY OFFICER:  I do.

5          THE COURT:  Thank you.

6          Members of the jury, the case is now submitted to you

7  for deliberation and verdict.

8          With respect to the -- positions 13 and 14, you will

9  be held in reserve pending notification from the clerk whether

10  you are needed or not needed.  You'll not participate in

11  deliberations at this time.  However, you will -- as indicated,

12  you will be held in reserve in case you are needed, and that

13  would happen only if one of the 12 are disqualified for some

14  reason.

15          So, what I would like you to do is to -- before

16  deliberations commence, is to go into the jury room and

17  retrieve whatever personal effects you have in there and I will

18  meet you in the hallway outside of the jury room to provide you

19  with your juror attendance certificates and also to instruct

20  you on the contact information that will allow the clerk to

21  immediately contact you in case you are needed.  If it happens

22  that you are needed, you will be assigned in the order of your

23  seating now, and the -- the jury will commence deliberations

24  from the very beginning if you are called in.

25          So, go ahead and go to the jury room and I -- as I

61

—2:16-cr-216-KJD-VCF - October 17, 2018—

1   indicated, I will meet Ms. Spangler and Mr. Hutchings just

2   outside in just a moment.

3       (Jury retired to deliberate at 11:04 a.m.)

4           THE COURT:  All right.  Counsel, if you will make sure

5   that Denise has phone numbers where you can be contacted

6   immediately in case there are any questions that come out of

7   the jury room I'll be able to consult with you.

8           Anything further?

9           MS. ROOHANI:  No.  Thank you, Your Honor.

10          MR. SMITH:  No, Your Honor.  Thank you.

11          THE COURT:  Are you okay with me discussing with these

12  two alternates their responsibility to -- to continue under the

13  admonition?

14          MS. ROOHANI:  Yes, Your Honor.

15          MR. SMITH:  Yes.  I'm fine with it, Judge.

16          THE COURT:  Okay.  Thank you.

17          All right.  We're in recess.

18      (Recess was taken at 11:05 a.m.)

19      (Outside the presence of the jury at 11:59 a.m.:)

20          COURTROOM ADMINISTRATOR:  All rise.

21          THE COURT:  The Court is informed that the jury has

22  reached verdicts.

23          Anything before we bring in the jury?

24          MS. ROOHANI:  No, Your Honor.

25          MR. SMITH:  No thank you, Your Honor.

62

————2:16-cr-216-KJD-VCF - October 17, 2018————

1          THE COURT:  All right.

2      (Brief pause in proceedings.)

3      (Jury returned to courtroom with verdict at 12:00 p.m.:)

4          THE COURT:  Please be seated.

5          Will the foreperson of the jury please rise.

6          JUROR NO. 4:  (Indicating).

7          THE COURT:  Has the jury reached a verdict on all

8  counts?

9          JUROR NO. 4:  Yes.

10          THE COURT:  Have you filled in your verdict on each of

11  the counts and signed and dated the form?

12          JUROR NO. 4:  Yes.

13          THE COURT:  Would you please hand that to the Court

14  security officer?

15          JUROR NO. 4:  (Juror complies).

16          THE COURT:  Thank you.

17          The clerk will read the verdict.

18          COURTROOM ADMINISTRATOR:  "United States of America

19  vs. Lonny Joseph Ditirro, Jr., 2:16-cr-216-KJD-VCF.

20          "Verdict Form.

21          "We, the jury, in the above-entitled case upon our

22  oath do say:

23          "Number 1.  That we find the defendant Lonny Joseph

24  Ditirro, Jr., guilty of the offense of sexual exploitation of

25  children, R.B., charged in Count One of the Indictment;

63

———2:16-cr-216-KJD-VCF - October 17, 2018———

1           "Number 2.  That we find the defendant Lonny Joseph

2     Ditirro, Jr., guilty of the offense of sexual exploitation of

3     children, C.A., charged in Count Two of the Indictment;

4           "Number 3.  That we find the defendant Lonny Joseph

5     Ditirro, Jr., guilty of the offense of sexual exploitation of

6     children, S.M., charged in Count Three of the Indictment;

7           "Number 4.  That we find the defendant Lonny Joseph

8     Ditirro, Jr., guilty of the offense -- offense of sexual

9     exploitation of children, T.H., charged in Count Four of the

10    Indictment;

11          "Number 5.  That we find the defendant Lonny Joseph

12    Ditirro, Jr. guilty of the offense of Possession of Child

13    Pornography charged in Count Five of the Indictment," dated

14    this 17th day of October, 2018, signed by the foreperson --

15    foreperson.

16          THE COURT:  Thank you, Ms. Clerk.

17          Does either side wish to have the jury polled?

18          MS. ROOHANI:  Not from the government, Your Honor.

19          MR. SMITH:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you.

21          Members of the jury, you have now completed your

22    service as jurors.  I want to thank you for your time and also

23    for the attention that you've shown throughout the presentation

24    of evidence.  You're now discharged.

25          I will meet you in the jury room momentarily to hand

64

———2:16-cr-216-KJD-VCF - October 17, 2018———

1  you your certificate of juror's attendance and, again, thank

2  you for your service.  You are discharged.

3      (Jury excused from courtroom at 12:03 p.m.)

4          THE COURT:  Sentencing date, Ms. Clerk?

5          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

6          Wednesday, February 6th, 2019, at 9:00 a.m.

7          MR. SMITH:  I'm sorry, Ms. Saavedra, that was the 5th;

8  right?

9          COURTROOM ADMINISTRATOR:  The 6th.

10         MR. SMITH:  The 6th.

11         COURTROOM ADMINISTRATOR:  Yes.

12         MR. SMITH:  I'm sorry.  I think I'm getting hard of

13 hearing.

14         COURTROOM ADMINISTRATOR:  No problem.

15         MR. SMITH:  Thank you, Judge.  That helped.  Those

16 visual aids at my age are really helpful.

17         THE COURT:  Okay.  We are adjourned.

18         MR. SMITH:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MS. ROOHANI:  Thank you, Your Honor.

21     (Proceedings adjourned at 12:04 p.m.)

22 ///

23 ///

24 ///

25 ///

————2:16-cr-216-KJD-VCF - October 17, 2018————

1                            --oOo--

2                   COURT REPORTER'S CERTIFICATE

3

4        I, <u>Heather K. Newman</u>, Official Court Reporter, United

5    States District Court, District of Nevada, Las Vegas, Nevada,

6    do hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true, complete, and

8    correct transcript of the proceedings had in connection with

9    the above-entitled matter.

10

11   DATED:  <u>2-27-2019</u>           _____<u>/s/ Heather K. Newman</u>
                                    Heather K. Newman, CCR #774
12                                  OFFICIAL FEDERAL REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25



1   DAYLE ELIESON
    United States Attorney
2   District of Nevada
    ELHAM ROOHANI
3   Assistant United States Attorney
    Nevada Bar Number 12080
    501 Las Vegas Boulevard South
4   Las Vegas, Nevada 89101
    (702) 388-6336
5   Email: elham.roohani@usdoj.gov

FILED      RECEIVED
ENTERED    SERVED ON
           COUNSEL/PARTIES OF RECORD

APR 2 4 2018

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

6              UNITED STATES DISTRICT COURT
7                  DISTRICT OF NEVADA
                       -oOo-

8   UNITED STATES OF AMERICA,          )    **SUPERSEDING**
                                       )    **CRIMINAL INDICTMENT**
9              Plaintiff,              )
                                       )    Case No: 2:16-cr-0216-KJD-VCF
10        vs.                          )
                                       )    **VIOLATIONS:**
11  LONNY JOSEPH DITIRRO, JR.,         )
                                       )    **COUNT I**
12             Defendant.             )    Sexual Exploitation of Children, in violation
                                       )    of 18 U.S.C. § 2251(a)
13                                     )
                                       )    **COUNT II**
14                                     )    Sexual Exploitation of Children, in violation
                                       )    of 18 U.S.C. § 2251(a)
15                                     )
                                       )    **COUNT III**
16                                     )    Sexual Exploitation of Children, in violation
                                       )    of 18 U.S.C. § 2251(a)
17                                     )
                                       )    **COUNT IV**
18                                     )    Sexual Exploitation of Children, in violation
                                       )    of 18 U.S.C. § 2251(a)
19                                     )
                                       )    **COUNT V**
20                                     )    Possession of Child Pornography, in violation
                                       )    of 18 U.S.C. § 2252A(a)(5)
21                                     )
                                       )    **FORFEITURE ALLEGATIONS**
                                       )    Criminal Forfeiture, 18 U.S.C. § 2253
22

23

24

THE GRAND JURY CHARGES THAT:

**COUNT ONE**

*Sexual Exploitation of Children*

Beginning on a date unknown, and continuing to on or about July 10, 2014, in the State and Federal District of Nevada,

**LONNY JOSEPH DITIRRO, JR.,**

defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, "R.B.," to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and that visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

**COUNT TWO**

*Sexual Exploitation of Children*

Beginning on a date unknown, and continuing to on or about March 3, 2015, in the State and Federal District of Nevada,

**LONNY JOSEPH DITIRRO, JR.,**

defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, "C.A.," to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and that visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

2

## COUNT THREE
### *Sexual Exploitation of Children*

Beginning on a date unknown, and continuing to on or about August 12, 2015, in the State and Federal District of Nevada,

### LONNY JOSEPH DITIRRO, JR.,

defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, "S.M.," to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and that visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

## COUNT FOUR
### *Sexual Exploitation of Children*

Beginning on a date unknown, and continuing to on or about August 14, 2014, in the State and Federal District of Nevada,

### LONNY JOSEPH DITIRRO, JR.,

defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, "T.H.," to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, and that visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

3

SER 0095

## COUNT FIVE

### *Possession of Child Pornography*

Beginning on a date unknown, and continuing to on or about September 10, 2015, in the State and Federal District of Nevada,

### LONNY JOSEPH DITIRRO, JR.,

defendant herein, did knowingly possess any book, magazine, periodical, film, videotape, computer disk, and any other material that contains an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), that has been mailed, and shipped and transported using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2252A(a)(5)(B) and 2252A(b)(2).

## FORFEITURE ALLEGATION

### *Sexual Exploitation of Children and Possession of Child Pornography*

1.  The allegations contained in Counts One, Two, Three, Four, and Five of this Criminal Indictment are Hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 2253(a)(1), 2253(a)(2), and 2253(a)(3).

2.  Upon conviction of any of the felony offenses charged in Counts One, Two, Three, Four, and Five of this Criminal Indictment,

### LONNY JOSEPH DITIRRO, JR.,

defendant herein, shall forfeit to the United States of America, any visual depiction described in Title 18, United States Code, Sections 2251 and 2252A, and any book, magazine, periodical, film, videotape, and other matter which contains any such visual depiction, which was produced,

SER 0096

1 transported, mailed, shipped and received in violation of Title 18, United States Code, Sections

2 2251(a) and 2252A(a)(5)(B):

3     defendant herein, shall forfeit to the United States of America, any property, real and

4 personal, constituting and traceable to gross profits and other proceeds obtained from violations of

5 Title 18, United States Code, Sections 2251(a) and 2252A(a)(5)(B):

6     defendant herein, shall forfeit to the United States of America, any property, real and

7 personal, used and intended to be used to commit and to promote the commission of Title 18,

8 United States Code, Sections 2251(a) and 2252A(a)(5)(B) and any property traceable to such

9 property:

10     (1) SanDisk Micro Secure Digital Card (16GB) Ultra Plus.

11 (all of which constitutes property).

12     All pursuant to Title 18, United States Code, Sections 2251(a), 2251(e), 2252A(a)(5)(B),

13 and 2252A(b)(2).

14     **DATED:** this 24th day of April, 2018.

15     **A TRUE BILL:**

16

17                                 /S/
                      FOREPERSON OF THE GRAND JURY

18

19 DAYLE ELIESON
   United States Attorney

20

21 *Elham Roohani*

   ELHAM ROOHANI

22 Assistant United States Attorney

23

24

                              5                          **SER 0097**

**BRIAN J. SMITH, ESQ.**
**State Bar Number 11279**
**9525 Hillwood Dr., Suite 190**
**Las Vegas, Nevada 89134**
**Tel. 702-380-8248**
**Fax. 702-868-5778**
**brian@bjsmithcriminaldefense.com**
**Attorney for DITIRRO**

## UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.:     2:16-cr-00216-KJD-VCF |
| vs. ) | |
| ) | |
| LONNY DITIRRO, ) | **SUPPLEMENT TO DEFENDANT'S** |
| ) | **OBJECTIONS TO MAGISTRATE'S** |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |
| ) | |
| _____ ) | |

Defendant LONNY DITIRRO through his attorney BRIAN J. SMITH, ESQ., respectfully submits this Supplement to Defendant's Objection to Magistrate Judge Cam Ferenbach's Report and Recommendation. (See ECF No. 43). This supplement is made and based upon the attached memorandum of points and authorities and exhibits, the documents already on file, and the arguments at any hearing granted.

DATED this 30th day of October 2017.


_____/s/ Brian J. Smith_____
BRIAN J. SMITH
**Law Office of Brian J. Smith, LTD.**
Attorney for DITIRRO

## **Memorandum of Points and Authorities**

### **I. Introduction**

In the report and recommendation of Magistrate Judge Cam Ferenbach (ECF No. 43), it was determined that there was not an unreasonable delay in the obtaining of the search warrant in this case. In other words, the report and recommendation suggests that it did not violate the 4th Amendment's protection against unreasonable searches and seizures to hold the SD card owned by Ditirro for a period of three months.

In making this determination the Magistrate made several assumptions about the facts of the case, concluding, "Ditirro's possessory interests and the actual interference with those interests were minimal." (*See* ECF No. 43, at 11, line 17-18). The Magistrate suggests that Ditirro never sought the return of the property, that he could nevertheless use alternative SD cards, and that it is significant that Ditirro lost the card. Id at 11.

### **II. Argument**

It is clear that after seizing an item, police must obtain a search warrant within a reasonable period of time. Segura v. U.S., 468 U.S. 796 (1984). "Officers who [delay in obtaining a warrant] will recognize that whatever evidence they discover as a … result of the [delay] may be suppressed." Id at 812. The entire process must take "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." Illinois v. McArthur, 531 U.S. 326, 332, 121 S. Ct. 946, 951, 148 L. Ed. 2d 838 (2001). The reasonableness of the length of a delay in obtaining a search warrant involves a weighing of "the nature and quality of the intrusion on the individual's 4th Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637, 2642, 77 L. Ed. 2d 110

SER 0099

(1983).

In the analysis of the individual interests of Ditirro in the SD card, the Court primarily notes that Ditirro lost the card. This is not an established fact. At the evidentiary hearing, it is revealed that Ismail may have been with Ditirro on the day she came into possession of the SD card. *See* Evidentiary Hearing, page 159. It is also revealed, both in the phone conversation with Detective Tooley and through the testimony of Torrez, that Ismail is worried about being cheated on and has investigated Ditirro's electronic media in attempt at discovering infidelity. *See e.g,* Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, 5:40-6:10; Evidentiary Hearing, page 159, line 5-7 (Torrez states that Ismail recovered the SD card while Ditirro was in the shower at her place).

It is not insignificant that the record contains several inconsistent statements from Ismail concerning when she last saw Ditirro and when and how she recovered the SD card. *C.f.* Evidentiary Hearing at 14, line 3-8; at 33, line 5-13, Evidentiary Hearing at 33, line 8-13, Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, 16:00-16:30; 17:00-18:16. It is clear that as soon as she came into possession of the card, he reports repeatedly asking for it back from her. Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, 18:25-19:01. This suggests he had strong suspicions that Ismail had his card and was keeping it from him. Further, it is likely that Ismail took the card from Ditirro's possessions in attempt to shed light on her preoccupation with Ditirro's possible affair.

The fact that Ditirro may have owned other SD cards should not factor towards the analysis of individual 4th Amendment interest. His interest involved a privacy and possessory interest in the contents of that particular card, something that cannot be considered to be coequal with another card containing separate data. Modern SD cards can hold an extremely large amount of personal

3

SER 0100

data. The subject card contained unique data that belonged to Ditirro and such data is central to his possessory interest to be considered in the above mentioned 4th Amendment analysis.

As recognized by the Magistrate, Ismail and Torrez refused to tell Ditirro where the SD card was. Thus, Ditirro would not have known nor could have known to request the card back from law enforcement. As a result, that Ditirro "never sought return of the property" is a moot point and not relevant to the above analysis. In fact, as explained by Ismail, Ditirro repeatedly asked for the card back from her, but she ignored his requests. Ditirro made his possessory interest clear. This possessory interest should not be considered "minimal" as no factor explained above significantly diminishes the interest. This individual possessory interest can only be outweighed then by an important, reasonable government interest that justifies the type of intrusion.

Turning to the side of government interest, the delay entailed a time period of three months. The Magistrate's report and recommendation suggests two months passed before Detective Tooley applied for a search warrant. *See* ECF No. 43, at 12, line 7-8. Further delay beyond the application itself is reportedly due to the "heavy caseload" of the department and the need to "prioritize cases." Nothing offered by the Government points to an exigency or need to preserve the evidence while a diligent effort to obtain a warrant was active. *See e.g.,* Illinois v. McArthur, 531 U.S. 326, 337, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)(delay in obtaining search warrant justified by exigency of possible evidence destruction, found to 'limited and tailored reasonably to secure law enforcement needs while protecting privacy interests.').

In United States v. Song Ja Cha, 597 F.3d 995, 1005 (9th Cir. 2010), the Ninth Circuit found that a seizure of a residence for at least 26.5 hours without a warrant was unreasonable. The Court points to "systemic" errors committed by police, resulting in an extended delay without justification. In Song Ja Cha, police had delayed completion of their reports, application for search warrant, and the execution of the search warrant itself without a reasonable, justifiable purpose.

4

SER 0101

The government argued to the Court that despite the delay, officers were "extraordinarily diligent and worked tirelessly around the clock." United States v. Song Ja Cha, 597 F.3d 995, 1000 (9th Cir. 2010). However, the Court found that nevertheless "they took a much longer time than was reasonably necessary to obtain the warrant." Id at 1001. Moreover, when a suspect is not in custody yet his property is the subject of a seizure, possessory interests are much stronger instead of "virtually nonexistent" for someone in custody. Id at 1002. The Court focuses on the fact that Mr. Cha, the suspect in the case, was rendered homeless for the duration of the seizure, could not contest the seizure, and was also not in custody at the time. Id. The Court did not find the officers acted in bad faith, bur rather that the delay was longer than necessary when juxtaposed to the individual possessory interests involved. Bad faith is thus not a necessary element of a finding of unreasonable delay in obtaining a search warrant. There were chances for moving things along faster, such as officers "having all day Sunday to obtain the warrant before the late-night-hour of 10 p.m.," but no reasonable explanation was given to justify the delay. Id at 1001.

In the present case, Ditirro was not in custody and was not on notice of any investigation. He had no ability to ask for the card back from law enforcement because that fact was hidden from him. Effectively, the government was able to hold his property for a three-month period without the normal protections afforded to such property interests. The Magistrate focuses on the fact that private actors handed over the property to police, most notably that Ditirro "lost" the card. As it is not clear that the card was ever lost and may have been taken from Ditirro's property, it is also not clear that his interests in the card were "minimal." The Supreme Court has recognized that the contents of cell phones, containing data in similar amounts and quality to an SD card, are a high privacy item in which individuals have a particularly powerful possessory interest. Riley v. California, 134 S. Ct. 2473, 2484-9, 189 L. Ed. 2d 430 (2014) (cell phone is like a minicomputer capable of storing an immense amount of personal and sensitive information), see also United

5

States v. Winn, 79 F.Supp.3d 904, 914 (S.D. Ill. 2015) (items like cell phones enjoy a high privacy

protections due to the amount of personal data on the storage of the phone, as in photos, emails,

letters, music, and other tools for managing and documenting a personal life).

It is not insignificant that "the purpose of the diligence requirement is to ensure that

property thought to contain contraband can be returned promptly to its owners to limit the

intrusion on their possessory interests, should contraband not be found." United States v. Johnson,

806 F.3d 1323, 1349 (11th 2015). Furthermore, "when law enforcement is aware of or should be

aware of who the owners of seized property are, they must act diligently so the purpose underlying

the rule will be effectuated." Id. In United States v. Winn, 79 F.Supp.3d 904, 915 (S.D. Ill. 2015),

the Court noted that a delay linked merely to departmental organization of officers or otherwise

failing to give officers adequate resources to process warrant applications cannot justify an

unreasonable delay in obtaining a search warrant. Speaking of a nine-day period of delay in

obtaining a search warrant, the Winn Court explains:

> Even if the Court accepted that Detective Lambert could not work on the case
>
> during his off days or while he was the training, that still means it took him- a
>
> detective with over ten-years' experience- three full days to conduct his portion of
>
> the investigation regarding a misdemeanor crime and prepare a two-page warrant
>
> application, only half of which contained original content. This timeline is a strain
>
> on the imagination.
>
> United States v. Winn, 79 F.Supp.3d 904, 915 (S.D. Ill. 2015).

Issues involving failure or delay of delegation of tasks related to obtaining search warrants, failure

to staff, or to adequately give officers sufficient resources to process warrant applications could

lead to a delay that become constitutionally unreasonable. United States v. Burgard, 675 F.3d

1029, 1035 (7th Cir. 2012). In particular, a delay involving non-complex and mostly boilerplate

6

SER 0103

type affidavit is less likely to be reasonable. *See e.g.,* Id at 1034.

In the instant case, the following facts have been relied upon in assessing the handling of the search warrant application: (1) Metro obtained the card September 10, 2015, (2) Nothing happened until late November, when Detective Tooley was assigned to the case, (3) Detective Tooley applied for a search warrant on December 2, 2015, (4) there was a "heavy caseload at any given time and as a result they were forced to prioritize cases. (*See* ECF No. 43, page 12, line 5-13).

Other than departmental staff and resource related issues, nothing exigent or imperative took place that would justify a lengthy delay of three months. Detective Tooley has ample experience, her career spans about thirteen years working on child pornography cases. *See* Evidentiary Hearing, page 59, line 3-5. The SD card in question here was only a 16 gigabyte card, a smaller size card which holds much less data than many other commonly-used cards. *See* Evidentiary Hearing at page 60. Detective Tooley recognized that this type of volume could be searched and examined quickly. *See* Evidentiary Hearing at page 61. Additionally, Detective Tooley admits that the majority of the affidavit involves boilerplate copy and paste, with only one section amounting to less than two pages of the seven page affidavit being individualized to Ditirro's case. *See* Evidentiary Hearing at page 67-69.

One factor of major contention encompasses the "private actors" that handed the SD card to the authorities. To be sure, it has been determined that the search committed by police after speaking with Torrez and Ismail was more expansive than the private actor search. (*See* ECF No. 43, at page 6-8). By hinging the reasonableness of the delay on the fact that the card was first brought to the attention of law enforcement by Torrez and Ismail, the Magistrate threatens to supersede Ditirro's constitutional possessory interest under the 4th amendment on the bare assumption that the limited role of private actors can circumvent a lengthy delay by government

SER 0104

1  actors. This does not overcome the fact that the government held onto an SD card containing

2  personal data, knowing the identity of the owner of the card, a card that carried a strong

3  expectation of privacy outside of the argument involving private actor interference.

4        The conduct of private actors should not be considered irrelevant in defining the scope of

5  the Fourth Amendment. *See* Dow Chemical Co. v. United States, 476 U.S. 227, 232 (1986)

6  (conduct that would have been tortious or criminal if done by a private actor is but one factor to be

7  considered in determining whether that conduct violates a reasonable expectation of privacy);

8  Kyllo v. United States, 533 U.S. 27 (2001) (thermal imaging was held to be a search due to such

9  technology being beyond what could have been viewed by a private actor from the public); Katz v.

10 United States, 389 U.S. 347 (1967)(key factor in 4th Amendment protection is the level of

11 exposure to the public or a public actor). "The more that an individual exposes to private actors,

12 the more difficult it becomes to keep that same information from governmental actors." *See Sam*

13 *Kamin,* The Private is Public: The Relevance of Private Actors in Defining the Fourth

14 Amendment, 46 B.C.L.Rev. 83, 117 (2004), http://lawdigitalcommons.bc.edu/bclr/vol46/issl/2. In

15 United States v. Johnson, *supra*, the Court held that the fact that property to be searched was

16 turned over to law enforcement by a private actor is merely one of the factors in the balancing test

17 of individual 4th Amendment interest versus the interest of the government alleged to justify the

18 intrusion. Johnson, 806 F.3d 1323, 1339 (11th 2015). Moreover, seeking to retrieve the property

19 immediately after it being taken suggests a strong protected privacy interest in the item.

20       "I wanted to see what he was hiding from me," said Ismail at the Evidentiary Hearing

21 about the SD card she viewed through her phone. *See* Evidentiary Hearing at page 14, line 19.

22 Ismail mentions that she knew Ditirro to be a private, secluded person, even blocking Ismail "out

23 of certain areas of his life". Id at page 17-18. Although the Magistrate assumed the card to be lost

24 by Ditirro, this point is also contradictory to Ismail's admission that Ditirro told her he was "really

8

SER 0105

wanting that [SD card] back" from her. *See* Evidentiary Hearing at page 43, line 25. As Ismail has always held out Ditirro to be a very private individual who would have wanted his data to remain private, it is clear that Ditirro not only expected his data to remain private but also that he was careful to shield his personal life from even someone he was dating. Even if, assuming for the sake of argument Ditirro's SD card was not purposely stolen or taken by Ismail, leaving an item with a trusted friend has been considered differently than leaving the items exposed to the public sphere. For example, locking a closed briefcase inside the locked trunk of a trusted friend does not indicate that a defendant intended to leave it open for 'public inspection and consumption,' nor does it indicate any diminution of an expectation of privacy in the item. Johnson, 806 F.3d 1323, 1345 (11th 2015), *citing* United States v. Infante-Ruiz, 13 F.3d 498 (1st Cir. 1994). Nevertheless, it is apparent that beyond how Ismail obtained the card, Ditirro's 4th Amendment interests in the property were not minimal and should only be able to overcome by a reasonable, diligent, and substantial government interest. No showing of the kind has taken place in this case. Instead, the report and recommendation of the Magistrate largely relies on the determination of Ditirro's constitutional interests as minimal or diminished. As such, when the Ditirro's interest is seen as usual or even heightened as argued above, the delay of the government clearly becomes unreasonable.

**III. Conclusion**

      The search and seizure process can be foiled when law enforcement instigates such a delay in obtaining a warrant that it unreasonably frustrates constitutional protections of property and privacy interests. In the present case, a three-month delay took place alleged to involve staffing, resource and departmental issues. None of these minor and ordinary circumstances work to overcome Ditirro's interest in the SD card to be free from unreasonable seizure and delay. In contrast to the finding of the report and recommendation (ECF No. 43), Ditirro's interest was not

9

SER 0106

diminished in anyway, as the data carried a high-expectation of privacy and was unique. Further, it is not clear how Ismail came into possession of the card. Ditirro now respectfully requests that the Court find the delay in obtaining the warrant unreasonable, and accordingly to suppress all fruits of constitutionally-defective warrant process.

DATED this 30th of October, 2017.


_____ */s/ Brian J. Smith* _____
BRIAN J. SMITH
**Law Office of Brian J. Smith, LTD.**
Attorney for DITIRRO

10

SER 0107

**Certificate of Service**

1

2          I hereby certify that, on October 30, 2017, I served the foregoing document upon the

3    parties or counsel listed below:

4    STEVEN W. MYHRE                              Lonny Ditirro, #53326048
     Acting United States Attorney               Nevada Southern Detention Center
5    District of Nevada                          2190 E. Mesquite
     ELHAM ROOHANI                               Pahrump, NV 89060
6    501 Las Vegas Blvd. South                    Via mail
7    Suite 1100
     Las Vegas, NV 89101
8    Via CM/ECF

9

10

11                                                      _____/s/ Brian J. Smith_____
                                                        BRIAN J. SMITH
12                                                      **Law Office of Brian J. Smith, LTD.**
                                                        Attorney for DITIRRO
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SER 0108

1

**BRIAN J. SMITH, ESQ.**
**State Bar Number 11279**
**9525 Hillwood Dr., Suite 190**
**Las Vegas, Nevada 89134**
**Tel. 702-380-8248**
**Fax. 702-868-5778**
**brian@bjsmithcriminaldefense.com**
**Attorney for DITIRRO**

2

3

4

5

6

7              UNITED STATES DISTRICT COURT

8           IN AND FOR THE DISTRICT OF NEVADA

9   UNITED STATES OF AMERICA,        )
                                     )
10               Plaintiff,          )
                                     )    Case No.:    2:16-cr-00216-KJD-VCF
11  vs.                              )
                                     )
12  LONNY DITIRRO,                   )    OBJECTIONS TO
                                     )    MAGISTRATE'S REPORT
13                                   )    AND RECOMMENDATION
                                     )
14               Defendant.          )
                                     )
15  _____ )

16          Defendant LONNY DITIRRO through his attorney BRIAN J. SMITH, ESQ., respectfully

17  submits this Objection to Magistrate Judge Cam Ferenbach's Report and Recommendation. (See

18  ECF No. 43). This objection is made and based upon the attached memorandum of points and

19  authorities and exhibits, the documents already on file, and the arguments at any hearing granted.

20          DATED this 21st day of September, 2017.

21

22                                          _____/s/ Brian J. Smith_____

23                                          BRIAN J. SMITH
                                            **Law Office of Brian J. Smith, LTD.**
24                                          Attorney for DITIRRO

25

26

27

28

                                                              **SER 0109**

**Memorandum of Points and Authorities**

I. **Introduction**

The Magistrate Judge, in issuing his report and recommendation, granted in part and denied in part DITTIRO's motion to suppress (ECF No. 32). However, the opinion of the Magistrate Judge nevertheless recommends that "any evidence initially obtained through private searches of the SD card be admitted." ECF No. 32 at 18. Further, "any evidence obtained from Dittiro's interrogation should be admitted." Id.

The first part of the opinion which deals with the existence of probable cause in Detective Tooley's request for a warrant is based largely on facts that, when examined from the totality of the circumstances found on record, are vague and inconsistent at best, and at worst carry a reckless disregard for the truth. Because the Magistrate Judge did grant that "the Metro Officers' testimony about what they viewed while searching the images contained in the SD card should not be admitted," the only remaining basis upon which to find probable cause would be the words of the private actors in the case, namely Stephen Torrez and Rachel Ismail. See ECF No. 32 at 9, line 11. Further, it is clear that the vague and inconsistent statements from these private actors, particularly those going to how the SD card was obtained, should bear upon the analysis concerning the unreasonable delay in obtaining and executing the search warrant in this case.

Finally, Dittiro made no voluntary waiver of his 5th and 6th amendment rights. His responses indicate a serious lack of comprehension towards the nature of his rights, and his mental caliber at the time was significantly reduced due to several factors including nicotine withdrawal, a shattered mental state, and coercive and overbearing law enforcement tactics. The statements Dittiro made to Special Agent Flahtery and Detective Miller were made under significant mental duress.

2

SER 0110

## II. Argument

a. **The vague, inconsistent, and reckless statements by Torrez and Ismail do not suffice to create probable cause.**

An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause for issuance of a search warrant. Illinois v. Gates, 462 U.S. 213, 239, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). In analyzing a warrant for probable cause based upon the words of a witness or informant, veracity and basis of knowledge are to be examined in the totality of the circumstances. A "mere conclusory statement" gives the magistrate "virtually no basis at all for making a judgment regarding probable cause." Id. The determination of probable-cause in the issuance of a search warrant cannot be a mere ratification of the bare conclusions of others. Id. Corroboration through other sources of information reduces the chances of a "reckless or prevaricating tale," providing a credible and substantial basis for the hearsay. Id, *quoting* Jones v. United States, 362 U.S. 257, 269, 80 S. Ct. 725, 736, 4 L.Ed2d 697 (1960). Even if a search warrant application is supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances. United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The appropriate remedy is suppression if the magistrate or judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Id at 924; *See also* Franks v. Delaware, 438 U.S. 154, 98 S.Ct 2674, 57 L.Ed.2d 667 (1978).

Detective Tooley, the affiant of the search warrant application at issue, relied primarily on both the testimony of the officers who viewed the contents of the SD card and the testimony of Rachel Ismail. Although there is mention in the application of the involvement of Stephen Torrez handling and viewing of the files contained on the SD card, Torrez' role is limited and is mostly portrayed as a middleman between Ismail and law enforcement viewing the files. As a result,

3

SER 0111

because the report and recommendation states that the officers inspecting the SD card may have exceeded the scope of the private search, most of the determination of the probable cause will turn on the testimony and credibility of Ismail.

The testimony of Torrez at the Evidentiary Hearing not only reveals his limited view of the situation, but also the fact that his understanding of the events is contrary to the events as recalled by the main witness, Rachel Ismail. First, Torrez mentions that Rachel came over crying and upset the day she brought the SD card, specifically concerned that Dittiro may have been having an affair. Evidentiary Hearing at 159, line 18-19. She claimed to have just been with Dittiro, and while he was in the shower she recovered the SD card in question. Evidentiary Hearing at 159, page 159, line 23-24. Torrez specifically states Rachel said nothing about "lying in bed and [finding] the card stuck to her leg." Evidentiary Hearing, page 159, line 5-7. Further, Torrez, who is familiar and friendly with Dittiro, could not recognize Dittro within the few pictures he viewed, despite Ismail first claiming to have seen pictures involving Dittiro engaging with underage girls. Evidentiary Hearing at 160, line 6-7. Torrez did not at any point describe the pictures that he did view, nor how many pictures he viewed, only that he perceived the pictures to be "explicit." Evidentiary Hearing at 160, line 3-8.

It is clear that the words of Torrez, when considered alone, do not suffice to create probable cause. Torrez fails to describe with any particularity the qualities or quantities of the pictures he viewed.  Additionally Torrez reveals that what Ismail told him was inconsistent with what she told police. Importantly, Torrez makes clear that Ismail first brought the card to his attention while highly agitated and upset with Dittiro. From this lens the veracity and consistency of the remaining aspects of probable cause should be viewed, the testimony of Rachel Ismail.

The testimony of Ismail is not only vague but also inconsistent. First, at the evidentiary hearing, Ismail directly contradicts what she told Torrez when she states that Dittiro was not

4

SER 0112

around her when she found the SD card. Evidentiary Hearing at 14, line 3-8; at 33, line 5-13. On direct examination she said at the time of finding the SD card, she had not seen Dittiro for at least twenty-four hours. Evidentiary Hearing at 33, line 8-13. Also at the evidentiary hearing, Ismail could only describe one photo that may have contained a sexual depiction of a child. See Evidentiary Hearing at 21-23. She states that she did not view any more "restricted" files beyond the one she describes. Evidentiary Hearing at 34, line 20; at 23, line 18-19. Ismail recounts that when she brought the SD card to the attention of Torrez, she was trying to figure out what the pictures were, and what they meant, and she was unsure about the necessity of police involvement. Evidentiary Hearing at 34, line 10-22.

It is significant that Ismail says when she spoke with police for the first time about the contents of the SD card, the officers had already viewed much of the contents of the card. Evidentiary Hearing at 35, line 25. That is, before Ismail was able to complete a written voluntary statement, officers told her they found data and pictures on the card that "showed more of a young age." Evidentiary Hearing at 36, line 23-24. Ismail tells officers that to her understanding, anything concerning a young age would be in the "restrictive files." Evidentiary Hearing at 37, line 1-5. She Officers explained to Ismail that they had seen disturbing images, specifically making comment about seeing what "looked like a 14-year-old." Evidentiary Hearing at 37, line 16-17. Officers Bianco and Wilson accordingly not only overstepped bounds as far as an unwarranted search, but then also seeded the mind of Ismail with their description of what they believed to have seen on the SD card.

Ismail does tell officers that she thought she recognized one of the girls in a picture located outside of the "restrictive" folder. She explains that although she and Dittiro had broken up, she learned that Dittiro was traveling to Texas to see his mother. See Search Warrant Application at Bates 16. Ismail believed Dittiro may have seen a girl she recognized from his Facebook account.

5

SER 0113

Id. However, Ismail was inferring this to be the case from the pictures she briefly viewed and had no specific understanding of when or why Dittiro traveled to Texas. See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 6:07-6:19. Ismail tells Detective Tooley that she began to intuit a connection between Dittiro and other females when Dittiro decided to end the relationship with Ismail. See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, 5:50-6:10. Importantly, at the time of the search warrant application, Detective Tooley had not identified the suspected minor in Texas. See Search Warrant Application at Bates 16. Ismail does not specifically describe in detail to police in person, nor to Detective Tooley on the phone, any of the pictures including who she believed to be S.M. (minor from Texas) contained explicit, sexual scenes. The only picture she describes in any detail is single picture viewed within the "restricted" folder. See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 11:00-12:00.

Importantly, her description of the single "restricted" picture she viewed was significantly lacking in specificity. She describes a picture that does not include faces, mostly displaying a distorted image of the bodies of what appeared to be a male and a female. Evidentiary Hearing at 21, line 15-17. At best, when pressured on the details of this picture, Ismail agreed the female body appeared to be "underdeveloped," but could not approximate an age. Evidentiary Hearing at 23, line 3-11. Ismail says she can only see the "groin area" of the female, could not tell who or how old the male was, nor could she tell how old the female was but assumed a young age due to the "disproportionate" size of the body depicted. See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 10:20-12:46.

Detective Tooley was first interested in the voluntary statement of Ismail, but felt it was too vague in reference to any specific age evaluation or sexual acts, and so she followed up by phone. Evidentiary Hearing at 50, line 21-24. In the recording of the call between Detective Tooley and Ismail played and entered at the Evidentiary Hearing, Tooley makes clear that in order to proceed

6

SER 0114

with the case Ismail would have to describe more specific instances of criminal material she may have viewed. See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 10:20-10. Tooley asks, "How many images did you see of an adult male engaged in sex with children," to which Ismail responds, "wow that one just like that one just I don't know-- that for sure is one." See Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 10:55-11:08. Ismail does mention seeing a couple images involving Dittiro himself, but could not say if the females involved in those pics were children or other adults:

> Rachel Ismail: Some of it looked like he downloaded pornography, and then a lot of looked like he actually was doing his own pornography.
>
> Detective Tooley: Ok, his own with children, or his own like with other adults?
>
> Rachel Ismail: I don't even know, honestly.
>
> Detective Tooley Rachel Ismail Recorded Interview, 11-30-15, at 10:10-10:20.

Detective Tooley proceeded with the application for the search warrant on the evidence and testimony emanating from the officers, Torrez, and Ismail. As the testimony of the officers has been excluded, and the testimony of Torrez isn't clear beyond bare assumptions and assertions, all that remains upon which to support a finding of probable cause is the testimony of Rachel Ismail.

The 9th Circuit has said that probable cause shown through the statement of a victim or witness must be based on a sufficient basis of knowledge. Peng v. Mei Chin Penghu, 335 F.3d 970, 978 (9th Cir. 2003), *citing* Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir.1991). This basis of knowledge can be established if the victim provides "facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator. Id. Inconsistencies in the witness testimony in Peng were not found to be dispositive of probable cause because they were not only incidental to the substantive facts, but also the

7

SER 0115

witness provided a sufficient and corroborated detailed statement to police. <u>Peng</u>, 335 F.3d at 979.

The Court found that nevertheless there were clear "material, historical facts not in dispute."

There are four circumstances in which the good faith exception to the exclusionary rule does not apply because reliance on the search warrant is per se unreasonable:

> (1) where an affiant misleads the issuing magistrate or judge by making a false
> statement or recklessly disregarding the truth in making a statement; (2) where the
> magistrate or judge wholly abandons her judicial role in approving the warrant,
> acting only as a "rubber stamp" to the warrant application rather than as a neutral
> and detached official; (3) where the warrant is facially deficient in detail as to the
> place to be searched or the things to be found that the officers could not reasonably
> presume it to be valid; or (4) where the affidavit upon which the warrant is based is
> so lacking in indicia of probable cause that no reasonable officer could rely upon it
> in good faith.

> <u>United States v. Crews</u>, 502 F.3d 1130 (9th Cir. 2007).

Here, Detective Tooley knew or should have known that the veracity, quality, and quantity of the information provided by Ismail was lacking in probable cause. This is best indicated by Detective Tooley's own comments at the Evidentiary Hearing, notably that she believed Ismail "wasn't specific so" the Detective wanted "to get specific, if she could describe the sexual act or describe how old she believed the child to be." Evidentiary Hearing at 50, line 22-24. However, when pressing Ismail on the specifics of what she saw, Detective Tooley was unable to get straight answers. Ismail could only describe in any detail one picture involving a male and female of unknown ages, suggesting that the picture was heavily distorted and taken from an angle that made it difficult to discern the characteristics of the people involved. Further, as described above, when asked specifically about if the pictures involving Dittiro himself included children or merely other

8

SER 0116

adults, Ismail responds with "I don't even know, honestly." Detective Tooley Rachel Ismail

Recorded Interview, 11-30-15, at 10:10-10:20.

Additionally, without the testimony of the officers, the application for the warrant becomes

so lacking in substantial indicia of probable cause, that no officer could reasonably rely upon it in

good faith. Torrez makes no clear statement, and instead relies on hearsay from Ismail. *See* Search

Warrant Application at Bates 16; *see also* Evidentiary Hearing at 78-79.  Ismail's testimony was

not only influenced by what Officers Bianco and Wilson told her they saw, but it was also wholly

lacking in any specific details from personal knowledge. Ismail also could not say with any

certainty that she knew of Dittiro's trip to Texas, what it involved, or who he visited. Therefore,

Detective Tooley knew or should have known that Ismail's testimony was insufficient, unreliable,

and inconsistent and could not be relied upon for probable cause. Further, Detective Tooley

included statements in her application for a search warrant that overstate and misstate what she

heard from Ismail, namely that she saw any explicit sexual pictures involving Dittiro and minors.

Ismail could only describe one picture with specificity, and the details concerning that picture are

minimal and unclear. She could not report with any certainty the ages or identities when pressed

by Detective Tooley for details.

The search warrant application failed to show probable cause, recklessly misled the

Magistrate, and therefore cannot be relied on in good faith.

**b. Statements made by Dittiro under custodial interrogation should be suppressed.**

The burden is on the government to demonstrate that the defendant knowingly and

intelligently waived his privilege against self-incrimination and his right to retained or appointed

counsel. Miranda v. Arizona, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628, 16 L. Ed. 2d 694 (1966).

Dittro denies that his unintelligible response to the dispensation of Miranda around 2:00 in the

9

interview with Detective Miller and Special Agent Flahtery is a knowing recognition or waiver of his rights.

When under subtle forms of psychological persuasion, the mental condition of a defendant is a significant factor in the voluntariness calculus. Colorado v. Connelly, 479 U.S. 157, 164, 107 S. Ct. 515, 520, 93 L. Ed. 2d 473 (1986). Dittiro makes statements to interviewers that he "can't think straight" and specifically mentions he is going through nicotine withdrawal. Recorded Interview with Dittiro, Detective Miller, and SA Flahtery, 06-17-16, at 3:24-28; 13:30-13:40 ("I can't even remember right now, I'm having such a bad nicotine fit."); 52:09 ("Oh damn this nicotine fit."); 52:22 ("I hate when it's hard to think like this"); 54:45 ("It's kind of hard to make decisions right now.");  59:29 ("I feel like I'm even walking sideways"); 1:01:18 (mentioning that his "brain" doesn't seem "lucid"). These statements suggest that Dittiro was experiencing unusual and significant mental disturbance.

It is indicative of his lack of understanding and comprehension of the situation that Dittiro questions his rights in the final fifteen minutes of the recorded conversation. Id at 49:00-1:03:51. He expressly questions his need for an attorney, while mentioning that his attorney told him not to give statements to police. Id. This revelation is telling of his lack of appreciation of the situation, specifically that his vulnerable state of mind was not grasping the circumstances normally. Notably, it is at this time that Special Agent Flahtery provides Dittiro with a clear statement concerning his rights. Id at 50:20-51:22. Dittiro then makes two requests for his attorney, only to have Detective Miller continue to try to pressure him to make additional statements. Id. 51:00-52:00. Dittiro continues to complain of mental impairment, then makes vulnerable and honest statements concerning his understanding of the process, despite just having heard additional and concise warnings concerning his 5th and 6th amendment rights. Id at 52:00-52:45. Detective Miller is forced to attempt to dispense warnings about Dittiro's rights again. Id.  In a span of

**SER 0118**

seven minutes, Dittiro is given warnings at least eleven times from either Detective Miller or Special Agent Flahtery. Id 49:40; 50:28; 51:12; 51:40; 52:49; 53:35; 54:30; and 55:00. After being repeatedly told it was his decision whether or not he wanted to speak to police, Dittiro tells his interviewers that "It's kinda hard to make decisions right now." Id at 54:55.

Under a totality of the circumstances, Dittiro's lack of sophistication, his overt physical discomfort and duress, and the interrogation tactics utilized in questioning him directly following his federal arrest by a SWAT ream, bring into serious doubt that Dittiro grasped the situation and understood his rights and his ability to waive them. Additionally, Dittiro's laughter within the conversation is not properly understood as his intent to engage in a "light-hearted" conversation, but instead is a sign of a retreated and distressed state of mind exhibited by unnatural and uneasy laughter. Even after a sustained fifteen minutes of going over his rights and ability to remain silent, and following another request to have his attorney contacted, Dittiro makes another concession of his mental state, asking "Umm, so are we going to keep talking about it.. or… ." Id at 1:02:20. It is clear Dittiro is unable to grasp the gravity of the situation, his ability to remain silent, and his ability to speak through his attorney.

Dittiro made no voluntary waiver of his 5th and 6th amendment rights. Further, any statements he made to Special Agent Flahtery and Detective Miller were made under significant mental duress and thus not made voluntarily. Accordingly, under the totality of the circumstances, Dittiro's statements made to investigators on June 17, 2016 should be suppressed.

**c**. **Investigators used a two-step interrogation technique.**

Incriminating statements made and then repeated after deliberate mid-stream Miranda warnings are inadmissible. Missouri v. Seibert, 542 U.S. 600, 621 (2004). If it can be determined that interrogators deliberately employed a two-step Miranda interrogation strategy, a Court must evaluate the effectiveness of the midstream Miranda warning. United States v. Williams, 435 F.3d

SER 0119

1148, 1160 (9th Cir. 2006). The court must determine, based on objective evidence, whether the
midstream warning adequately and effectively appraised the suspect that he had a "genuine choice
whether to follow up on his earlier admission." Id.

Here, Dittiro was awoken early in the morning of June 17, 2016 to at least fifteen members
of law enforcement, including highly armed SWAT members and agents of the Federal Bureau of
Investigation. Dittiro was "immediately placed into handcuffs, he and his two roommates." See
Evidentiary Hearing at 114, line 12-13. He was placed into a vehicle and within fifteen minutes
was prepared for interrogation at the FBI office. Id at 114, line 20. Dittiro was not told the
circumstances of the investigation until nearly an hour into his interrogation at the FBI office. Id at
115, 10-11; Recorded Interview with Dittro, Detective Miller, and SA Flahtery, 06-17-16, at
48:45.

The crux of the position of the government on this point surrounds the fact that the
unrecorded questions that Special Agent Flaherty and Detective Miller asked Dittiro prior to the
dispensing of Miranda warnings were not calculated to elicit an incriminating response from the
suspect. See ECF No. 32 at 11-12. Although Special Agent Flaherty suggests that the questions
were "biographical-type questioning," she does admit to asking him about his living situation and
with whom he stays. Evidentiary Hearing at 116, line 1-5. Although the government qualifies this
questioning as routine and not incriminating within the context of a child pornography case,
because we do not have a record of the questions asked of Dittiro we cannot know exactly how the
questions were asked. In a case where a suspect is accused of inappropriate contact with minors,
questions surrounding his living situation and where or with whom he stays, could reasonably be
expected to elicit an incriminating response.

As suggested above, the midstream warning here did not effectively apprise Dittiro that he
had a genuine choice whether or not to follow up with the questioning he underwent prior to the

**SER 0120**

Miranda warning. This is best displayed by Dittiro's total lack of understanding of the nature of the eleven repeated warnings within the last fifteen minutes of the conversation with investigators. It can be argued that the interrogation before and after Miranda warnings should be considered continuous, in that the questions on both sides were likely to elicit an incriminating response. The continuous subject then is not centered exclusively on the contents of the SD card, but rather concerns Dittiro's personal contacts, living situation, and social habits. Although we cannot speak to the details of the unrecorded conversation, the lack of clear curative measures until the latter part of the interrogation at the FBI offices suggests Dittiro was unfairly questioned under the pressures of custodial interrogation, and such pressure was made to be continuous throughout both interrogations. This pressure goes to the heart of the concern in Seibert, namely that coercive interrogative processes were utilized to bridge the conversations before and after Miranda warnings, effectively invaliding the power and impact of Miranda protections.

### d. Unreasonable Delay in Execution of the Search Warrant

The report and recommendation from the Magistrate Judge relies on a misreading of factual circumstances in order to conclude that the five-month delay between police obtaining the card and the execution of the warrant was reasonable. See ECF No. 43 at 13-14. First, it is not clear that Dittiro lost the SD card in question. As explained above, Torrez reveals Ismail gave inconsistent testimony concerning how she came about the SD card. In particular, Torrez reveals that Ismail was highly upset over a possible affair Dittiro may have been having, and suggests that she was with Dittiro when she obtained the card herself. Additionally, the Detective Tooley in the Application for the Search Warrant frames Torrez exclusively as a middleman between Ismail and

Although it was through the action of private actors that police obtained the SD card, the credibility and motive of Ismail can be brought into question. When taken together with the fact that Ismail's extended testimony does not clearly reveal the extent of what she may have viewed

13

SER 0121

on the SD card, along with the fact that we do not know how or when she came about the SD card, it must be considered that the weight currently being given to the fact that a "private actor" turned over the card to law enforcement is an overestimation and should be reassessed.

### III. CONCLUSION

Once excised of the unconstitutional testimony excluded by the report and recommendation, the search warrant involved in the case was significantly deficient of probable cause. The statements of the primary witness within the search warrant application were clearly inconsistent, vague, and tainted by the information gleaned from the officers who searched the contents of the SD card without warrant. Police then delayed obtaining a search warrant for three months, and further delayed execution of the warrant for an additional two months, amounting to an unreasonable seizure under the Fourth Amendment. Detective Miller and Agent Flahtery obtained statements from Dittiro in violation of his Fifth Amendment rights and <u>Miranda</u>. For each of these reasons, the SD card, Dittiro's statements, and the evidence derived from the statements should be suppressed.

DATED this 21st of September, 2017.


_____*/s/ Brian J. Smith*_____
BRIAN J. SMITH
**Law Office of Brian J. Smith, LTD.**
Attorney for DITIRRO

14

SER 0122

**Certificate of Service**

I hereby certify that, on September 21, 2017, I served the foregoing document upon the

parties or counsel listed below:

STEVEN W. MYHRE                          Lonny Dittiro, #53326048
Acting United States Attorney            Nevada Southern Detention Center
District of Nevada                       2190 E. Mesquite
ELHAM ROOHANI                            Pahrump, NV 89060
501 Las Vegas Blvd. South                 Via mail
Suite 1100
Las Vegas, NV 89101
Via CM/ECF



                                         _____/s/ Brian J. Smith_____
                                         BRIAN J. SMITH
                                         **Law Office of Brian J. Smith, LTD.**
                                         Attorney for DITIRRO

SER 0123

RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
RYAN NORWOOD
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Ryan_Norwood@fd.org

Attorney for Lonny Joseph Ditirro, Jr.

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-216-KJD-VCF |
| Plaintiff, | **MOTION TO SUPPRESS EVIDENCE** |
| v. | (Evidentiary Hearing Requested) |
| LONNY JOSEPH DITIRRO, JR., | |
| Defendant. | |

<u>Certification</u>: This Motion is timely filed.

The defendant Lonny Joseph Ditirro Jr., by and through his counsel of record, Ryan Norwood, Assistant Federal Public Defender, moves this Court for an order suppressing the SD card, statements, and derivative evidence in this case. A Memorandum of Points and Authorities is attached.

DATED this 24th day of October, 2016.

RENE L. VALLADARES
Federal Public Defender

By: _/s/ Ryan Norwood_

RYAN NORWOOD
Assistant Federal Public Defender
Attorney for Lonny Joseph Ditirro, Jr.

<u>**MEMORANDUM OF POINTS OF AUTHORITIES**</u>

**I.     SUMMARY OF ARGUMENT**

On September 10, 2015, Stephen Baltazar, an individual involved in law enforcement, contacted Las Vegas Metropolitan Police Department ("Metro") regarding an SD card[1] belonging to the defendant Lonny Joseph Ditirro. Mr. Baltazar indicated he got the card from Rachael Saito, an ex-girlfriend of Mr. Ditirro, who claimed the card belonged to Mr. Ditirro and that it had child pornography on it. Without a warrant, Metro officers used Mr. Baltazar's phone to examine the contents of the SD card. Believing the SD card contained child pornography, police seized the card that day.

Police delayed seeking a search warrant for nearly three months. On December 2, 2015, a Metro detective finally sought and obtained a warrant to search the SD card. To execute the warrant, the detective left a copy of the warrant in the case file. Police delayed actually examining the card for an additional two months. There is no explanation for the delays.

On June 17, 2016, a SWAT team of at least fifteen state and federal agents went to Mr. Ditirro's home with an arrest and search warrant in the instant case. Mr. Ditirro was arrested and questioned three times for unspecified amounts of time. The agents exploited Mr. Ditirro's lack of sophistication and physical duress to elicit involuntary statements. While at least three interrogations occurred, only one was recorded. The hour-long recording reveals the agents used a two-step interrogation technique with midstream *Miranda* warnings to elicit Mr. Ditirro's statements.

Police violated Mr. Ditirro's Fourth and Fifth Amendment rights in three ways. First, police unlawfully searched and seized the card without a warrant. Second, police caused an unreasonable three-month delay in obtaining a search warrant, which was an unconstitutional

---

[1] An SD (Secure Digital) card is "[a] family of very popular flash memory cards used for storage in portable devices." PC Mag, Definition of: SD Card, http://www.pcmag.com/encyclopedia/term/50962/sd-card (last visited Oct. 20, 2016).

2

seizure.  Third, police elicited Mr. Ditirro's involuntary statements in violation of his Fifth

Amendment rights and *Miranda*.  All evidence obtained as a result of these constitutional

violations should be suppressed.  An evidentiary hearing is requested.

## II. RELEVANT PROCEDURAL AND FACTUAL HISTORY[2]

### A. Initial investigation

On September 10, 2015, Metro Officers N. Bianco and G. Wilson responded to a "child

molestation call" at an address in Las Vegas, Nevada.  Exhibit A, Police Report of N. Bianco,

Bates 10.  The officers met with the reporting party, Stephen Baltazar, and his wife Tiffany

Gonyea.  *Id.*  According to Officer Bianco, the following occurred:

> Baltazar stated that his friend Saito, Rachael found her ex-boyfriend Ditirro, Joseph MicroSD card in her bed.  When Saito put the card into her phone, what appeared to be child pornography was stored on the card, and initially didn't want to speak to the police because she was scared that Ditirro would retaliate so she gave the card to Baltazar.

> Looking through the pictures using Baltazars cell phone, which he voluntar[il]y let us use, were multiple pornographic images. Multiple images in particular were naked females that appeared to be less than 16 years old performing sexual acts.  Saito arrived to the apartment, and she stated that one of the females that appeared to be below 16 goes by the name of 'S[.]', and according to Ditirro's facebook graduates in 2017.  Saito also mentioned that Ditirro once drove down to Texas to meet up with the female.  Other images on the MicroSD card that Saito mentioned were what she said appeared to be a 5 Y/O child performing sexual acts on that of a adult male.

> Looking through the MicroSD card, the only images viewed that were in question was the pictures of 'S[.]' and the other females that looked less tha[n] 16.  Saito stated that the pictures of the children less than 5 are in a specific folder on that card. . . . The

---

[2] The following factual summary is taken from discovery provided by the government to the defense to date and should not be interpreted as a concession or agreement to any facts. Mr. Ditirro reserves the right to dispute or supplement the facts as necessary.

3

MicroSD was impounded connecting to this event number which
has the pornographic images on it.

Ex. A at 10-11.  It is unclear whether Mr. Baltazar examined the contents of the card prior to
the police arrival.  It is also unclear what images officers actually viewed using Mr. Baltazar's
phone.  Finally, it is unclear if officers showed images to Ms. Saito upon her arrival.  The report
indicates: "Saito arrived to the apartment, and she stated that one of the females that appeared
to be below 16 goes by the name of 'S[.'], and according to Ditirro's facebook graduates in
2017." *Id.* at 10.  This statement leaves ambiguous whether Ms. Saito was describing something
she had previously seen on the card, whether she believed "S." was under 16, or whether she
made a statement in response to officers showing her images on the card.

On November 30, 2015, Metro Detective S. Tooley interviewed Ms. Saito.  Exhibit C,
Search Warrant & Affidavit of Tooley, Bates 58; Exhibit D, Recorded Interview of Saito.[3]  On
that day, Ms. Saito made a number of inconsistent statements about what she had seen on the
card on September 9, 2015.  For instance, Ms. Saito stated she saw downloaded pornography
and "his own pornography," though she did not know whether the images were of children or
adults.  Ex. D at 10:14-10:28.  At one point, Ms. Saito said she saw more than three images of
adults with children, but later claimed she saw one pictures of "juvenile stuff" and immediately
took the card out of her phone because she did not want the forensic data on her phone.  *Id.* at
10:54-11:16, 11:51-12:14.  Ms. Saito indicated that, not knowing what to do, she contacted a
friend who is involved in law enforcement.  *Id.* at 1:45-1:52.

On December 2, 2015, Detective Tooley applied for and obtained a warrant to search
the SanDisk Micro Secure Digital Card stored in Metro's Evidence Vault for evidence of
possession of child pornography.  Ex. C at 55, 57, 63.  The probable cause affidavit underlying

---

[3] A copy of all audio exhibits are manually filed with the clerk's office, and courtesy
copies are provided to chambers and to the government.

4

SER 0127

1   the warrant is almost identical to the narrative of Officer Bianco's police report.  *Compare* Ex.

2   C at 57-58 *with* Ex. A at 10-11.  Accordingly, the warrant affidavit contains the same

3   ambiguities about the pre-warrant police search of the SD card noted above.  *See supra* page 4.

4        On February 18, 2016, Metro Internet Crimes Against Children (ICAC) Examiner Matt

5   Trafford took the disk from the evidence vault and brought it to the ICAC Task Force office for

6   examination.  Exhibit E, ICAC Examiner's Report of Matt Trafford, at Bates 95.  On the disk,

7   Officer Trafford purportedly found 254 images and 42 videos he categorized as child abuse

8   material, 111 images and 22 videos categorized as child exploitation, and images of the suspect

9   Lonny Ditirro.  *Id.* at 96.  The images were divided into dozens of folders titled by name and

10   numbers, as well as folders titled "Me" and "Me Restricted" containing selfie-type images of

11   Mr. Ditirro.  *Id.* at 97.  Additionally, "the suspect's resume" was recovered on the card.  *Id.*

12       **B.**    **State court appearance**

13        On May 2, 2016, the state prosecutor filed a complaint charging Mr. Ditirro with

14   possessing child pornography under Nev. Rev. Stat. §§ 200.700, 200.730.  Exhibit F, Criminal

15   Complaint in *State of Nevada v. Lonny Ditirro*, Case No. 16406660X; Exhibit G, Register of

16   Actions for Case No. 16406660X.  The complaint was supported by the declaration of Metro

17   Detective Scott Miller.  Ex. F at pp. 5-8.  Mr. Ditirro made his initial appearance in state court,

18   alongside his counsel of record (retained attorney James C. Gallo), on May 27, 2016.  Ex. G.

19   The state court judge released Mr. Ditirro on bond with conditions including house arrest.  *Id.*

20       **C.**    **Federal complaint and warrant**

21        On June 10, 2016, the government filed a complaint and arrest warrant in the instant

22   case charging Mr. Ditirro with possessing child pornography under 18 U.S.C. § 2252A(a)(5).

23   ECF No. 1.  The probable cause affidavit underlying the complaint was written by the same

24   detective as in the state case (Detective Scott Miller) and contained the same factual allegations.

25   *Compare* ECF No. 1, pp. 2-4, *with* Ex. F, pp. 4-5.  The government obtained a sealed arrest

26   warrant for Mr. Ditirro.  ECF No. 8, *United States v. Ditirro*, 2:16-mj-431-NJK.

5

<sup></sup>

On June 16, 2016, the government sought and obtained a sealed search warrant for Mr. Ditirro's home under a separate case number, 2:16-mj-442-CWH. Exhibit H, Search and Seizure Warrant.[4] The search warrant affidavit written by the same Detective Scott Miller indicated, based on the same facts addressed above, "evidence of a crime involving the sexual exploitation of a child may be found on the computers or other digital devices" located at Mr. Ditirro's residence. *Id.* at Bates 114.

**D.      FBI Interrogation**

The next morning, at approximately 7:00 a.m. on June 17, 2016, an FBI SWAT team including at least fifteen state and federal law enforcement officers went to Mr. Ditirro's home. Exhibit I, Report of Detective Scott Miller, Bates 66-67; ECF No. 8, *United States v. Ditirro*, 2:16-mj-431-NJK. Mr. Ditirro was placed under arrest and taken to an FBI office for "processing." Ex. I at 67.

At the FBI office, Detective Miller and Agent Flaherty questioned Mr. Ditirro for an unspecified period of time. *Id.* At some point, Detective Miller turned on an audio recorder. Exhibit J, FBI Office Recording of Lonny Ditirro (June 17, 2016). Detective Miller stated:

> Like I told you, I'm going to read you your rights, and make sure you understand those, okay? You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to consult with an attorney before questioning. You have the right to the presence of an attorney during questioning. If you cannot afford an attorney, one will be appointed to you before questioning. Do you understand these rights, Lonny?

Ex. J at 1:40-2:04. Mr. Ditirro responded, "Yeah." *Id.* at 2:01. Detective Miller resumed the questioning, "We were talking just a second ago. Who did you say that you live with?" Ex. J at 2:04-2:10. Mr. Ditirro explained he shares a studio apartment with two roommates and that

---

[4] The search warrant was subsequently unsealed pursuant to an unopposed motion to unseal, ECF No. 21 (Aug. 23, 2016), though the case 2:16-mj-442-CWH remains sealed.

SER 0129

he sleeps on a mat. *Id.* at 2:15-3:18. Detective Miller also referenced an earlier round of questioning at the apartment. *Id.* at 6:02-6:17 ("Tell me this, cause I was asking you at the apartment, you have a suspended driver license to my knowledge, so how are you driving at work? Do they not know or did you get that fixed?").

Detective Miller proceeded to ask Mr. Ditirro questions about his employment, education, and interests. When asked what his interests were, Mr. Ditirro responded, "I like drawing, basketball . . . ." *Id.* at 7:28-7:39. Detective Miller asked Mr. Ditirro whether he had "computer experience" and whether he was good at math. *Id.* at 8:10-8:20. Mr. Ditirro responded, "Some. I have my days and I don't. Like, usually I can normally do math in my head, but like, not all the time." *Id.* at 8:20-8:36.

Detective Miller and Agent Flaherty also asked Mr. Ditirro for personal identifying information, including his phone number, how long he had used his phone number, the whereabouts of his previous phone, his email addresses and passwords (current and deleted), Facebook username and password, Twitter username, Instagram account information, KIK user account, Zoosk account, and MeetMe account. Ex. J at 10:54-22:10. Detective Miller asked Mr. Ditirro for the name and details of his Internet service provider and phone provider. *Id.* at 22:15-26:48 (discussing Cricket Wireless and CenturyLink). Detective Miller further asked Mr. Ditirro what he used his phone for and asked him about his online dating habits. *Id.* at 29:45.

Detective Miller asked Mr. Ditirro about the people he dated. Mr. Ditirro stated his ex-girlfriend Rachel Saito, who had schizophrenia and manic depressive disorder, would yell at him and tell him the government was after her. Ex. J at 29:59-32:30. Rachel had once tried to poison him by putting something in his food, would punch him, and attempted to stab him. *Id.* at 33:35-34:23, 35:37-35:50. She also did not let Mr. Ditirro go to work. *Id.* at 34:45. She accused him of having sex with his two male roommates. *Id.* at 38:59-39:22.

7

1    Detective Miller asked Mr. Ditirro how he saved pictures and resumes.  Ex. J at 41:45-

2   42:11 ("What about, on, like pictures, things like that, all that kinda stuff—how do you save

3   stuff to keep stuff—frickin' resumes, anything like that?").  Mr. Ditirro stated he used to save

4   resumes and pictures on an SD card.  *Id.* at 42:50.  Agent Flaherty asked how many SD cards

5   Mr. Ditirro had and what phone he had used the SD cards on.  *Id.* at 43:25, 43:58.  Mr. Ditirro

6   stated he thought he had given Rachel an SD card because she did not have one; the SD card

7   had pictures of himself on it.  *Id.* at 44:36-44:56.

8    Detective Miller also asked Mr. Ditirro whether he knew the difference between adult

9   and child pornography, and what an "adult" meant to him.  Ex. J at 47:14-47:33.  Mr. Ditirro

10   responded an adult was "the big people."  *Id.* at 47:33-47:35.

11    At various points in the recording, Mr. Ditirro indicated he felt lightheaded, had a

12   headache, and could not think properly.  Ex. J at 3:26 ("It's hard for me to think."); *id.* at 14:17-

13   14:29 ("It feels like my, my head is like when you work out too much and your muscle doesn't

14   want to work anymore.  That's kinda how my head feels right now." ); *id.* at 54:54 ("It's kind

15   of hard to make decisions right now.").  In response, Detective Miller and Agent Flaherty

16   commented Mr. Ditirro probably just wanted a cigarette.

17    Detective Miller asked Mr. Ditirro whether he had ever downloaded child pornography.

18   *Id.* at 49:00.  Mr. Ditirro asked, "Should I have my lawyer come?"  *Id.* at 49:30.  Detective

19   Miller said that was "up to you" and "we're just here to talk."  *Id.* at 49:42.  Mr. Ditirro stated

20   his lawyer, James Gallo, had told him not to make any statements.  *Id.* at 49:49-50:22.  Agent

21   Flaherty told Mr. Ditirro it was his option to talk or not.  *Id.* at 50:33-50:56.  Mr. Ditirro stated

22   his lawyer should probably be present.  *Id.* at 50:50-51:03 ("I think I probably should have him

23   come, or whatever.").

24    But the questioning did not stop.  Detective Miller stated he was "confused" because

25   Mr. Ditirro had "been cool talkin' with us and stuff."  Ex. J at 51:34-51:56.  Mr. Ditirro said it

26   was hard to think and he did not know if it was better to have his attorney speak with the police.

8

SER 0131

*Id.* at 52:30-52:50. Detective Miller and Agent Flaherty told Mr. Ditirro they wanted to talk to him about the federal child pornography case, which he was being charged with and for which they had an arrest warrant. Ex. J at 53:43-54:11. Mr. Ditirro said it was hard to make decisions right now. *Id.* at 54:54. Mr. Ditirro expressed his belief it would "sound bad" if he did not want to answer questions. *Id.* at 55:35. He asked for a restroom break, which Detective Miller permitted and accompanied him on. Agent Flaherty also left the room.

When Detective Miller and Mr. Ditirro returned to the interview room, Mr. Ditirro stated, again, it would be a good thing for his attorney to be present. *Id.* at 1:01:29. Detective Miller repeated that that was fine, but Mr. Ditirro could no longer ask them questions about his case and to remember they were serving a federal search warrant at his residence and he had an arrest warrant and would be appearing before a magistrate judge. *Id.* at 1:01:33-1:02:13. When Agent Flaherty returned, Detective Miller acknowledged Mr. Ditirro had invoked his right to have counsel present and turned off the recording. *Id.* at 1:02:10-1:03:53. However, Mr. Ditirro's counsel was apparently not contacted and Mr. Ditirro "spontaneously uttered" statements about a girl he went to visit in New York. Ex. I at 67.

A few hours later, Mr. Ditirro made his initial appearance in federal court. ECF No 4. Mr. Ditirro was appointed counsel and ordered detained pending trial that same day, on June 17, 2016. ECF Nos. 4, 6.

The government filed an indictment on July 19, 2016, charging Mr. Ditirro with one count of sexual exploitation of children under 18 U.S.C. § 2251(a) and one count of possessing child pornography under 18 U.S.C. § 2252A(a)(5). ECF No. 13.

## III. ARGUMENT

Police officers violated Mr. Ditirro's constitutional rights in three different ways. First, Metro officers searched and seized the SD card without a warrant. Second, officers unreasonably delayed pursuing a search warrant for the card for three months. Third, Detective Miller and Agent Flaherty obtained Mr. Ditirro's statements in violation of his Fifth

9

Amendment privilege against self-incrimination and *Miranda*.  Suppression is warranted for each of these violations.

### A. Police violated Mr. Ditirro's rights by searching his SD card without a warrant on September 10, 2015.

Metro officers conducted a presumptively unreasonable search by examining the SD card's contents without a warrant.  To the extent Mr. Baltazar viewed the SD card as a private citizen, his (and Ms. Saito's) search of the card before Metro's does not extinguish the illegality of the police search that followed.  A hearing is necessary to determine the exact sequence of events, but it appears Mr. Baltazar acted as a government agent and the police exceeded the scope of any private search in violation of the Fourth Amendment.  All evidence tainted by the unlawful search should be suppressed, including the SD card and the later-obtained search warrant, which was only obtained through tainted evidence.

### 1. Officers conducted a presumptively unreasonable search by examining the SD card's contents without a warrant.

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citation omitted).  "Such a warrant ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."  *Id.* (citation and internal quotation marks omitted).  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Id.* Here, officers conducted an unlawful search under *Walter v. United States*, 447 U.S. 649, 654 (1980), and *United States v. Young*, 573 F.3d 711 (9th Cir. 2009).

An officer's authority to possess a package is distinct from his authority to examine its contents.  *Walter*, 447 U.S. at 654.  In *Walter*, employees of a private carrier received a misdirected shipment and called the FBI after they opened the boxes and found containers

10

suggestive of sexually explicit films. *Id.* at 651-52. Without a warrant, FBI agents extracted the films from the containers and viewed them on a projector. *Id.* at 652. The Supreme Court held suppression was warranted, as the FBI was not entitled to search the films without a warrant. *Id.* at 658-60. "The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents." *Id.* at 654. "Nor d[id] the fact that the packages and one or more of the boxes had been opened by a private party before they were acquired by the FBI excuse the failure to obtain a search warrant." *Id.* at 656. Even though FBI agents had reason to believe the content of the films were illegal, "the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy." *Id.* at 654. "It was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances." *Id.*

Even in circumstances where government agents may lawfully seize a package to prevent loss or destruction of suspected contraband (exigencies not at play here), the Fourth Amendment requires that they obtain a warrant before examining the package's contents. *Young*, 573 F.3d at 721. In *Young,* a private security guard discovered a gun in Young's backpack, which Young had left in his hotel room. *Id.* at 14. Security contacted the police and took an officer to the room. *Id.* at 715. The guard then held open the backpack so that police could see the weapon. *Id.* The Ninth Circuit affirmed the suppression of the gun, reasoning a hotel "guest has a legitimate and significant privacy interest in the room's contents, and does not lose his expectation of privacy against unlawful government intrusions into his closed briefcase or the contents of his computer hard drive when hotel staff sees the briefcase, laptop, or other belongings while cleaning the room or changing a light bulb." *Id.* at 721. "Closed packages or containers, such as Young's backpack, are in the general class of effects in which the public at large has a legitimate expectation of privacy, making warrantless searches of them presumptively unreasonable." *Id.* (citation omitted). This presumption is particularly strong in the electronic context, as digital storage devices "implicate privacy concerns far beyond those

11

implicated by the search of a cigarette pack, a wallet, or a purse." *Riley*, 134 S. Ct. at 2488-89 (holding police may not conduct warrantless searches of digital information on a cell phone seized from an arrestee).

Here, Mr. Ditirro had a legitimate expectation of privacy in the content of his SD card. That right was not extinguished when he lost his card, just as the *Walter* sender retained an expectation of privacy when the shipment was misdirected. As in *Walter*, officers here suspected the SD card contained contraband. However, the fact they were in lawful possession of the card (to the extent Mr. Baltazar gave the card to them) did not give them authority to search it. *See Walter*, 447 U.S. at 654. Nor did Rachal Saito's prior search excuse the failure to obtain a search warrant. *See id.* at 656. As in *Walter*, "[i]t was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances." *Id.* at 654. Like packaged film reels and closed backpacks, the SD card supported a reasonable expectation of privacy. Officers used Mr. Baltazar's cell phone to examine the card's contents without any attempt to get a warrant. Ex. A at 10. This was unreasonable and violated Mr. Ditirro's rights.

The government may attempt to circumvent the Fourth Amendment by arguing the searches were first conducted by private citizens. However, that argument fails.

### 2. Mr. Baltazar acted as a government agent if he searched while police were present.

The government's discovery is unclear about the precise sequence of events leading to the search of the SD card on September 10, 2015. According to Officer Bianco, Mr. Baltazar and his wife called police to their home to report a crime. Ex. A at 10. "Looking through the pictures using Baltazars cell phone, which he voluntar[il]y let us use, were multiple pornographic images." *Id.* The government may try to use this ambiguity to argue the officers

12

simply duplicated Mr. Baltazar's private search, which would not implicate the Fourth Amendment. That argument fails under the facts of this case.[5]

Although searches conducted by private persons generally do not come within the scope of the Fourth Amendment, "the [F]ourth [A]mendment does apply if the private person, 'in light of all the circumstances of the case, must be regarded as an "instrument" or agent of the state.'" *United States v. McGreevy*, 652 F.2d 849, 851 (9th Cir. 1981) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 447 (1971)). To determine whether a private individual is acting as a government instrument, the relevant inquiry is: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *United States v. Reed*, 15 F.3d 928, 930-31 (9th Cir. 1994) (citations omitted). The defendant has the burden of showing government action. *Id.* at 931. The two-part "government instrument" standard applies to off-duty police officers as well as private citizens. *See McGreevy*, 652 F.2d at 851.

In *Reed*, the Ninth Circuit found a Fourth Amendment violation based on a hotel manager's search of a guest's room where (1) officers "knew of and acquiesced" in the search because they were personally present during the search, knew exactly what the manager was doing as he was doing it, and made no attempt to discourage him from examining the guest's personal belongings beyond what was required to protect hotel property; and (2) the manager intended to help police gather proof the guest was using his room to deal narcotics. Accordingly, information gathered in the search should have been suppressed. *Id.* at 933.

Here, if Mr. Baltazar searched the SD card once police arrived on September 10, 2015, he acted as a government instrument. Both prongs of the two-part test would be met. First,

---

[5] As explained, the discovery is unclear as to whether Mr. Baltazar searched the card prior to police arriving. The defense does not concede any prior search by Mr. Baltazar was private. Any prior search by Mr. Baltazar, especially in light of his status and connections to law enforcement, would be unlawful for the same reasons the police search was unlawful.

13

SER 0136

Metro officers knew of and acquiesced in any search Mr. Baltazar conducted after their arrival. Mr. Baltazar is himself "involved in law enforcement." Ex. D at 1:45-1:52.  According to Officer Bianco's report, officers "[l]ook[ed] through the pictures using Baltazars cell phone, which he voluntar[il]y let [officers] use." Ex. A at 10.  As in *Reed*, it appears officers were present during the search, knew exactly what Mr. Baltazar was doing with the card in his phone, and made no attempt to discourage him in the warrantless search.  Officers here went further than in *Reed*, taking part in the warrantless search by taking Mr. Baltazar's phone from him and using it to look through multiple images on the card.  Second, Mr. Baltazar intended to help police gather proof of a crime, as evidenced by his phone call to police reporting a crime.  *Id.* If Mr. Baltazar acted as a government instrument, the search was unlawful.

### 3. Even if the prior searches were truly private, officers may have exceeded the scope of any private search.

Both Ms. Saito and Mr. Baltazar searched the SD card.  Even if those searches did not violate the Fourth Amendment, "the Government may not exceed the scope of the private search." *United States v. Jacobsen*, 466 U.S. 109, 116 (1984).  "The additional invasions of [Ditirro's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115.  Particularly in the digital media context, police examining more files in an electronic folder than already searched by a private individual may violate the Fourth Amendment.  *United States v. Tosti*, 733 F.3d 816, 822 n.2 (9th Cir. 2013) (finding no violation where police viewed same exact images of computer tech's search, but leaving open "whether examining more files within the same electronic folder already searched by a private individual would constitute a search for Fourth Amendment purposes").

Here, officers may have exceeded the scope of any private search.  A hearing is necessary to determine the precise scope of each search, as the government's discovery does not provide a clear timeline.  The images were located within "dozens of folders" on the card. Ex. E at 97.  Ms. Saito gave a conflicting account of her search to Detective Tooley.  Ms. Saito

14

indicated that when she searched the card on September 9, 2015, she saw downloaded pornography and "his own pornography," though she did not know whether the images were of children or adults. Ex. D at 10:14-10:28. Ms. Saito also indicated she saw "more than three" images of adults with children, but later stated she immediately took the card out of her phone upon seeing "one picture" of "juvenile stuff" in a "Restricted" folder because she did not want the forensic data on her phone. *Id.* at 10:54-11:16, 11:51-12:14. The government's discovery does not indicate precisely what Mr. Baltazar saw on the card (if anything) before or after officers arrived on September 10, 2015. Officer Bianco claims the only images viewed by police that day were images of S.M. "and the other females that looked less tha[n] 16." Ex. A at 11. A hearing is necessary to determine the scope of each private and governmental search.

### 4. The police unlawfully seized the SD card pursuant to their illegal search.

To enforce the Fourth Amendment, evidence unconstitutionally seized may not constitute proof against the victim of the illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). This exclusionary rule "prohibits the introduction of tangible materials seized during an unlawful search [or seizure], and of testimony concerning knowledge acquired during an unlawful search [or seizure]." *Murray v. United States*, 487 U.S. 533, 536 (1988) (internal citations omitted). "Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence both tangible and testimonial that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful seizure [or seizure] . . . ." *Id.* at 536-37. By refusing to admit evidence obtained through unlawful police conduct, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." *Michigan v. Tucker*, 417 U.S. 322, 447 (1974). The SD card must be suppressed as fruit of the unlawful search.

15

**5.  Metro's search warrant does not establish probable cause and is itself tainted by the illegal searches.**

All evidence officers obtained during the illegal warrantless search was tainted and should not have been included in the affidavit for a search warrant.  *See United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citing *Wong Sun*, 371 U.S. 471).  "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant."  *Vasey*, 834 F.2d at 788 (citation omitted).  "A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant."  *Id.*  Here, absent information obtained through the unlawful searches, the probable cause affidavit is insufficient to establish probable cause.  Ex. C at 57-58.

**B.  The three-month delay in obtaining a search warrant was an unreasonable seizure that violated Mr. Ditirro's rights.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Even "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.'"  *Jacobsen,* 466 U.S. at 124.  An unreasonable delay between the seizure of a package and obtaining a search warrant violates an individual's Fourth Amendment rights, warranting suppression.  *United States v. Dass*, 849 F.2d 414, 414-16 (9th Cir. 1988).  Courts determine whether the delay was "reasonable" under the totality of the circumstances and on a case-by-case basis.  *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2408 (2016).

To determine whether the delay was unreasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Sullivan*, 797 F.3d at 633

16

(quoting *United States v. Place,* 462 U.S. 696, 703 (1983)). In balancing these interests, courts may consider whether the individual consented to a seizure and search, as well as the defendant's parolee status. *Sullivan*, 797 F.3d at 633. Suppression is the appropriate remedy for an unreasonable delay. *Dass*, 849 F.2d at 414 (affirming suppression where law enforcement unreasonably seized mailed packages for 7 to 23 days).

In *Dass*, the Ninth Circuit found the government's detention of mailed packages for 7 to 23 day was unreasonable. *Dass*, 840 F.2d at 415. "In holding that law enforcement acted unreasonably by detaining packages for 7 to 23 days before executing a search warrant, *Dass* implicitly determined that such a lengthy retention of mailed packages constituted a substantial intrusion into the possessory interests of the individuals who placed the packages in the mail." *Sullivan*, 979 F.3d at 613 (citing *Dass*, 840 F. at 415).

The Eleventh Circuit found a 21-day delay unreasonable in *United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009). In *Mitchell*, ICE agents went to Mitchell's home based on a suspicion he was engaged in distributing and receiving child pornography. *Id.* at 1349. Mitchell made incriminating statements and consented to a search of his computer. *Id.* Agents removed the hard drive from the computer and obtained a search warrant three weeks later. *Id.* at 1349-50. In balancing the private interests against the governmental interest, the Eleventh Circuit noted the possessory interest at stake was "substantial," explaining:

> Computers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives. Thus, the detention of the hard drive for over three weeks before a warrant was sought constitutes a significant interference with Mitchell's possessory interest. Nor was that interference eliminated by admissions Mitchell made that provided probable cause for the seizure.

*Id.* at 1351. The Fourth Amendment's requirements for prompt search warrants apply "with even greater force to the hard drive of a computer, which is the digital equivalent of its owner's

17

home, capable of holding a universe of private information." *Id.* at 1352 (citation omitted). Balanced against the substantial possessory interest, the government's only justification for the delay was that the agent in the case went on a two-week training trip after seizing the hard drive. *Id.* at 1351. The Eleventh Circuit held the delay was unjustified and unreasonable under the circumstances. *Id.* at 1352.

Here, the delay was even longer than the *combined* delays in *Dass* and *Mitchell*. Metro waited three months—seizing the SD card on September 10, 2015, and applying for a search warrant on December 2, 2015. Ex. A at 11; Ex. C at 55. Mr. Ditirro never consented to a seizure or search of his card. Nor was he on parole or any other status that would reduce his privacy or possessory interest in his property. Mr. Ditirro maintained a significant possessory interest in his SD card, which, like the hard drive in *Mitchell*, was capable of storing "personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature." 565 F.3d at 1351. Indeed, the SD card had personal (non-contraband) pictures, resumes, and documents stored on it. Ex. J at 42:50. Mr. Ditirro's interests were not eliminated by any probable cause officers had that the SD card contained illegal content. *See Mitchell*, 565 F.3d 1351. There is no discernable excuse in the discovery for Metro's lengthy delay. Accordingly, even if the initial seizure was justified, the 3-month delay was unreasonable and the SD card should be suppressed.

In addition to the 3-month delay in seeking a search warrant, another 2-month delay followed before Metro examined the card, heightening the unreasonableness of the delay. Nevada law requires "[t]he officer taking property under the warrant [to] give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or [to] leave the copy and receipt at the place from which the property was taken." Nev. Rev. Stat. § 179.075. Metro's Search Warrant Return form also indicates the return must be made within ten days of the issuance of the warrant, and a copy of the search warrant must be left with a "person or 'at the place of search.'" Ex. C at 65. These requirements

18

1    comport with principles of notice, due process, and criminal procedure.  However, none of those

2    goals was met here.  According to the ICAC report, Detective Tooley "served" a search warrant

3    for the device that had been impounded in Metro's Evidence Vault on December 2, 2015.  Ex.

4    E at 95.  Detective Tooley then left a copy of the search warrant return with the "case file."  Ex.

5    C at 65.  Stashing a copy of the search warrant return in her own case file did not comport with

6    Nev. Rev. Stat. § 179.075, Metro's policy, or principles of notice, due process, or criminal

7    procedure.  For no apparent reason, two more months passed before the warrant was actually

8    effectuated through an ICAC examination.  This conduct unreasonably added to the 3-month

9    delay in obtaining a search warrant in the first instance.  Suppression is warranted.

### C.   Detective Miller and Agent Flaherty obtained statements from Mr. Ditirro in violation of his Fifth Amendment rights and *Miranda*.

12       The statements made by Mr. Ditirro on June 17, 2016, were not voluntary.  Mr. Ditirro's

13   will was overborne by the psychological pressure and physical duress placed on him by law

14   enforcement officers, who arrested him and questioned him at the FBI office just before his

15   arraignment.  The totality of the circumstances, including Mr. Ditirro's lack of sophistication

16   and the officers' interrogation tactics, render his statements a product of police coercion.

17   Furthermore, Detective Miller and Agent Flaherty used a two-step interrogation technique with

18   midstream *Miranda* warnings to obtain the statements.   Accordingly, the statements and

19   evidence derived from those involuntary statements should be suppressed.

### 1.   Mr. Ditirro made involuntary statements due to coercive police activity under the totality of the circumstances.

22       Involuntary or coerced statements are inadmissible at trial because their admission is a

23   violation of a defendant's right to due process under the Fifth Amendment.  *Brown v. Horell,*

24   644 F.3d 969, 979 (9th Cir. 2011) (citations omitted).  A confession is involuntary if it is not

25   "the product of a rational intellect and a free will."  *Id.*  A necessary predicate to finding a

26   confession involuntary is that it was produced through coercive police activity. *Colorado v.*

19

*Connelly,* 479 U.S. 157, 167 (1986). Coercive police activity can be the result of either "physical intimidation or psychological pressure." *Brown*, 644 F.3d at 989 (citation omitted).

Whether a confession is involuntary must be analyzed within the totality of the circumstances—"both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226-27 (1973). Courts should therefore "determine[ ] the factual circumstances surrounding the confession, assess[ ] the psychological impact on the accused, and evaluate[ ] the legal significance of how the accused reacted." *Id.* at 226. In *Schneckloth*, for example, the Supreme Court considered "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (internal citations omitted). The government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

Here, under the totality of the circumstances, Mr. Ditirro's statements were involuntary. Early in the morning on June 17, 2016, an FBI SWAT team including *at least fifteen* state and federal law enforcement officers arrested Mr. Ditirro in his home. Ex. I at 66-67. Detective Miller questioned Mr. Ditirro for an unspecified period of time at his home, likely with a full SWAT team dressed in uniform and with weapons swarming the studio apartment. At some point, officer(s) or agent(s) took Mr. Ditirro to the FBI office, where Detective Miller questioned Mr. Ditirro without recording and then with a recording for at least an hour.

Mr. Ditirro gave responses that indicate a particular vulnerability and lack of sophistication. Lack of sophistication and having no experience with police are characteristics that can render an individual particularly susceptible to interrogation techniques. *Campos v. Stone*, --- F. Supp. 3d --- , 2016 WL 4426964, at *9 (N.D. Cal. Aug. 22, 2016) (finding statements were not voluntary). For instance, when Detective Miller asked Mr. Ditirro what his interests were, Mr. Ditirro responded, "I like drawing, basketball." Ex. J at 7:28-7:39. When

20

Detective Miller asked Mr. Ditirro whether he was good at math, Mr. Ditirro responded, "Some. I have my days and I don't. Like, usually I can normally do math in my head, but like, not all the time." *Id.* at 8:10-8:36. And when Detective Miller also asked Mr. Ditirro whether he knew the difference between adult and child pornography, and what an "adult" meant to him, Mr. Ditirro responded an adult was "the big people." *Id.* at 47:14-47:35.

Throughout the hour-long recorded interrogation, Mr. Ditirro expressed feeling light-headed and that he could not think. Ex. J at 3:26 ("It's hard for me to think."); *id.* at 14:17-14:29 ("It feels like my, my head is like when you work out too much and your muscle doesn't want to work anymore. That's kinda how my head feels right now." ); *id.* at 54:54 ("It's kind of hard to make decisions right now."). Whether the headaches resulted from wanting a cigarette, as the agents joked, or something more serious, the added mental impairment and physical discomfort is a factor for the Court to consider.

Detective Miller's conduct is particularly troubling given that he knew Mr. Ditirro was represented by counsel in the state case. Detective Miller is the probable cause affiant in both state and federal complaints. *Compare* ECF No. 1, pp. 2-4, *with* Ex. F, pp. 4-5. The state case docket clearly indicates Mr. Ditirro was represented by counsel on the date of the federal interrogation. Ex. G. Detective Miller and Agent Flaherty well knew that Mr. Ditirro would make his initial appearance (either with same counsel or appointed counsel) immediately following the interrogation. Instead of scrupulously honoring Mr. Ditirro's constitutional right to counsel, the agents capitalized on Mr. Ditirro's vulnerabilities. Mr. Ditirro's statements were involuntary under the totality of the circumstances and should be excluded.

### 2. Detective Miller and Agent Flaherty used a two-step interrogation technique.

The Fifth Amendment guarantees no person "shall be compelled in any criminal case to be a witness against himself." Based on that guarantee, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of

21

procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 346, 444 (1966). One of the Supreme Court's primary concerns in *Miranda* was the temptation for law enforcement officers, operating with little or no supervision over their investigative actions, to overbear the will of a defendant in an isolated custodial interrogation setting. *Id.* at 461, 466.

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001). In determining whether a suspect was in custody for the purposes of determining whether *Miranda* warnings were required, the court determines whether there was a formal arrest or restraint on freedom of movement to the degree associated with formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994). In addition to being in custody, the individual must also be subject to interrogation to trigger the *Miranda* requirement. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

Interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 291 at 301. An "incriminating response" is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* at 302. Whether the questioning constitutes an interrogation is an objective test that focuses on the perception of the defendant; the officer's subjective intent in asking the questions is relevant, but not determinative. *See, e.g.*, *United States v. LaPierre*, 998 F.2d 1460, n.6 (9th Cir. 1993); *Innis*, 446 U.S. at 301-02. There can be doubt Mr. Ditirro was subject to a custodial interrogation. He was formally under arrest and questioned at his home and at the FBI office about his phone and Internet use, dating history, and the evidence police had against him.

22

Discovery reveals Detective Miller obtained statements from Ditirro in at least two rounds of questioning *prior* to the recorded interrogation—at Ditirro's home and at the FBI office. Ex. J at 2:04, 6:02 ("We were talking just a second ago . . . Tell me this, 'cause I was asking you at the apartment . . ."). Discovery provides no indication that those prior statements were *Mirandized*. Miller apparently obtained statements in a deliberate two-step interrogation with a midstream *Miranda* warning. *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)). *Seibert* explained police may not obtain a confession by the use of a two-step interrogation strategy by deliberately withholding *Miranda* warnings until a suspect confesses, then following a *Miranda* warning and a repetition of the confession already given. 542 U.S. at 604, 609-11 (Souter, J., plurality opinion).

### 3. This Court should suppress the involuntary statements and evidence derived from those statements.

Mr. Ditirro's statements should be suppressed because (1) they were involuntarily made and (2) they were elicited through a two-step interrogation technique. Although Mr. Ditirro did not "confess" in the classic sense, he made statements that are inculpatory when combined with other evidence. For instance, in response to Detective Miller's pointed questions about Mr. Ditirro's use of SD cards and how he saved "stuff" such as his resumes, Mr. Ditirro indicated he saved his resume on an SD card and that he gave an SD card to Rachel Saito. Ex. J at 41:45-44:36. This was not a random question. The ICAC examiner noted he recovered "the suspect's resume" on the SD card seized by Metro. Ex. E at 97. The government should not be permitted to use these involuntary statements to bolster other witness testimony and its case-in-chief.

Mr. Ditirro's statements on June 17, 2016, also led to physical fruits including subpoena returns. Detective Miller and Agent Flaherty specifically asked Mr. Ditirro for his username and passwords for MeetMe, Facebook, Twitter, Instagram, KIK, Zoosk, and his email addresses, as well as the name and details of his Internet service provider and phone provider.

23

1  Ex. J at 10:54-22:26:48.  Agents used Mr. Ditirro's responses to subpoena a number of those

2  companies, including MeetMe, Inc.[6]  Exhibit K, FBI Subpoena to MeetMe, Inc.

3          Should the Court find the statements were involuntary, the subpoena returns and any

4  other derivative evidence should be suppressed as fruit of the poisonous tree.  The Fifth

5  Amendment "requires the exclusion of the physical fruit of actually coerced statements."

6  *United States v. Patane*, 542 U.S. 630, 644 (2004); *but see id.* (explaining a *Miranda* violation,

7  absent coercion, does not require derivative evidence to be suppressed).  Accordingly, if the

8  Court finds Mr. Ditirro's statements were involuntary under the totality of the circumstances,

9  all derivative evidence must also be suppressed.

10  **IV.    CONCLUSION**

11          Police unlawfully searched Mr. Ditirro's SD card without a warrant and seized the card

12  pursuant to the search.  Police then delayed obtaining a search warrant for three months, which

13  constitutes an unreasonable seizure under the Fourth Amendemnt.  Detective Miller and Agent

14  Flaherty then obtained statements from Mr. Ditirro in violation of his Fifth Amendment rights

15  and *Miranda*, and proceeded to obtain physical evidence derived from the involuntary

16  statements.  For each of these reasons, the SD card, Mr. Ditirro's statements, and evidence

17  derived from the statements should be suppressed.

18          DATED this 24th day of October, 2016.

19                                          RENE L. VALLADARES
                                            Federal Public Defender
20

21                                   By:   */s/ Ryan Norwood*

22                                          RYAN NORWOOD
                                            Assistant Federal Public Defender
23                                          Attorney for Lonny Joseph Ditirro, Jr.

24

25          [6] The government has indicated it is in possession 400 pages of subpoena returns, but
    the discovery has not yet been produced to the defense.  The defense has made a number of
26  other discovery requests that are still pending.

SER 0147

**CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on October 24, 2016, she served an electronic copy of the above and foregoing **MOTION TO SUPPRESS** by electronic service (ECF) to the person named below:

DANIEL BOGDEN
United States Attorney
ELHAM ROOHANI
Assistant United States Attorney
501 S. Las Vegas Blvd Ste 1100
Las Vegas, NV 89101

*/s/ Nancy Vasquez, Legal Assistant*
_____
Employee of the Federal Public Defender

SER 0148

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 151 of 229

# EXHIBIT A

# Redacted by the FPD for personal identifiers

# EXHIBIT A

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 152 of 229

Las Vegas Metropolitan Police
Department
400 S. Martin Luther King Blvd.
Las Vegas, NV 89106



Case Report No.: **LLV150910002991**

**Arrest / Detective Report**

## Administrative

| | |
|---|---|
| Location | Las Vegas, NV 89121 | Sector /Beat | H1 |
| Occurred On (Date / Time) | Wednesday 9/9/2015 12:00:00 AM | Or Between (Date / Time) | |
| Reporting Officer | 15086 - Blanco, Nicholas | Reported On | 9/10/2015 |
| Entered By | 15086 - Blanco, Nicholas | Entered On | 9/10/2015 7:30:09 PM |
| Supervisor | 07044 - Cook, Ryan M | Follow Up | Pro Squad | SE 32 | Follow Up |
| Jurisdiction | Las Vegas, City of | Report Type | | Disposition | Active |
| Route To: | | Related Cases | |
| Connecting Reports | Property Rpt Voluntary Statement | | |

Assisting Officers:
09177 - Wilson, Garret G        Officer
07792 - Lange, Christopher J    Detective

## Offenses

| | |
|---|---|
| Att Poss Porn Of Pers  Under16, (1st)(F)-NRS 200.730.1 | |
| Completed   Yes          Hate/Bias | Domestic Violence   No |
| Entry                    Premises Entered | Tools |
| Weapons | Type Security |
| Criminal Activities | Location Type   Residence/Home |

## Victims

Name: <u>UKNOWN</u>

| | |
|---|---|
| Victim Type | **Individual** | Written Statement | Can ID Suspect |
| Victim of | **60390 - Att Poss Porn Of Pers  Under16, (1st)(F)-NRS 200.730.1** | | Domestic Battery   No |
| SSN | DOB | Age   05 | Sex   Unknown | Race   Unknown | Ethnicity   Unknown |
| Height | Weight | Hair Color | Eye Color | | |
| Employer/School | | | Work Schedule | |
| Occupation/Grade | | | | |
| DLN | DL State | DL Country | | |
| Resident   Unknown | | Tourist Departure Date | |
| Injury | | Injury Weapons | |

Addresses

Phones

Email

Offender Relationships
S - Ditirro, Lonny Joseph Jr.        Relationship Unknown

Domestic Violence Information
Relationship to Suspect                 Primary Aggressor  Determined
Intimate Relationship                   Drug/Alcohol Involvement
Voluntary Statement                     DV Information Provided
Injury Severity                         Medical Attention
Photos Taken

Notes:

## Suspects

Name: <u>Ditirro, Lonny Joseph Jr.</u>

| | |
|---|---|
| Written Stmt.   No | Alerts | Non-English   No | Language |
| Aliases | | | |
| Moniker | | | |
| Scope ID | DOB | Age   33 | SSN | |
| Race   White | Ethnicity   Not Hispanic or Latino | Build | | Handedness |

**SER 0150**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 153 of 229



Sex  Male    Height  6' 4"    Weight  250    Hair Color  Brown    Eye Color  Brown
Employer/School                                    Occupation/Grade
Hair Length                      Hair Style                      Eyes
Complexion                       Facial hair                     Teeth
Appearance
Speech                                            Injury/Condition
DLN  ████████                    Speech Characteristics
Resident  Resident    DL State  Nevada                  DL Country  USA
Habitual Offender Status    Tourist Departure                    Place of Birth
Primary Means of Attack/Weapon                      MO Factors
Employer/School                             Weapon Features
                                            Occupation/Grade

Scars, Marks and Tattoos
Addresses
Residence  ████████████████████████████████████████

Phones

Domestic Violence Information
TPO In Effect                    Drug/Alcohol Involvement          Voluntary Statement
Injury Severity                  Medical Attention                DV Info provided
Photos Taken                     Suspect Demeanor

Notes:

## Arrestees

## Witnesses

Witness Name: Saito, Rachael

Written Statement  Yes          Can ID Suspect  Yes              Testify

SSN  ██████     DOB  ██████     Age  40    Race  White    Ethnicity  Not Hispanic or Latino

Sex  Female    Height  5' 10"    Weight  180    Hair Color  Brown    Eye Color  Blue

Addresses
Residence  ███████████████████████████████

Phones
Cellular  ██████████

Notes:

## Other Entities

Name: Contact  Gonyea, Tiffany

Written Statement  No           Can ID Suspect  Yes

SSN  ██████     DOB  ██████     Age  30    Race  White              Ethnicity  Not Hispanic or Latino
Sex  Female    Height  5' 5"    Weight  190    Hair Color  Brown    Eye Color  Hazel
Employer/School                 Occupation/Grade
Tourist  Unknown                Departure Date
DLN                DL State                     DL Country

Addresses
Residence  ████████████████████████████████████
Phones
Home/Residence  ██████████
Missing Person / Runaway

Physical Appearance              Physical Build                   Headwear Color
Skin Complexion                  Eye Description                  Teeth Description
Hair Length                      Hair Style                      Facial Hair
Speech Characteristics           Speech Manner                   Dominate Hand
Injury or Condition                            Distinctive Jewelry
Medical Info                                                     Blood Type
Headwear Color                                 Probable Destination
Disappearance Type               Missing Before      How long at present address
Responsible Adult                Relationship to MP               POB
Last seen by          Last seen where                 Last seen Date/Time
Last seen wearing                                     Fingerprints Available

11/3/2015 6:46 AM                LLV150910002991                 Page 6 of 6
                                                                 SER 0151
                                                                 00008

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 154 of 229

| | | |
|---|---|---|
| Footprints Available | X-rays Available | Dental Available |
| Photo Attached | Corrected Vision | Circumcised |

Scars, Marks, Tattoos:

**Dead Body Report Information**

| | |
|---|---|
| Coroner/Physician | Coroner/Physician Name |
| Coroner Case # | Coroner Seal # |
| Case of Death | Date/Time Pronounced |
| Public Administrator | Hospital/Mortuary |
| Facility Name | Attendant Name |
| Photos Taken | |

Synopsis

Investigation

Scene

Body

Evidence at Scene

Notes:

**Name: Contact  Baltazar, Stephen**

Written Statement   No                    Can ID Suspect   Yes

| | | | | |
|---|---|---|---|---|
| SSN | DOB | Age  41 | Race  White | Ethnicity  Not Hispanic or Latino |
| Sex  Male  Height  5' 8"  Weight | | Hair Color  Black | | Eye Color |
| Employer/School | Occupation/Grade | | | |
| Tourist | Departure Date | | | |
| DLN | DL State | | DL Country | |

Addresses
Residence
Phones
Home/Residence

Missing Person / Runaway

| | | |
|---|---|---|
| Physical Appearance | Physical Build | Headwear Color |
| Skin Complexion | Eye Description | Teeth Description |
| Hair Length | Hair Style | Facial Hair |
| Speech Characteristics | Speech Manner | Dominate Hand |
| Injury or Condition | Distinctive Jewelry | |
| Medical Info | | Blood Type |
| Headwear Color | Probable Destination | |
| Disappearance Type | Missing Before | How long at present address |
| Responsible Adult | Relationship to MP | POB |
| Last seen by | Last seen where | Last seen Date/Time |
| Last seen wearing | | Fingerprints Available |
| Footprints Available | X-rays Available | Dental Available |
| Photo Attached | Corrected Vision | Circumcised |

Scars, Marks, Tattoos:

**Dead Body Report Information**

| | |
|---|---|
| Coroner/Physician | Coroner/Physician Name |
| Coroner Case # | Coroner Seal # |
| Case of Death | Date/Time Pronounced |
| Public Administrator | Hospital/Mortuary |
| Facility Name | Attendant Name |
| Photos Taken | |

Synopsis

Investigation

Scene

Body

Evidence at Scene

00009

SER 0152

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 155 of 229

Notes:

## Properties

Type:   Electronics (TV, Music, CD/DVD Players, etc...)

| | | | Quantity | 1 | | Value | | Color | Black |

Status          Impounded
Description      16 gb scandisk MicroSD card
Manufacturer     scandisk                           Model                          Serial No.\VIN
Vehicle Year                          Body Type
Lic Plate #                           Lic Plate State                                Lic Plate Exp
Insurance Company
Owner          S - Ditirro, Lonny Joseph Jr.
Notes:

### Detailed Property Information

Length                                Width                          Height
Horse Power                           Propulsion Serial #
Caliber                               Barrel Length
Features

### Recovered Property Information

Recovered Date                        Recovered Value
Recovered Location                    Recovered Reason
Recovered By                          Recovered Stock #
Owner Type                            Released To
Insurance Rep.                        Tow Company

## Solvability

## Modus Operandi

MO General
Occupied?          Yes                            Surrounding Area    Middle of Block
General Premise    Apartment                      Specific Premise    Room
MO Against Property
Entry Point                           Exit Point                     Entry Location
Entry/Attempt Method                  Entry Tool                     Vehicle Entry
Safe Entry                            Suspect Actions                Additional Factors
Victim Location                       Electronic Locks               Video Surveillance
Maid                                  Inspectress

MO Against People
Victim-Suspect Relationship                          Pre-Incident Contact
Victim Condition                      Suspect Solicited/Offered
Suspect Pretended to Be                  Suspect Actions
Sexual Acts        Other                Vehicle Involvement

## Narrative

On September 10th 2015 I Officer N. Bianco p# 15086 and Officer G. Wilson P# 9177 were operating in marked patrol unit 3K2 received a Child Molestation call at _____ Upon location we came into contact with the P/R Baltazar, Stephen DOB _____ and his wife Gonyea, Tiffany DOB _____. Baltazar stated that his friend Saito, Rachael DOB _____ found her ex-boyfriend Ditirro, Joseph Do____ _____ MicroSD card in her bed. When Saito put the card into her phone, what appeared to be child pornography was stored on the card, and initially didn't want to speak to the police because she was scared that Ditirro would retaliate so she gave the card to Baltazar.

Looking through the pictures using Baltazars cell phone, which he voluntary let us use, were multiple pornographic images. Multiple images in particular were naked females that appeared to be less than 16 years old performing sexual acts. Saito arrived to the apartment, and she stated that one of the females that appeared to be below 16 goes by the name of 'S____ , and according to Ditirro's facebook graduates in 2017. Saito also mentioned that Ditirro once drove down to Texas to meet up with the female. Other images on the MicroSD card that Saito mentioned were what she said appeared to be a 5 Y/O child performing sexual acts on that of a adult male.

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 156 of 229

Looking through the MicroSD card, the only images viewed that were in question was the pictures of 'S████ and the other females that looked less that 16. Saito stated that the pictures of the children less than 5 are in a specific folder on that card.  Detective C. Lang P# 7752 of Sex Crimes was contacted regarding this case. The MicroSD was impounded connecting to this event number which has the pornographic images on it.

Patrol Follow-Up

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 157 of 229

# EXHIBIT B

# EXHIBIT B

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 158 of 229

Page 1 of 1

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**VOLUNTARY STATEMENT**

Event # LLV15041000 2991

THIS PORTION TO BE COMPLETED BY OFFICER

Specific Crime: POSS. CHILD PORNOGRAPHY LESS THAN 16 Y/O

Location of Occurrence: ▓▓▓▓▓ LV NV 89169

Date Occurred: 9/10/15
Time Occurred: 1823
Sector/Beat: H1
☐ City   ☐ County

Your Name (Last / First / Middle): Saito Rachael Lee

Date of Birth: ▓▓
Social Security #: ▓▓

Race: W
Sex: F
Height: 5'10
Weight: 180
Hair: Brn
Eyes: Blu
Work Schd. (Hours): 9-3pm
(Days Off): Varies
Business / School: ▓▓

Residence Address: (Number & Street) ▓▓   Bldg/Apt.# City ▓▓   State Zip Code ▓▓
Res. Phone: ▓▓
Bus. Phone: ▓▓

Bus. (Local) Address: (Number & Street) ▓▓   Bldg/Apt.# City   State Zip Code
Occupation: Waitress
Depart Date (if visitor):

Best place to contact you during the day ▓▓
Best time to contact you during the day ▓▓
Can You Identify the Suspect? ☑ Yes ☐ No

DETAILS: 9-9-2015 I was laying in bed and found a SD card stuck to my leg.

I put in my phone and saw So much Porn which included Kiddi Porn Children in full penatration and oral with grown men, Children were 5-10 various ages.

Also A girl whom Graduates 2017 a teen - whom is on Lanny Joseph Dittres FB was with him few weeks ago and she in a minor he is about 34 yrs, so he traved all the way to Whichita TX to be with her for this.

Most importanty - the Child extream minor porn is absolutly victums and really bothers me, because these are acts of crimes against most vulnerable of humanity Children.

I HAVE READ THIS STATEMENT AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED HEREIN. THIS STATEMENT WAS COMPLETED AT (LOCATION) ▓▓ LV NV 89169
ON THE 10th DAY OF SEPT AT 2015 (AM/PM), 1100.

Witness/Officer: _____ (SIGNATURE)

Witness/Officer: N.C. Blanco (PRINTED)   P# 10096

SIGNATURE OF PERSON GIVING STATEMENT: _____

LVMPD 85 (REV. 6-08)

00012

**SER 0156**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 159 of 229

# EXHIBIT C

# Redacted by the FPD for personal identifiers

# EXHIBIT C

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 160 of 229

LVMPD Event 150910-2991

## APPLICATION AND AFFIDAVIT
for
## SEARCH WARRANT

STATE OF NEVADA )
                   )
COUNTY OF CLARK )

I, Detective Shannon Tooley P# 6224, being first sworn deposes and states that she is the Affiant herein and is a Police Detective with the Las Vegas Metropolitan Police Department (LVMPD). Affiant is currently assigned to the Detective Bureau, Crimes Against Youth and Family Bureau, Internet Crimes Against Children Task Force (ICACTF) and has been employed with the Las Vegas Metropolitan Department as a Police Officer since June of 1999. There is probable cause to believe that certain property hereinafter described will be found on the following described premises, to wit:

**Digital Storage Device impounded under LVMPD event number 150910-2991, currently located in the LVMPD Evidence Vault, 3201 Technology Court, Las Vegas, Clark County, Nevada 89101, specifically:**

    **1.  SanDisk Micro Secure Digital Card -- 16 GB**

**The digital data referred to and sought to be analyzed / seized from the digital storage device consists of the following:**

1.    Any data evidence of visual depictions/representations (images and videos) that depict minors (real or animated) in an erotic, sensual or sexual manner. This would include depictions of children engaged in any form of sexual activity or simulated sexual activity, children displaying their genitals in a lewd and lascivious manner, children displayed in any manner of undress (partial or complete), and children who are clothed, but displayed in a sexually suggestive, erotic, or sensual manner.

2.    Any data evidence of Internet activity associated with web sites visited relating to the subject matters involved in this investigation, including but not limited to children, child sexual exploitation, child pornography, incest, and file sharing etc.

3.    Any data evidence of digital communications (such as e-mail, instant messaging / chatting, file sharing) relating to the subject matters involved in this investigation, including, but not limited to children, child sexual exploitation, child pornography, incest and file sharing etc.

4.    Any data evidence relating to file sharing applications and processes.

5.    Any text based data / files relating to the subject matters involved in this

00055
**SER 0158**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 161 of 229

investigation including, but not limited to children, child sexual exploitation, child pornography, incest and file sharing etc.

6.      Any text based data / files relating to Internet search terms, email addresses, screen names, web site addresses, children's names and passwords.

7.      Any data / files which would tend to establish the identity of persons in control of said data, which items of property would consist in part of and include, but not be limited to personal pictures, documents, education/work certificates, e-mail correspondence, bills, receipts, bank account information, software registration information, computer account information, file date access information, web site account information, Internet activity information which tend to show possession, dominion and control over said device(s) / data of investigative interest.

8.      Together with the aforementioned to be seized, is other indicia evidence of computer usage, ownership, possession, or control of said evidence / data.

**Digital Evidence Forensics Component**
Because of the nature of this investigation, as outlined below in the probable cause of this affidavit, your affiant is requesting authorization to remove any items of digital related evidence to a location suitable for the analysis of this evidence with the LVMPD.

Authorization is requested to conduct a digital forensic analysis, using industry standard accepted methods, of any items of digital evidence recovered pursuant to this search warrant.

Such examination will be conducted by an individual trained in the analysis of digital evidence according to accepted industry standard methodologies in a proper lab environment at the Las Vegas Metropolitan Police Department and/or its affiliates.

Also, this analysis may include the search of password protected and/or encrypted files.

It should be noted that digital evidence analysis is a highly technical process requiring trained professionals using appropriate equipment, software and techniques to complete an analysis. This digital evidence analysis can be a lengthy process. In fact, once an investigator is assigned, it is not unusual for the analysis of a single hard drive to take up to two or more weeks to complete the analysis and reporting process.

**Affiant Background Information**
Affiant is a Police Detective with the Las Vegas Metropolitan Police Department who is cross-deputized as a Special Deputy United States Marshal with the Federal Bureau of Investigation, assigned to the Internet Crimes Against Children Task Force. As a result of her assignment, she investigates matters relating to child exploitation and the use of high technology and the Internet. This typically involves cases related to child luring and child pornography.

Affiant is currently in her sixteenth year as a law enforcement officer with the LVMPD, 11 years of which she has been conducting felony sex crimes investigations (sexual assault, child sexual abuse, child pornography and child luring etc.). She has been working with the Las Vegas Internet Crimes Against Children Task Force, where she has been currently assigned for the past 8 years.

Affiant has conducted, participated in, and/or consulted in over 1000 sexual related crimes, including investigations of individuals and locations suspected of the sexual exploitation of children and has participated in the execution of numerous search warrants which have resulted in the seizure of multiple items of child pornography and various items of evidence consisting of child sexual exploitation and abuse.

Affiant has received specialized training in the realm of sex crimes and sexually motivated crimes from the LVMPD, FBI, Search Group, Public Agency Training Council, United States Department of Justice Office of Juvenile Justice, Internet Crimes Against Children Program, and Project Safe Childhood. Affiant continues to stay abreast of investigative subject matters related to sexually motivated crimes by participating in and reading professional papers and articles written on related subject matters by industry professionals.

As it relates to computers and digital forensic analysis, Affiant has received training through Guidance Software Corporation, National White Collar Crime Center, Search Group and Paraben Corporation. Also, Affiant is certified in handheld (cellular phones/PDA's) data recovery.

Affiant has over 500 hours of training, course work and study in child sexual abuse, child exploitation and computer investigations / forensics.

**Probable Cause Offering**

This affidavit is made in support of an application for warrant to search for and seize instrumentalities, fruits, and evidence of violations of Nevada Revised Statutes-Possession of Child Pornography, NRS 200.730

The statements contained in this affidavit are based in part on information gathered through fellow officers, and on Affiant's investigation, training, experience and background as a police detective with the Las Vegas Metropolitan Police Department. Since this affidavit is being submitted for the limited purpose of securing a search warrant, Affiant has not included each and every fact known to her concerning this investigation. Affiant has set forth only the facts that she believes are necessary to establish probable cause to believe that evidence of violations of NRS 200.730 is located on the aforementioned item.

On September 10, 2015, LVMPD Officers N. Bianco, P#15086 and G. Wilson, P#9177 were dispatched to [redacted] reference a child exploitation call. Upon arrival, officers made contact with the person reporting (PR), Stephan Baltazar, DOB: [redacted] and his wife, Tiffany Gonyea, DOB: [redacted]. Per

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 162 of 229

00057

**SER 0160**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 163 of 229

Baltazar, his friend, Rachael Saito, DOB: ▓▓▓, found a micro Secure Digital (SD) card in her bed. Per Saito, the SD card belongs to her ex-boyfriend, Lonny Joseph Ditirro, DOB ▓▓▓ Baltazar described Saito put the SD card in her phone and discovered what appeared to be child pornographic images on the SD card. Saito, in fear Ditirro would retaliate against her if she went to the police, provided the card to Baltazar.

Officers, using Baltazar's cell phone viewed the SD card. Officers observed several images of females, who appeared to be under the age of 16, engaged in sexual acts.

Saito arrived while officers were still on scene and stated one of the females on the SD card who appears to be under 16, goes by the name of S▓▓ and per Ditirro's facebook page, graduates in 2017. Per Saito, Ditirro drove to Texas to meet with S▓▓. Also, Saito described seeing an image of a child who appeared to be 5 years old engaged in sexual acts with an adult male.

This report was documented under LVMPD event 150910-2991. Officer Bianco impounded the SanDisk Micro SD card under the same event.

On November 30, 2015, Detective Tooley conducted a recorded interview with Saito. Saito described her and Ditirro had begun dating in February of this year. Shortly thereafter, Ditirro moved in to her apartment at ▓▓▓▓▓▓ Nevada. Saito described she had discovered Ditirro had been chatting on Facebook with a 15 year girl named S▓▓ M▓ from Wichita, Texas.

Saito described she and Ditirro broke up around July, but began a casual relationship in August; however, are no longer together. Daito described, in August, Ditirro told her he was going to visit his mother who lives in El Paso, Texas, but Saito believes Ditirro met up with S▓▓.

Saito described on or about September 9, 2015, while in bed, she discovered a micro SD card stuck to her leg. Saito believed it to be Ditirro's SD card because he had asked if she had seen the card. Saito described she placed the SD card in her phone and observed both clothed and nude pictures of Ditirro, images of Ditirro engaged in sexual acts with a child she believes is S▓▓. Also, Saito located images of other children who appear to be under the age of 16 engaged in sexual acts. Specifically, Saito described an image of a female child around the age of 12 engaged in sexual intercourse with an adult male.

Based on training and experience, Affiant knows micro SD cards can store images, videos and other digital files. Affiant knows users can store files to a SD card by capturing images and videos using their cellular phone, downloading files from the internet, and transferring digital files to the SD card.

Affiant believes a search of the SanDisk SD card will reveal evidence of child sexual exploitation and ownership.

**Child Pornography, Collecting and Suspects Information**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 164 of 229

LVMPD Event 150910-2991

Affiant knows, through training and experience, as well as the training and experience of other Detectives, that child pornography is not readily available in retail establishments in the United States because it is illegal. Accordingly, individuals who wish to obtain child pornography do so by ordering it from abroad, subscribing to Web sites and groups or by discreet contact with other individuals who share their interests and have it available. The use of computers to traffic in, trade or collect child pornography has become one of the preferred methods of obtaining this material. An individual familiar with a computer will use it in some private location to interact with another individual or a business offering such materials. The use of a computer offers individuals interested in obtaining child pornography a sense of anonymity, privacy and secrecy not available elsewhere, as well as the added benefit of speedy transmissions and communications.

Also, Affiant knows through training and experience, the most effective way to expand a collection of child pornography is to offer another collector, via a trade over the Internet, images that the trading partner does not already possess. Accordingly, it is necessary to keep a great number of images in storage so as to have adequate material to allow participation in this informal barter system and thus collectors of child pornography tend to retain it for long periods of time. This tendency is enhanced by the increased sense of security that a computer provides. In addition to the emotional value the images have to the collector, the images of child pornography are intrinsically valuable for trading and/or selling and therefore are rarely destroyed or deleted by a collector. In addition, persons who procure child pornography and who have a proclivity for sexual activity involving children, obtain and retain magazines, films, videos, pictures and other items of child pornography, as well as correspondence, advertising, bills and notes relating to sexual activity involving children for long periods of time and do not dispose of or destroy such materials except to trade with others in exchange for similar items. Individuals who procure child pornography normally and generally keep such material in their residence or other secure location to ensure convenient and ready access as well as to ensure the degree of privacy necessary to enjoy the collection.

Collectors of child pornography who use personal computers in their homes tend to retain their personal files and data for extended periods of time, even if a person has replaced, traded in or "upgraded" to a new personal computer. Affiant knows personal computer users to routinely transfer most of their data onto their new computers when making an upgrade. This data transfer is often done by saving files from the old computer to media sources, then opening them onto the new computer and saving them to the new hard drive. Visual data such as child pornography is as likely, if not more so, to be transferred to a person's new or upgraded computer system.

Persons involved in the viewing, sending or receiving of child pornography tend to retain it for extended periods of time, even spanning many years. Those interested in child pornography prize the visual images they have obtained, traded and/or sold. It is also understood that no matter how much child pornography a collector has, he never has enough and rarely throws anything away. Another typical feature of a child pornography collection is its constancy. Even if evidence of the existence of a child pornography collection is years old, chances are, he still has the collection; only now, it is larger.

00059

SER 0162

Affiant knows these types of individuals, involved in child pornography, also collect and maintain collateral materials, such as erotica and educational material.  Erotica is anything that serves or fuels a sexual purpose for a given individual.  Some of the more common types of erotica for these individuals interested in child sexual exploitation / child pornography are collections of images of children in different settings to include, those in different stages of undress, those wearing bathing suits, those at play, those wearing tight clothes or those who are even dressed but are portrayed in a promiscuous, sensual or erotic manner.  Additionally, this erotica can include drawings of children and child pornography, cartoons of children and child pornography, diaries relating to children or the offenders interest in children, letters, writings or stories about children and child sexual exploitation etc.  Educational material is anything that enhances an individual's ability to commit a sexual related crime, circumvent or thwart law enforcement, and/or manipulate a child, parent or guardian.  These typically include books, writings, or articles on these listed subject matters.

### Computers, Technology and Digital Forensics

Computer related, digital evidence can be located throughout a hard drive or other digital media by employing a number of forensically sound, industry standard techniques.

In addition to items that a user creates and intentionally saves or downloads from a device or the internet and intentionally saves, a computer forensic analyst can also recover and document items that have been deleted by a user.  Computer files and evidentiary remnants of files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet.  It should be noted, that items deleted from a computer hard drive or other digital media by a user, are not actually erased / eradicated from it.  Deleted items are only removed from the user's active view and the space on the hard drive / media that contained the items are marked as available for use.  As such, those items / data still remain, intact, on the hard drive until overwritten by other random computer usage.  These deleted items can then be recovered using computer forensic practices.  Because of this, deleted data can often remain on a hard drive for years before being overwritten and irretrievable.

Additionally, there are many other valuable artifacts and system files that can and do exist on computer hard drives and other digital media, that a computer user is completely unaware of, that tracks their activities and computer usage, which can be recovered, interpreted and documented during analysis.

Specifically regarding on-line communication mediums like Email and Instant Messaging "chat" clients, records of communications can be intentionally saved by a user, saved by the client program itself, archived, and/or later deleted, or cached to the Windows pagefile.sys a.k.a. "swap file" which is a form of virtual memory used by Windows that writes data in memory to the hard drive to assist it in memory usage, which a can be recovered during analysis.  As a result, even communications between two individuals in the on-line, internet realm, often exists even though the user never intended it to.  As previously stated, this evidence can exist for very long periods of time.

**SER 0163**

**Sealing Information**

Affiant requests that this Affidavit be sealed due to the fact this investigation involves child sexual exploitation and the fact this is an ongoing investigation where potential victims have yet to be identified. Affiant believes that if the suspect becomes aware of this investigation, it may place victims in harm's way and evidence may be destroyed.

Affiant also knows based on experience that computer forensic examinations often reveal additional unidentified suspect information such as email accounts and online storage servers, and in many cases, additional computers which have yet to be identified and may contain additional evidence of criminal acts committed by the subject(s) of this investigation or new information revealing additional suspects not yet identified.

Affiant knows that searching computer systems is a highly technical process which requires specific expertise, specialized equipment and applications, a significant amount of time and a proper environment suitable for a forensic analysis. It is therefore necessary to perform this search in a controlled laboratory type environment, not out in the field.

Affiant knows that searching items of digital evidence can be a lengthy and arduous process that takes a significant amount of time to complete, which is exacerbated by the large volumes of data that is capable of being stored in a digital medium. In addition to that, current case loads and differing case assignment priorities are likely to cause some searches to be halted while other cases of higher priorities are re-assigned for priority analysis. As a result, it is not unusual for some forensic analysis searches to take several months before they are completed from beginning to end.

Affiant therefore requests authorization to conduct a complete and thorough computer forensic analysis of the **SanDisk Micro Secure Digital Card – 16 GB** already in the possession of the LVMPD, searching for the previously listed items of evidence located in the form of data within.

**Wherefore, Affiant requests that a Search Warrant issue directing a search for and seizure of the aforementioned items at the location set forth.**

_____
Detective S. Tooley P# 6224, AFFIANT
Las Vegas Metropolitan Police Department

Subscribed and sworn to before me this _____ day of _____, 2015

_____
**JUDGE**

Approved by: \\\\ ' ' .'

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 166 of 229

00061
**SER 0164**

Las Vegas Metropolitan Police Department
# SEARCH WARRANT

STATE OF NEVADA )
                    )
COUNTY OF CLARK)

The State of Nevada, to any Peace Officer in the County of Clark, proof by Affidavit having been made before me by Detective Shannon Tooley, P# 6224, LVMPD, said Affidavit attached hereto and incorporated herein by reference, that there is probable cause that certain property, namely:

1.    Any data evidence of visual depictions/representations (images and videos) that depict minors (real or animated) in an erotic, sensual or sexual manner. This would include depictions of children engaged in any form of sexual activity or simulated sexual activity, children displaying their genitals in a lewd and lascivious manner, children displayed in any manner of undress (partial or complete), and children who are clothed, but displayed in a sexually suggestive, erotic, or sensual manner.

2.    Any data evidence of Internet activity associated with web sites visited relating to the subject matters involved in this investigation, including but not limited to children, child sexual exploitation, child pornography, incest, and file sharing etc.

3.    Any data evidence of digital communications (such as e-mail, instant messaging / chatting, file sharing) relating to the subject matters involved in this investigation, including but not limited to children, child sexual exploitation, child pornography, incest and file sharing etc.

4.    Any data evidence relating to file sharing applications and processes.

5.    Any text based data / files relating to the subject matters involved in this investigation, including but not limited to children, child sexual exploitation, child pornography, incest and file sharing etc.

6.    Any text based data / files relating to Internet search terms, email addresses, screen names, web site addresses, children's names and passwords.

7.    Any data / files which would tend to establish the identity of persons in control of said data, which items of property would consist in part of and include, but not be limited to personal pictures, documents, education/work certificates, e-mail correspondence, bills, receipts, bank account information, software registration information, computer account information, file date access information, web site account information, Internet activity information which tend to show possession, dominion and control over said device(s) / data of investigative interest.

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 167 of 229

00062

**SER 0165**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 168 of 229

LVMPD Event 150910-2991

8.    Together with the aforementioned to be seized, is other indicia evidence of computer usage, ownership, possession, or control of said evidence / data.

Is presently located at/on:

**Digital Storage Device impounded under LVMPD event number 150910-2991, currently located in the LVMPD Evidence Vault, 3201 Technology Court, Las Vegas, Clark County, Nevada 89101, specifically:**

1.  **SanDisk Micro Secure Digital Card – 16 GB**

As I am satisfied that there is probable cause to believe that said property is located as set forth above and that based upon the affidavit attached hereto there are sufficient grounds for the issuance of the Search Warrant.

You are hereby commanded to search forthwith said premises for said property, serving this warrant between 7 a.m. and 7 p.m., and if the property is there to seize it, prepare a written inventory of the property seized, and make a return for me within 10 days.

Dated this ____ day of _____, 2015

_____
**JUDGE**

PAGE 9 OF 10

00063

**SER 0166**

Las Vegas Metropolitan Police Department

IN RE:  Search Warrant for            )
                                      )
                                      )        ORDER SEALING
                                      .)          AFFIDAVIT
premise known as                      )
**SanDisk Micro Secure Digital Card – 16 GB)**
_____         )

Upon the ex parte application of Detective Shannon Tooley a commissioned officer with the Las Vegas Metropolitan Police Department and Affiant, to seal the affidavit in support of the attached search warrant, and for good cause appearing therefore,

IT IS HEREBY ORDERED that the affidavit in support of the attached search warrant be ordered sealed pending further order of this Court except that copies may be provided to the office of the Clark County District Attorney and the District Attorney may provide copies to a Defendant in a criminal proceeding as part of the criminal discovery process, and

IT IS FURTHER ORDERED a copy of this order sealing the affidavit be left at the premises along with the search warrant in lieu of the affidavit in support of the warrant.

Dated this _____ day of _____, 2015

_____
**JUDGE**


_____
**AFFIANT**

00064

**SER 0167**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 170 of 229

*[handwritten text]*

Page _1_ of _1_

# RETURN

(Must be made within 10 days of Issuance of Warrant)

The Search and Seizure Warrant authorizing a search and seizure at the following described location(s):

_____ *[handwritten]* _____

was executed on _____ *Dec..... 2, 2011* _____
                          (month, day, year)

A copy of this inventory was left with _____ *[handwritten]* _____

_____
(name of person or "at the place of search")

The following is an inventory of property taken pursuant to the warrant:

This inventory was made by: _____ *[handwritten]* _____

_____ *[handwritten]* _____

(at least two officers including affiant if present. If person from whom property is taken is present include that person.)

LVMPD 718 (REV. 5-04)

SER 0168

00065

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 171 of 229

# EXHIBIT D

# EXHIBIT D

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 172 of 229



Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 173 of 229

# EXHIBIT E

EXHIBIT E

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 174 of 229

**150910-2991**

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## ICAC TASK FORCE



# EXAMINER'S REPORT

| | |
|---|---|
| **EXAMINER:** | MATT TRAFFORD P#14286 |
| **EVENT NUMBER:** | 150910-2991 |
| **DATE COMPLETED:** | 03-07-16 |

**Summary:**

On 12-02-15, Det. S. Tooley #6224 of the Las Vegas Metropolitan Police Department's Internet Crimes against Children Task Force Unit served a search warrant for a digital storage device that had been impounded in the LVMPD Evidence Vault for evidence relating to the crimes of Possession of Child Pornography as defined by NRS 200.730.

Det. Tooley's search warrant allowed for the below listed item to be examined for evidence relating to the above mentioned crimes.  Please see below for a description of the item in question.

On 02-18-16, I was assigned this case for examination. This was also the date that I picked up the evidence from the evidence vault and brought it back to the ICAC Task Force office for examination.

00095

**SER 0172**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 175 of 229

**150910-2991**

**Forensic Tools Used:**

Access Data's FTK 5.6, Encase 6.19 Imager, and NetClean.

**Media Examined:**

## Package 1 Item No. 1

San Disk Micro Media Card 16GB Ultra Plus

**Investigative Findings:**

All collected items and findings were bookmarked and placed onto a thumb drive in electronic reports for investigative review. It will be the responsibility of the investigating detective to review the electronic reports for their evidentiary value.

**Photos of Evidence**

This folder contains 1 photograph of the evidence that I examined.

## Package 1 Item No. 1

**NetClean Summary**

I used a program called NetClean that contains hash databases that are of known images and videos relating to child exploitation. The hash databases identify the known images and videos and categorize them into pre-categorized files.

I was able to recover 254 images and 42 videos that were categorized as "Child Abuse Material (CAM)-Illegal."

I was able to recover 111 images and 22 videos that were categorized as "Child Exploitation (non_CAM)/Age Difficult."

I was able to recover 30 Images that were categorized as being "CGI/Animation-Child Exploitative."

Lastly I recovered 235 images of the suspect, "Lonny Ditirro." The images of the suspect help shows ownership of this San Disk Micro Media Card.

Please review the entire NetClean report for its evidentiary value.

00096
SER 0173

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 176 of 229

**150910-2991**

**FTK Report**

Once I completed the NetClean report I loaded the image file into FTK so I could easily bookmark additional images that didn't fall into the child pornography categories that I listed in the NetClean report.

I discovered that the suspect had created dozens of folders that he titled by name. Some of the titles contained a number at the end that might indicate the age of the individual.

Based on detectives Tooley's affidavit the suspect was communicating and possibly meeting with girls he had listed by folder names.

One such folder is titled, "Item No. 1 Folder T____ H____ 13." There are actual images of the suspect with this individual. I also captured images and screenshots of letters that possibly show how this individual had fallen for the suspect. One screenshot lists the name of "T____ Ditirro."

A second folder that is titled, "Item No. 1 Folder S____ L____ M____" contains images of an individual who played on the girls Junior High basketball team named, "NJH Ladycats." This individual is also seen in image with the suspect.

Based on Det. Tooley's affidavit the suspect was to meet with a S____ M____ of Wichita Texas. The NJH Ladycats girl's basketball picture might be from Norman Junior High located in Kaufman Texas. A Google search showed that there is Wichita Falls Texas located NW of Fort Worth and a Kaufman Texas that is located just SE of Forth Worth Texas.

You'll also find nude images of this individual as well as screenshot's of the girl with the suspect's webcam image included. There are several of these images.

Please review this folder for its evidentiary value.

The suspect also had two folders that were titled, "Me" and "Me Restricted." The "Me" folder contains dozens of selfie type images of himself. The "Me Restricted" folder contains nude images of the suspect. Both of the folders show ownership of this device.

Lastly I recovered the suspect's resume that I bookmarked under the titled, "Item No. 1 Suspect's Resume."

Please see both the NetClean and FTK reports for their evidentiary value.

SER 0174

00097

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 177 of 229

**150910-2991**

**Conclusion**

It is my conclusion that the suspect is in possession of child pornography as defined by NRS 200.730.

It is my conclusion also that the suspect has met up with at least two young girls who are in their teens who possibly live out of state. I recovered images of the suspect and possible victim together. I also recovered nude images of these two girls as well. The exact age is unknown but they appear to be approximately 15 years of age.

*[handwritten signature]* 14286   3/7/16

00098
**SER 0175**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 178 of 229

# EXHIBIT F

# EXHIBIT F

JUSTICE COURT, LAS VEGAS TOWNSHIP
CLARK COUNTY, NEVADA

THE STATE OF NEVADA,

        Plaintiff,

   -vs-

LONNY JOSEPH DITIRRO, aka,
Lonny Joseph Ditirro Jr.,

        Defendant.

CASE NO:   16F06660X

DEPT NO:   2

CRIMINAL COMPLAINT

The Defendant above named having committed the crimes of POSSESSION OF VISUAL PRESENTATION DEPICTING SEXUAL CONDUCT OF A CHILD (Category B Felony - NRS 200.700, 200.730 - NOC 50374), in the manner following, to-wit: That the said Defendant, on or about the 10th day of September, 2015, at and within the County of Clark, State of Nevada,

COUNT 1

did willfully, unlawfully, feloniously, and knowingly have in his possession a film, photograph, or other visual presentation depicting a child under the age of 16 years of age as the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: 383fd68c-9ec6-4bac-bb75-c56cca0c52bc.jpg which depicts: Nude pre-pubescent female child lying on her back, with an image of a playboy bunny drawn above her vagina and the words "Fuck Me." One adult erect penis is seen above her that is dripping with ejaculation. Another adult's erect penis is penetrating her anus. The child also has a large amount of semen on her chest/stomach area.

COUNT 2

did willfully, unlawfully, feloniously, and knowingly have in his possession a film, photograph, or other visual presentation depicting a child under the age of 16 years of age as the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name:

W:\2016\2016F\066\60\16F06660-COMP-001.DOCX

SER 0177

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 180 of 229

1  x_448913c4.jpg which depicts: Nude pre-pubescent female child lying on her back, with her

2  legs spread apart. A nude adult male with an erect penis is in between her legs with his penis

3  touching said child's vaginal area.

4  COUNT 3

5       did willfully, unlawfully, feloniously, and knowingly have in his possession a film,

6  photograph, or other visual presentation depicting a child under the age of 16 years of age as

7  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

8  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: 10859.jpg

9  which depicts: Partially nude pre-pubescent male child lying on his back. An adult woman,

10  wearing a robe and partially exposing her breasts is seen with the child's penis in her mouth as

11  she performs oral sex on said child.

12  COUNT 4

13       did willfully, unlawfully, feloniously, and knowingly have in his possession a film,

14  photograph, or other visual presentation depicting a child under the age of 16 years of age as

15  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

16  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: 01-1.jpeg

17  which depicts: An adult male with an erect penis is seen holding his penis with his left hand

18  and ejaculating into the mouth of a pre-pubescent female child.

19  COUNT 5

20       did willfully, unlawfully, feloniously, and knowingly have in his possession a film,

21  photograph, or other visual presentation depicting a child under the age of 16 years of age as

22  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

23  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: 050085f7-

24  5a8a-4ce8-ac7f-770f847ea105.jpg which depicts: Nude pre-pubescent female child is seen

25  in the bathtub, sitting on top of a nude adult male who is lying on his back in the bathtub. The

26  child has both hands around male's penis as male is seen ejaculating.

27  COUNT 6

28       did willfully, unlawfully, feloniously, and knowingly have in his possession a film,

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 181 of 229

1  photograph, or other visual presentation depicting a child under the age of 16 years of age as

2  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

3  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: 3_2.jpeg

4  which depicts:  Nude pre-pubescent female child is seen standing with her legs spread open

5  and her arms spread open above her head as if she is tied up.  The child's mouth is covered

6  with tape.  The child also has clothes pins attached to both nipples of her un-developed breasts

7  and to her vagina.  This image is consistent with S&M.

8  COUNT 7

9        did  willfully, unlawfully, feloniously, and knowingly have in his possession a film,

10  photograph, or other visual presentation depicting a child under the age of 16 years of age as

11  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

12  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name:

13  47654709.dthumb which depicts: A nude adult male is lying on his back with an erect penis,

14  while a nude pre-pubescent female child is performing oral sex on said male until male

15  ejaculates.

16  COUNT 8

17        did  willfully, unlawfully, feloniously, and knowingly have in his possession a film,

18  photograph, or other visual presentation depicting a child under the age of 16 years of age as

19  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

20  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name: _leg-

21  lift_fk.mpg which depicts:  A nude adult male is lying on his back with an erect penis; while

22  a nude pre-pubescent female child is seen straddling the adult male.  The male is penetrating

23  the child's vagina with his penis as he has vaginal sex with said child.

24  COUNT 9

25        did  willfully, unlawfully, feloniously, and knowingly have in his possession a film,

26  photograph, or other visual presentation depicting a child under the age of 16 years of age as

27  the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or

28  simulate sexual conduct, to-wit: a SanDisk Micro SD card containing file name:

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 182 of 229

CONTENT_033 (2).3gpp  which depicts:  An adult male can be seen with an erect penis, as he masturbates and ejaculates on a pre-pubescent female child's face and mouth.

COUNT 10

did  willfully, unlawfully, feloniously, and knowingly have in his possession a film, photograph, or other visual presentation depicting a child under the age of 16 years of age as the subject of a sexual portrayal or engaging in, simulating, or assisting others to engage in or simulate  sexual  conduct,  to-wit:  a  SanDisk  Micro  SD  card  containing  file  name: CONTENT_112.3gpp which depicts: A nude pre-pubescent female child is lying on her back, as an adult male penetrates her vagina with his erect penis multiple times.

All of which is contrary to the form, force and effect of Statutes in such cases made and provided and against the peace and dignity of the State of Nevada.  Said Complainant makes this declaration subject to the penalty of perjury.

_____
04/29/16

16F06660X/jw
LVMPD EV# 1509102991
(TK2)

W:\2016\2016F\066\60\16F06660-COMP-001.DOCX

**SER 0180**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 183 of 229

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## DECLARATION OF WARRANT/SUMMONS
### (N.R.S. 171.106)
### (N.R.S. 53 amended 7/13/1993)

Event Number:   __150910-2991__

| | | |
|---|---|---|
| **STATE OF NEVADA** | ) | DITIRRO, LONNY JOSEPH |
| | ) **ss:** | |
| **COUNTY OF CLARK** | ) | DOB: ▓▓▓▓   SS#: ▓▓▓▓ |

Det. S. Miller, P#6507, being first duly sworn, deposes and says:

That he is a Police Detective, assigned to the Internet Crimes against Children Task Force (ICACTF) with the Las Vegas Metropolitan Police Department, being so employed for a period of 16 years, assigned to investigate the crime(s) of POSSESSION OF CHILD PORNOGRAPHY (10 counts) committed on or about 09/10/2015, which investigation has developed DITIRRO, LONNY JOSEPH as the perpetrator thereof.

THAT DECLARANT DEVELOPED THE FOLLOWING FACTS IN THE COURSE OF THE INVESTIGATION OF SAID CRIME, TO WIT:

On September 10, 2015, LVMPD Officers N. Bianco, P#15086 and G. Wilson, P#9177 were dispatched to the address of ▓▓▓▓ Las Vegas, Nevada 89121 reference a child exploitation call. Upon arrival, officers made contact with the person reporting (PR), Stephan Baltazar, DOB: ▓▓▓▓ and his wife, Tiffany Gonyea, DOB ▓▓▓▓. Per Baltazar, his friend, Rachael Saito, DOB: ▓▓▓▓, found a micro Secure Digital (SD) card in her bed. Per Saito, the SD card belongs to her ex-boyfriend, Lonny Joseph Ditirro, DOB: ▓▓▓▓ Baltazar described Saito put the SD card in her cell phone and discovered what appeared to be child pornographic images on the SD card. Saito, in fear Ditirro would retaliate against her if she went to the police, provided the card to Baltazar.

Officers, using Baltazar's cell phone viewed the SD card. Officers observed several images of females, who appeared to be under the age of 16, engaged in sexual acts.

Saito arrived while officers were still on scene and stated one of the females on the SD card who appears to be under 16, goes by the name of S▓▓▓ and per Ditirro's Facebook page, graduates in 2017. Per Saito, Ditirro drove to Texas to meet with S▓▓▓ Also, Saito described seeing an image of a child who appeared to be 5 years old engaged in sexual acts with an adult male.

This report was documented under LVMPD event 150910-2991. Officer Bianco impounded the SanDisk Micro SD card under the same event.

On November 30, 2015, Detective S. Tooley, P#6224, conducted a recorded interview with Saito. Saito described her and Ditirro had begun dating in February of 2015. Shortly thereafter,

**SER 0181**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 184 of 229

L    EGAS METROPOLITAN POLICE DEPARTMENT

## CONTINUATION

Event #:    150910-2991

Ditirro moved in to her apartment at ███████████, Las Vegas, Nevada 89121. Saito described she had discovered Ditirro had been chatting on Facebook with a 15 year old girl named S███ M██ from Wichita, Texas.

Saito described she and Ditirro broke up around July of 2015, but began a casual relationship in August of 2015; however, are no longer together. Saito described, in August 2015, Ditirro told her he was going to visit his mother who lives in El Paso, Texas, but Saito believes Ditirro met up with S███ in Texas. (S████ has not been identified at this time.)

Saito described on or about September 9, 2015, while in bed, she discovered a micro SD card stuck to her leg. Saito believed it to be Ditirro's SD card because he had asked her if she had seen the card. Saito described she placed the SD card in her phone and observed both clothed and nude pictures of Ditirro, images of Ditirro engaged in sexual acts with a child she believes is S████. Also, Saito located images of other children who appear to be under the age of 16 engaged in sexual acts. Specifically, Saito described an image of a female child around the age of 12 engaged in sexual intercourse with an adult male.

Based on training and experience, Affiant knows micro SD cards can store images, videos and other digital files. Affiant knows users can store files to a SD card by capturing images and videos using their cellular phone, downloading files from the internet, and transferring digital files to the SD card.

On December 2, 2015, Det. S. Tooley, P#6224, had a search warrant signed by Judge Diana Sullivan and served said warrant on same date to seize and perform a full forensic examination on said SanDisk Micro Secure Digital Card (16GB), for evidence of child pornography and proof of ownership of said SD card.

On 03/07/2016, LVMPD Forensic Examiner Matt Trafford, P#14286, completed a forensic examination on said SanDisk Micro Secure Digital Card (16GB). The results of said examination revealed 254 images and 42 videos of child pornography were found saved on said SD card. There were also 111 images that are child exploitive (age difficult) and 30 images of CGI/animation that are child exploitative. In addition, there are 235 images/videos of suspect Lonny Ditirro located on said SD card; proving said SD card belongs to him. 56 of the 254 images of child pornography were tagged as involving infants/toddlers and 5 images of the 254 being S&M (Sadomasochism)/violence related.

Affiant viewed the reported 254 images and 42 videos of child exploitation and found them all to be child pornographic in nature. The following is a description of 6 of the images and 4 of the videos:

IMAGES

File name: 383fd68c-9ec6-4bac-bb75-c56cca0c52bc.jpg
SHA1 Hash Value:  9CF25DAF2CA400E0B22479DB2177B850
Description:  [Graphic description of child sexual abuse material omitted.]

**SER 0182**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #:    150910-2991

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 186 of 229

**File name:** CONTENT_112.3gpp
**SHA1 Hash Value:**  6530AAB5688166F214F9A9BBCB5C3AEF
**Description:**  A nude pre-pubescent female child is lying on her back, as an adult male penetrates her vagina with his erect penis multiple times.

Affiant viewed the 235 images/videos of suspect Lonny Ditirro located on said SD card and confirmed said images to be that of suspect Lonny Ditirro, thus providing proof of ownership of said SD card as many of the images was "selfies" taken by Lonny himself. In addition, Lonny video recorded numerous videos of having sex with probable unidentified underage girls (ages 13-15) and pictures with various young teenage girls. The suspect also had two folders that were titled, "Me" and "Me Restricted." The "Me" folder contains dozens of "selfie" type images of himself. The "Me Restricted" folder contains nude images of the suspect. Both of these folders show additional ownership of said SD card. The suspect Lonny Ditirro also had his "Resume" saved to the SD card that also provided proof of ownership.

On 04/12/2016, IS Lisa Rowe served an Administrative Subpoena on Facebook, Inc. for all customer records pertaining to user account: www.facebook.com/lonny.j.ditirro.

On04/13/2016, Facebook, Inc. responded that user account: www.facebook.com/lonny.j.ditirro, resolves to Lonny Joseph Ditirro, IP address of 76.3.155.54, cell phone of 702-445-2725, email addresses of guardian_angel_l@hotmail.com and lonny.ditirro@gmail.com, and a profile picture that matches suspect Lonny Ditirro images found on SD card.

Upon doing a routine record check on Lonny Ditirro, he was further identified as Lonny Joseph Ditirro, DOB [redacted], SSN [redacted] Suspended Nevada Driver's License #2101646222, Height 6-4, weight 250, hair color: brown, eye color: brown. Subject has an outstanding traffic warrant out of Henderson (WA# 2822033, bail $2,310). Subject has used numerous addresses and phone numbers in the recent past and his exact location is unknown.

All attempts to locate Lonny Ditirro have been unsuccessful.

Wherefore, Declarant prays that a Warrant of Arrest be issued for suspect DITIRRO, LONNY JOSEPH on the charge(s) of POSSESSION OF CHILD PORNOGRAPHY (10 counts).

**I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.**

Executed on this 15th day of April, 2016.

DECLARANT:  _____  6507

WITNESS:  _____  3741    DATE:  _04/15/16_

**SER 0184**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 187 of 229

# EXHIBIT G

EXHIBIT G

10/4/2016                    https://lvjcpa.clarkcountynv.gov/Anonymous/CaseDetail.aspx?CaseID=11953702

Skip to Main Content Logout My Account Search Menu New Criminal Search Refine Search  Back          Location : Justice Court   Help

# REGISTER OF ACTIONS
## CASE NO. 16F06660X

| | | |
|---|---|---|
| State of Nevada vs. DITIRRO, LONNY JOSEPH | §<br>§<br>§<br>§ | Case Type:  **Felony**<br>Date Filed:  **05/02/2016**<br>Location:  **JC Department 2** |

## PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **Defendant** | **DITIRRO, LONNY JOSEPH** | **James C Gallo**<br>*Retained*<br>702-385-3131(W) |
| **State of<br>Nevada** | **State of Nevada** | |

## CHARGE INFORMATION

| Charges: DITIRRO, LONNY JOSEPH | Statute | Level | Date |
|---|---|---|---|
| 1. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 2. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 3. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 4. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 5. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 6. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 7. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 8. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 9. Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |
| 10.Poss visual porn of pers < 16, (1st) [50374] | 200.730.1 | Felony | 09/10/2015 |

## EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 04/29/2016 | **CTRACK Track Assignment JC02** |
| 04/29/2016 | **CTRACK Case Modified**<br>*Jurisdiction/DA;* |
| 05/02/2016 | **Criminal Complaint** |
| 05/02/2016 | **Filed Under Seal** |
| 05/02/2016 | **Request For Arrest Warrant** |
| 05/02/2016 | **Declaration of Warrant Summons (Affidavit)** |
| 05/04/2016 | **Arrest Warrant Request**  (7:30 AM) (Judicial Officer Sciscento, Joseph S.)<br>Result: Signing Completed |
| 05/04/2016 | **Minute Order - Department 02** |
| 05/04/2016 | **Arrest Warrant Ordered to be Issued**<br>*00/00 total bail; no bail; set in court* |
| 05/04/2016 | **Warrant Issued** |
| 05/04/2016 | **Arrest Warrant Confidential** |
| 05/04/2016 | **Arrest Warrant - Face Sheet** |
| 05/24/2016 | **Motion to Place on Calendar**<br>*to request own recognizance release or bail* |
| 05/27/2016 | **Motion**  (8:00 AM) (Judicial Officer Sciscento, Joseph S.)<br>*No bail posted*<br>Result: Motion Denied |
| 05/27/2016 | **Minute Order - Department 02** |
| 05/27/2016 | **Not in custody**<br>*Counts: 001; 002; 003; 004; 005; 006; 007; 008; 009; 010* |
| 05/27/2016 | **Warrant Walk - Through Granted**<br>*Surety Bond- 15,000/15,000 total bail with house arrest* |
| 05/27/2016 | **Defendant to be booked on Arrest Warrant & released on Bond**<br>*in the amount of 15,000/15,000 total bail with house arrest* |
| 05/27/2016 | **Bail Condition**<br>*to have no access to computers also to have no unsupervised individuals at the residence* |
| 05/27/2016 | **Defendant to Report to CCDC House Arrest**<br>*May 31 2016 10:00AM; To be Considered for House Arrest.* |
| 05/27/2016 | **Status Check**<br>*if bond posted and walk through completed* |
| 05/27/2016 | **Initial Appearance Completed**<br>*Advised of Charges on Criminal Complaint, Waives Reading of Criminal Complaint* |
| 05/27/2016 | **Counsel Confirms as Attorney of Record** |
| 05/27/2016 | **Motion**<br>*denied* |
| 05/27/2016 | **Warrant Stands** |
| 05/30/2016 | **Surety Bond Acceptance-Notice of Appearance** |

https://lvjcpa.clarkcountynv.gov/Anonymous/CaseDetail.aspx?CaseID=11953702                    1/2

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 188 of 229

**SER 0186**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 189 of 229

| | |
|---|---|
| 05/30/2016 | **Surety Bond** |
| 05/30/2016 | **Warrant Cleared** |
| 05/30/2016 | **Temporary Custody Record** |
| | *WALK THRU / BOND* |
| 05/31/2016 | **Warrant Service Slip** |
| 05/31/2016 | **Waiver of Extradition After Admission to Bail** |
| 06/01/2016 | **Status Check** (7:45 AM) (Judicial Officers Pro Tempore, Judge, Hunt, John A.) |
| | *Surety bond posted- in custody on other charges* |
| | *06/01/2016 Reset by Court to 06/01/2016* |
| | Result: Matter Heard |
| 06/01/2016 | **Not in custody** |
| | *Counts: 001; 002; 003; 004; 005; 006; 007; 008; 009; 010* |
| 06/01/2016 | **House Arrest Order Continues** |
| 06/01/2016 | **Status Check** |
| | *on counsel to appear and on bond* |
| 06/01/2016 | **Minute Order - Department 02** |
| 06/06/2016 | **Status Check** (8:00 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *Surety bond & house arrest* |
| | *06/06/2016 Reset by Court to 06/06/2016* |
| | Result: Matter Heard |
| 06/06/2016 | **House Arrest Order Continues** |
| 06/06/2016 | **Not in custody** |
| | *Counts: 001; 002; 003; 004; 005; 006; 007; 008; 009; 010* |
| 06/06/2016 | **Minute Order - Department 02** |
| 06/22/2016 | **House Arrest Report** |
| 07/12/2016 | **Motion** |
| | *For leave to withdraw as attorney of record.* |
| 07/14/2016 | *CANCELED* **Motion** (8:00 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *Vacated* |
| 07/14/2016 | **Motion** (7:45 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *Surety bond & House Arrest- In custody on other charges (Federal)* |
| | Result: Matter Heard |
| 07/14/2016 | **Motion to Withdraw as Counsel** |
| | *motion continued* |
| 07/14/2016 | **Comment** |
| | *Defendant not transported today in Federal Custody in Pahrump* |
| 07/14/2016 | **Remand - Cash or Surety** |
| | *Counts: 001; 002; 003; 004; 005; 006; 007; 008; 009; 010 - $0.00/$0.00 Total Bail* |
| 07/14/2016 | **Future Court Date Vacated** |
| | *08/23/16 at 9am* |
| 07/14/2016 | **Continued For Presence** |
| | *Defendant's presence- preliminary hearing called off* |
| 07/14/2016 | **Surety Bond Ordered Exonerated** |
| | *5272578993* |
| 07/14/2016 | **Minute Order - Department 02** |
| 07/14/2016 | **Surety Bond Exonerated** |
| 07/20/2016 | **Ex Parte Petition** |
| | *for writ of habeas corpus ad prosequendum for federal prisoner* |
| 07/20/2016 | **Order** |
| | *for issuance of writ of habeas corpus ad prosequendum for federal prisoner* |
| 08/01/2016 | **Writ of Habeas Corpus** |
| | *ad prosequendum for federal prisoner.* |
| 08/23/2016 | *CANCELED* **Preliminary Hearing** (9:00 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *Vacated* |
| | *Surety Bond & House Arrest* |
| 08/23/2016 | **Motion** (7:45 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *In custody* |
| | Result: Matter Heard |
| 08/23/2016 | **Comment** |
| | *Per Clark County Detention Center, Defendant was not transported today Writ to produce inmate not received* |
| 08/23/2016 | **Motion to Withdraw as Counsel** |
| | *motion continued* |
| 08/23/2016 | **Ball Stands - Cash or Surety** |
| | *Counts: 001; 002; 003; 004; 005; 006; 007; 008; 009; 010 - $0.00/$0.00 Total Bail* |
| 08/23/2016 | **Minute Order - Department 02** |
| 11/22/2016 | **Motion** (7:45 AM) (Judicial Officer Sciscento, Joseph S.) |
| | *In custody* |

---

**FINANCIAL INFORMATION**

---

| | | | | |
|---|---|---|---|---|
| | **Defendant DITIRRO, LONNY JOSEPH** | | | 50.00 |
| | Total Financial Assessment | | | 50.00 |
| | Total Payments and Credits | | | 0.00 |
| | **Balance Due as of 10/04/2016** | | | |
| | | | | 50.00 |
| 05/30/2016 | Transaction Assessment | | | (50.00) |
| 05/30/2016 | Payment (Window)   Receipt # PT-2016-06257 | | Express Bail Bonds | |

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 190 of 229

# EXHIBIT H
## Redacted by FPD for
## personal identifiers

# EXHIBIT H

## Redacted by FPD for

## personal identifiers

SER 0188

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 191 of 229



SEALED

00121

SER 0189

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 192 of 229

DANIEL G. BOGDEN
United States Attorney
CRISTINA D. SILVA
Assistant United States Attorney
Nevada Bar No.: 13760
501 Las Vegas Blvd. South, Ste. 1100
Las Vegas, Nevada 89101
(702) 388-6336 (phone)
(702) 388-5087 (fax)
Cristina.Silva@usdoj.gov
Attorneys for the United States



# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

IN THE MATTER OF THE SEARCH OF:

 DRIVE

CITY OF LAS VEGAS
COUNTY OF CLARK
STATE OF NEVADA

Magistrate No.   2:16-mj-442-CWH

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH
WARRANT**

**(Under Seal)**

I, Scott Miller, being first duly sworn, state the following:

1.        I am currently a Detective assigned to the Homicide & Sex Crimes Bureau, Internet Crimes Against Children Task Force and have been employed with the Las Vegas Metropolitan Department (LVMPD) since October 1999. I am cross-deputized as a Special Deputy United States Marshal with the Federal Bureau of Investigation (FBI), assigned to the Internet Crimes Against Children (ICAC) Task Force.  Among my duties on the ICAC Task force is to conduct investigations pursuant to the FBI Innocent Images National Initiative (IINI), which focuses on crimes where computers and the Internet are used in the sexual exploitation of children.  In conducting such investigations, I have gained firsthand knowledge and experience through IINI training, other Special Agents and Child Exploitation Task Force Officers.  I have received basic,

1

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 193 of 229

1    advanced and on the job training in the investigation of cases involving the sexual exploitation of

2    children.

3        2.        I have conducted, participated in, and/or consulted in several hundred sexual related

4    crimes, including investigations of individuals and locations suspected of the sexual exploitation of

5    children and have participated in the execution of numerous search warrants which have resulted in

6    the seizure of multiple items of child pornography and various items of evidence consisting of child

7    sexual exploitation and abuse.

8        3.        I have received specialized training in the realm of sex crimes and sexually motivated

9    crimes from the LVMPD, Public Agency Training Council, United States Department of Justice

10   Office of Juvenile Justice, ICAC Program, and National Children's Advocacy Center.  I continue to

11   stay abreast of investigative subject matters related to sexually motivated crimes by participating in

12   and reading professional papers and articles written on related subject matters by industry

13   professionals.

14       4.        I am submitting this Affidavit under Rule 41 of the Federal Rules of Criminal

15   Procedure in support of an Application for a Search Warrant authorizing a search of the residence

16   ████████████████████████████, in Las Vegas, more specifically described in Attachment A,

17   and incorporated by reference herein.  This affidavit is submitted in support of a warrant to search

18   the house, including any computer and computer media located therein, where the instrumentalities,

19   fruits, and evidence of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A,

20   as specified further in Attachment B, incorporated by reference herein, might be found.

21       5.        The purpose of this application is to seize evidence, more particularly described in

22   Attachment B, of violations of 18 U.S.C. § 2251(d)(1)(A), which makes it a crime to advertise child

23   pornography; 18 U.S.C. §§ 2252(a)(1) and 2252A(a)(1), which make it a crime to transport or ship

24   in interstate or foreign commerce, by computer, child pornography; 18 U.S.C. §§ 2252(a)(4)(B) and

00123

**SER 0191**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 194 of 229

1  2252A(a)(5)(B), which make it a crime to possess child pornography; and violations of 18 U.S.C. §§

2  2252(a)(2) and 2252A(a)(2), which make it a crime to receive and distribute child pornography.

3      6.      This affidavit is submitted in support of an application for a search warrant for

4  contraband, evidence, fruits and instrumentalities of criminal violations relating to child sexual

5  exploitation and travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. §§

6  2251(a) and 2423(b). As set forth below, I have probable cause to believe that such items, as set

7  forth in Attachment B, which is attached and incorporated by this reference, are currently on the

8  residence located at ██████████████████████ Las Vegas, Nevada 89169

9  (hereinafter the "**SUBJECT PREMISES**") more fully described in Attachment A, which is also

10  attached and incorporated by this reference.

11      7.      The facts set forth in this affidavit are based on the following: my own personal

12  knowledge; knowledge obtained from other individuals during my participation in this investigation,

13  including other law enforcement officers; my review of records related to this investigation;

14  communications with others who have knowledge of the events and circumstances described herein;

15  and information gained through my training and experience. Because this affidavit is submitted for

16  the limited purpose of establishing probable cause in support of an application for a search warrant,

17  it does not set forth each and every fact that I or others have learned during the course of this

18  investigation.

19                          **PERTINENT FEDERAL CRIMINAL STATUTES**

20      8.      This investigation concerns alleged violations of 18 U.S.C. §§ 2251, 2252 and

21  2252A, relating to material involving the sexual exploitation of minors.

22      9.      18 U.S.C. § 2251(d)(1)(A) prohibits a person from knowingly making and

23  publishing, or causing to be made and published, any notice offering to exchange, display, distribute,

24  and reproduce any visual depiction of child pornography.

00124

**SER 0192**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 195 of 229

10.     18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping in interstate or foreign commerce, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct.  18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping child pornography in interstate or foreign commerce by any means, including by computer.

11.     18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce.  18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

12.     18 U.S.C. § 2252(a)(4) prohibits a person from possessing one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce, or that were produced using materials that have traveled in interstate or foreign commerce.  18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

13.     The following non-exhaustive list of definitions applies to this Affidavit and Attachments A and B to this Affidavit:

00125

**SER 0193**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 196 of 229

a.      "Child erotica," as used herein, means any material relating to minors that serves a sexual purpose for a given individual, including fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, and images or videos of minors that are not sexually explicit. Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries. *See* Kenneth V. Lanning, *Child Molesters: A Behavioral Analysis* (2001) at 65. Federal courts have recognized the evidentiary value of child erotica and its admissibility in child pornography cases. *See United States v. Cross*, 928 F.2d 1030 (11th Cir. 1991) (testimony about persons deriving sexual satisfaction from and collecting non-sexual photographs of children admissible to show intent and explain actions of defendant); *United States v. Caldwell*, 181 F.3d 104 (6th Cir. 1999) (child erotica admissible under Federal Rule of Evidence 404(b) to show knowledge or intent).

b.      "Child pornography," as used herein, is defined in 18 U.S.C. § 2256 (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

c.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

d.      "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which

5

00126

**SER 0194**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 197 of 229

1   hosts the data associated with a website.  That web server receives requests from a user and delivers

2   information from the server to the user's computer via the Internet.

3            e.      "Computer hardware," as used herein, consists of all equipment which can

4   receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic,

5   magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing

6   devices (including, but not limited to, mobile telephones, video gaming devices, portable electronic

7   music players, central processing units, internal and peripheral storage devices such as fixed disks,

8   external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral

9   input/output devices (including, but not limited to, keyboards, printers, video display monitors, and

10  related communications devices such as cables and connections), as well as any devices,

11  mechanisms, or parts that can be used to restrict access to computer hardware (including, but not

12  limited to, physical keys and locks).

13           f.      "Computer software," as used herein, is digital information which can be

14  interpreted by a computer and any of its related components to direct the way they work.  Computer

15  software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to

16  run operating systems, applications, and utilities.

17           g.      "Computer-related documentation," as used herein, consists of written,

18  recorded, printed, or electronically stored material which explains or illustrates how to configure or

19  use computer hardware, computer software, or other related items.

20           h.      "Computer passwords, pass-phrases and data security devices," as used

21  herein, consist of information or items designed to restrict access to or hide computer software,

22  documentation, or data.  Data security devices may consist of hardware, software, or other

23  programming code.  A password or pass-phrase (a string of alpha-numeric characters) usually

24  operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware

00127

SER 0195

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 198 of 229

1    may include encryption devices, chips, and circuit boards.  Data security software of digital code

2    may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set

3    security functions when touched.  Data security software or code may also encrypt, compress, hide,

4    or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to

5    restore it.

6             i.        "Digital device" includes any electronic system or device capable of storing

7    and/or processing data in digital form, including: central-processing units; desktop computers; laptop

8    or notebook computers; personal digital assistants; wireless communication devices such as

9    telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as

10   keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related

11   communications devices such as modems, cables, and connections; storage media such as hard disk

12   drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

13            j.        "Hyperlink" refers to an item on a web page which, when selected, transfers

14   the user directly to another location in a hypertext document or to some other web page.

15            k.        The Internet is a global network of computers and other electronic devices

16   that communicate with each other.  Due to the structure of the Internet, connections between devices

17   on the Internet often cross state and international borders, even when the devices communicating

18   with each other are in the same state.

19            l.        "Internet Service Providers" (ISPs), as used herein, are commercial

20   organizations that are in business to provide individuals and businesses access to the Internet.  ISPs

21   provide a range of functions for their customers including access to the Internet, web hosting, e-mail,

22   remote storage, and co-location of computers and other communications equipment.  ISPs can offer

23   a range of options in providing access to the Internet including telephone based dial-up, broadband

24   based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite

00128

**SER 0196**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 199 of 229

1   based subscription.  ISPs typically charge a fee based upon the type of connection and volume of

2   data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an

3   account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal

4   password selected by the subscriber.  By using a computer equipped with a modem, the subscriber

5   can establish communication with an ISP over a telephone line, through a cable system or via

6   satellite, and can access the Internet by using his or her account name and personal password.

7          m.      "ISP Records" are records maintained by ISPs pertaining to their subscribers

8   (regardless of whether those subscribers are individuals or entities).  These records may include

9   account application information, subscriber and billing information, account access information

10  (often in the form of log files), e-mail communications, information concerning content uploaded

11  and/or stored on or via the ISP's servers, and other information, which may be stored both in

12  computer data format and in written or printed record format.  ISPs reserve and/or maintain

13  computer disk storage space on their computer system for their subscribers' use.  This service by

14  ISPs allows for both temporary and long-term storage of electronic communications and many other

15  types of electronic data and files.

16         n.      "Internet Protocol address" or "IP address" refers to a unique number used by

17  a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service

18  Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.

19  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is

20  used each time the computer accesses the Internet.  IP addresses are also used by computer servers,

21  including web servers, to communicate with other computers.

22         o.      "Minor" means any person under the age of eighteen years.  See 18 U.S.C. §

23  2256(1).

24

00129

**SER 0197**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 200 of 229

p.      "Preview image" refers to an image or a set of images that is a representative sample of a larger collection of images or video(s).  Preview images are commonly used to advertise the content of materials that are available at another internet location.

q.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

r.      A "social networking service" is an online service, platform, or site that focuses on facilitating the building of social networks or social relations among people who, for example, share interests, activities, backgrounds, or real-life connections. A social network service consists of a representation of each user (often a profile), his/her social links, and a variety of additional services, which may include the ability to create public and private groups or networks, as well as image and video sharing.  Most social network services are web-based and provide means for users to interact over the Internet, such as e-mail, instant messaging, or bulletin-board postings. Social networking sites allow users to share ideas, activities, events, and interests within their individual networks.  Examples of widely used social networking services include Facebook, Google+, and Twitter.

00130

SER 0198

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 201 of 229

1         s.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse,

2  including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite

3  sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of

4  the genitals or pubic area of any person.  See 18 U.S.C. § 2256(2).

5         t.    "Visual depictions" include undeveloped film and videotape, and data stored

6  on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18

7  U.S.C. § 2256(5).

8         u.    "Website" consists of textual pages of information and associated graphic

9  images.  The textual information is stored in a specific format known as Hyper-Text Mark-up

10  Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text

11  Transport Protocol (HTTP).

12         v.    "Imaging" or "copying" refers to an accurate reproduction of information

13  contained on an original physical item, independent of the electronic storage device.  "Imaging" or

14  "copying" maintains contents but attributes may change during the reproduction.

15         w.    "Hash value," or "SHA-1," refers to a mathematical algorithm generated

16  against data to produce a numeric value that is representative of that data.  A hash value may be run

17  on media to find the precise data from which the value was generated.  Hash values cannot be used

18  to find other data.  Secure Hash Algorithm Version 1, or SHA 1, is a mathematical algorithm.  SHA 1

19  was developed by the National Institute of Standards and Technology (NIST), along with the

20  National Security Agency (NSA).  The United States of America has adopted the SHA 1 hash

21  algorithm described herein as a Federal Information Processing Standard.  It is computationally

22  infeasible ($2^{160}$th) to find two different files that produce the same SHA 1 value.  This allows

23  investigators to identify a file by the value, regardless of the name of the file beyond 99.99 percent

24  certainty.  The SHA 1 digital signature can be explained as a digital fingerprint, or DNA of the file.

00131

**SER 0199**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 202 of 229

x.     "Steganography" refers to the art and science of communicating in a way that hides the existence of the communication. It is used to hide a file inside another. For example, steganography can be used to hide a child pornography image inside another graphic image file, audio file, or other file format.

y.     "Compressed file" refers to a file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY AND ONLINE CHILD EXPLOITATION

14.     Based upon my training and experience, I am aware that the following characteristics are generally found in varying combinations in people who produce, trade, distribute, or possess images of child pornography:

a.     They view children as sexual objects. They receive gratification from sexually explicit images of minors.

b.     They collect sexually explicit images of minors which they use for their own sexual gratification and fantasy.

c.     Although in the past they rarely, if ever, dispose of sexually explicit images of minors because the images are treated as prized possessions, it is becoming more common for them to download, view and erase the images. They have been known to store such images in different formats including photos, printouts, magazines, videotapes, and forms of digital media such as hard drives, diskettes, and CD-ROMs. They have been known to store such images in different places including their home, their car, and other areas under their control.

d.     They use sexually explicit images of minors as a means of reliving fantasies or actual sexual encounters. They also use the images as keepsakes and as a means of gaining

11

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 203 of 229

1    acceptance, status, trust, and psychological support by exchanging, trading, or selling the images to

2    other people with similar interests.

3            e.      They go to great lengths to conceal and protect from discovery their collection

4    of sexually explicit images of minors.  They may have passwords to access programs or control

5    encryption written down either in the vicinity of their computer, or on their person, for instance, in

6    their wallet or an address book.

7            f.      They maintain images of minors with whom they have had sexual contact.  If

8    a picture of a minor is taken by such a person depicting the minor in the nude, there is a high

9    probability the minor was used to produce sexually explicit images to be traded with people with

10   similar interests.

11       15.     Computers and computer technology have revolutionized the way in which

12   individuals interested in child pornography interact with each other.  Child pornography formerly

13   was produced using cameras and film (either still photography or movies).  The photographs

14   required darkroom facilities and a significant amount of skill in order to develop and reproduce the

15   images.  There were definable costs involved with the production of pornographic images.  To

16   distribute these on any scale required significant resources.  The photographs themselves were

17   somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution

18   of these wares was accomplished through a combination of personal contacts, mailings and

19   telephone calls.

20       16.     The development of computers has changed this.  Computers basically serve four

21   functions in connection with child pornography:  production, communication, distribution, and

22   storage.

23       17.     Child pornographers can now transfer photographs from a camera onto a computer-

24   readable format with a variety of devices, including scanners, memory-card readers, or directly from

00133

**SER 0201**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 204 of 229

digital cameras.  Modems allow computers to connect to other computers through the use of telephone, cable, or wireless connections.  Electronic contact can be made to literally millions of computers around the world.

18.     The capability of a computer to store images in digital form makes the computer itself an ideal repository for child pornography.  The storage capacity of electronic media used in home computers has increased tremendously within the last several years.  These drives can store an extremely large amount of visual images at very high resolution.

19.     The Internet, the World Wide Web, and other Internet components afford individuals many different and relatively secure and anonymous venues for obtaining, viewing, and trading child pornography, for communicating with others to do so, or for enticing children.

20.     Collectors and distributors of child pornography also use online resources to retrieve, store and share child pornography, including services offered by Internet Portals such as Google, America Online (AOL), Yahoo!, Hotmail, and Facebook among others.  Online services allow a user to set up an account providing e-mail and instant-messaging services, as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  And even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

21.     As is the case with most digital technology, computer communications can be saved or stored on hardware, and computer storage media are used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  However, digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client

00134

SER 0202

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 205 of 229

1   software, among others).  In addition to electronic communications, a computer user's Internet

2   activities generally leave traces or "footprints" in the web cache and history files of the browser

3   used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer

4   to peer software, when the computer was sharing files, and some of the files which were uploaded or

5   downloaded.  Such information is often maintained for long periods of time until overwritten by

6   other data.

7       22.      The interaction between software applications and the computer operating systems

8   often results in material obtained from the Internet being stored multiple times, and even in different

9   locations, on a computer hard drive without the user's knowledge.  Even if the computer user is

10  sophisticated and understands this automatic storage of information on his computer's hard drive,

11  attempts at deleting the material often fail because the material may be automatically stored multiple

12  times and in multiple locations within the computer media.  As a result, digital data that may have

13  evidentiary value to this investigation could exist in the user's computer media, despite, and long

14  after, attempts at deleting it.  A thorough search of this media could uncover evidence of receipt,

15  distribution, and possession of child pornography.

16      23.      Data that exists on a computer is particularly resilient to deletion.  Computer files or

17  remnants of such files can be recovered months or even years after they have been downloaded onto

18  a hard drive, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be

19  stored for years at little to no cost.  Even when such files have been deleted, they can be recovered

20  months or years later using readily-available forensic tools.  When a person "deletes" a file on a

21  home computer, the file is sent to the recycle bin, where it can be easily accessed by the user.  Even

22  when a person deletes a file from the recycle bin, the data contained in the file does not actually

23  disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore,

24  deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space

00135

**SER 0203**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 206 of 229

1   on the hard drive that is not allocated to an active file or that is unused after a file has been allocated

2   to a set block of storage space – for long periods of time before they are overwritten.  In addition. a

3   computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

4   Similarly, files that have been viewed via the Internet are automatically downloaded into a

5   temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive

6   space devoted to these files, and the files are only overwritten as they are replaced with more

7   recently viewed Internet pages.  Thus, the ability to retrieve residues of an electronic file from a hard

8   drive depends less on when the file was downloaded or viewed than on a particular user's operating

9   system, storage capacity, and computer habits.

10                     SPECIFICS OF SEARCHES AND SEIZURES OF COMPUTER SYSTEMS

11          24.     Searches and seizures of evidence from computers commonly require agents to

12   download or copy information from the computers and their components. or seize most or all

13   computer items (computer hardware. computer software, and computer related documentation) to be

14   processed later by a qualified computer expert in a laboratory or other controlled environment.  This

15   is almost always true because of the following:

16                  a.      Computer storage devices (like hard disks, diskettes, tapes, laser disks,

17   magneto opticals, and others) can store the equivalent of thousands of pages of information.

18   Especially when the user wants to conceal criminal evidence, he or she often stores it in random

19   order with deceptive file names.  This requires searching authorities to examine all the stored data to

20   determine whether it is included in the warrant.  This sorting process can take days or weeks,

21   depending on the volume of data stored. and it would be generally impossible to accomplish this

22   kind of data search on site; and

23                  b.      Searching computer systems for criminal evidence is a highly technical

24   process requiring expert skill and a properly controlled environment.  The vast array of computer

00136

SER 0204

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 207 of 229

1  hardware and software available requires even computer experts to specialize in some systems and

2  applications, so it is difficult to know before a search which expert should analyze the system and its

3  data.  The search of a computer system is an exacting scientific procedure which is designed to

4  protect the integrity of the evidence and to recover even hidden, erased, compressed, password-

5  protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or

6  destruction (which may be caused by malicious code or normal activities of an operating system),

7  the controlled environment of a laboratory is essential to its complete and accurate analysis.

8       25.     In order to fully retrieve data from a computer system, the analyst needs all magnetic

9  storage devices as well as the central processing unit (CPU).  In cases involving child pornography

10  where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough

11  and efficient search due to software and hardware configuration issues.  In addition, the analyst

12  needs all the system software (operating systems or interfaces, and hardware drivers) and any

13  applications software which may have been used to create the data (whether stored on hard drives or

14  on external media).

15       26.     In addition, there is probable cause to believe that the computer and its storage

16  devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the

17  meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

18                    **SEARCH METHODOLOGY TO BE EMPLOYED**

19       27.     The search procedure of electronic data contained in computer hardware, computer

20  software, and/or memory storage devices may include the following techniques (the following is a

21  non-exclusive list, as other search procedures may be used):

22            a.     examination of all of the data contained in such computer hardware, computer

23  software, and/or memory storage devices to view the data and determine whether that data falls

24  within the items to be seized as set forth herein;

00137

**SER 0205**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 208 of 229

1           b.      searching for and attempting to recover any deleted, hidden, or encrypted data

2 to determine whether that data falls within the list of items to be seized as set forth herein (any data

3 that is encrypted and unreadable will not be returned unless law enforcement personnel have

4 determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

5 activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses

6 specified above);

7           c.      surveying various file directories and the individual files they contain;

8           d.      opening files in order to determine their contents;

9           e.      using hash values to narrow the scope of what may be found.  Hash values are

10 used to find previously identified files of images of child pornography and do not capture images

11 that are the result of new production, images embedded in an alternative file format, or images

12 altered, for instance, by a single pixel.  Thus, hash value results are under-inclusive, but are still a

13 helpful tool;

14           f.      scanning storage areas;

15           g.      performing key word searches through all electronic storage areas to

16 determine whether occurrences of language contained in such storage areas exist that are likely to

17 appear in the evidence described in Attachment A; and/or

18           h.      performing any other data analysis technique that may be necessary to locate

19 and retrieve the evidence described in Attachment B.

## DETAILS OF THE INVESTIGATION

21     28.    The Internet Crimes Against Children (ICAC) Task Force is currently investigating

22 LONNY DITIRRO, his apparent sexual exploitation of children and his interstate travel with intent

23 to engage or watch illicit sexual conduct with minors.  As discussed more fully below, an

24 investigation thus far has demonstrated that there is probable cause to believe that LONNY

00138

**SER 0206**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 209 of 229

1   DITIRRO traveled from Las Vegas, Nevada to Wichita, Texas, for the purposes of meeting minor

2   children, and then engage in sexually explicit conduct with minors. There is also probable cause to

3   believe that LONNY DITIRRO was present during the elicit conduct and was aware that the elicit

4   conduct was being videotaped. Accordingly, this affidavit is made in support of an application for a

5   warrant to search the SUBJECT PREMISES and seize contraband, instrumentalities, fruits, and

6   evidence of criminal violations relating to the sexual exploitation of children and travel with intent

7   to engage in illicit sexual conduct.

8         29.   On September 10, 2015, Las Vegas Metropolitan Police Department (LVMPD)

9   Officers N. Bianco, P#15086 and G. Wilson, P#9177 were dispatched to the address of ████████

10  █████ Las Vegas, Nevada 89121 reference a child exploitation call. Upon arrival, officers made

11  contact with the person reporting (PR), Stephan Baltazar (DOB: ████████) and his wife, Tiffany

12  Gonyea (DOB: ████████). Per Baltazar, his friend, Rachael Saito (DOB: ████████), found a

13  micro Secure Digital (SD) card in her bed. Per Saito, the SD card belongs to her ex-boyfriend,

14  Lonny Joseph Ditirro (DOB: ████████. Baltazar described Saito put the SD card in her cell phone

15  and discovered what appeared to be child pornographic images on the SD card. Saito, in fear

16  LONNY DITIRRO would retaliate against her if she went to the police, provided the card to

17  Baltazar.

18        30.   Officers N. Bianco, P#15086 and G. Wilson, P#9177, using Baltazar's cell phone

19  viewed the micro secure digital SD card. Officers observed several images of females, who appeared

20  to be under the age of 16, engaged in sexual acts.

21        31.   Rachael Saito arrived while officers were still on scene and stated one of the females

22  on the SD card who appears to be under 16, goes by the name of "S████" and per LONNY

23  DITIRRO's Facebook page, "S████" graduates from high school in 2017. Per Rachael Saito,

24  LONNY DITIRRO drove to Wichita, Texas (unknown exact location) to meet with S████. Also,

18

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 210 of 229

1    Rachael Saito described seeing an image of a child who appeared to be 5 years old engaged in sexual

2    acts with an adult male.

3           32.    This report was documented under LVMPD event number 150910-2991. Officer

4    Bianco impounded the SanDisk Micro SD card under the same event number.

5           33.    On November 30, 2015, Detective S. Tooley, P#6224, formerly of the Internet

6    Crimes Against Children Task Force, conducted a recorded interview with Rachael Saito. Rachael

7    Saito described her and LONNY DITIRRO had begun dating in February of 2015. Shortly

8    thereafter, LONNY DITIRRO moved in to her apartment at ▓▓▓▓▓▓▓▓▓▓▓▓▓,

9    ▓▓▓▓▓▓▓▓▓▓▓. Rachael Saito described she had discovered LONNY DITIRRO had been

10    chatting on Facebook with a 15 year old girl, identified herein as "S.M.," from Wichita, Texas.

11          34.    Rachael Saito described she and LONNY DITIRRO broke up around July of 2015,

12    but began a casual relationship in August of 2015; however, they are no longer together. Rachael

13    Saito described, in August 2015, LONNY DITIRRO told her he was going to visit his mother who

14    lives in El Paso, Texas, but Rachael Saito believes LONNY DITIRRO met up with S.M. in Texas.

15    (S.M. has not been identified at this time.)

16          35.    Rachael Saito described on or about September 9, 2015, while in bed, she discovered

17    a micro SD card stuck to her leg. Rachael Saito believed it to be LONNY DITIRRO's SD card

18    because he had asked her if she had seen the card. Rachael Saito described that she placed the SD

19    card in her phone and observed both clothed and nude pictures of LONNY DITIRRO, and images of

20    LONNY DITIRRO engaged in sexual acts with a child she believes is S.M. Also, Rachael Saito

21    located images of other children who appear to be under the age of 16 engaged in sexual acts.

22    Specifically, Rachael Saito described an image of a female child around the age of 12 engaged in

23    sexual intercourse with an adult male.

24

00140

**SER 0208**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 211 of 229

36.     On December 2, 2015, Det. Shannon Tooley, P#6224, had a search warrant signed by State of Nevada Justice Court Judge Diana Sullivan and served said warrant on same date to seize and perform a full forensic examination on said SanDisk Micro Secure Digital Card (16GB), for evidence of child pornography and proof of ownership of said SD card.

37.     On March 7, 2016, LVMPD Forensic Examiner Matt Trafford, P#14286, completed a forensic examination on said SanDisk Micro Secure Digital Card (16GB). The results of said examination revealed 254 images and 42 videos of child pornography were found saved on said SD card. There were also 111 images that are child exploitive (age difficult) and 30 images of CGI/animation that are child exploitative. In addition, there are 235 images/videos of suspect LONNY DIIIRRO located on said SD card; proving said SD card belongs to him. 56 of the 254 images of child pornography were tagged as involving infants/toddlers and 5 images of the 254 being S&M (Sadomasochism)/violence related.

38.     I personally viewed the reported 254 images and 42 videos of child exploitation and found them all to be child pornographic in nature. The following is a description of 6 of the images and 4 of the videos:

    a.    **File name:** 01-1.jpeg
        **SHA1 Hash Value:** 4ADDE8053FFDE0021ACB6EF8C4A35BDB
        **Description:** An adult male with an erect penis is seen holding his penis with his left hand and ejaculating into the mouth of a pre-pubescent female child.

        **This image was put on the SD card on 07/11/2014, but no EXIF data as far as when actual image created.**

    b.    **File name:** 050085f7-5a8a-4ee8-ac7f-770f847ea105.jpg
        **SHA1 Hash Value:** 9FD0FF3C2F4770A6D327FA4AB279FF0F
        **Description:** Nude pre-pubescent female child is seen in the bathtub, sitting on top of a nude adult male who is lying on his back in the bathtub. The child has both hands around male's penis as male is seen ejaculating.

        **This image was put on the SD card on 07/11/2014, but no EXIF data as far as when actual image created.**

00141

SER 0209

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 213 of 229

**Description:** Nude pre-pubescent female child lying on her back, with an image of a playboy bunny drawn above her vagina and the words "Fuck Me." One adult erect penis is seen above her that is dripping with ejaculation. Another adult's erect penis is penetrating her anus. The child also has a large amount of semen on her chest/stomach area.

**This image was put on the SD card on 12/28/2014, but no EXIF data as far as when actual image created.**

i.    **File name:** x_448913e4.jpg
      **SHA1 Hash Value:** C318491BEF15012387AB220E93CC2E30
      **Description:** Nude pre-pubescent female child lying on her back, with her legs spread apart. A nude adult male with an erect penis is in between her legs with his penis touching said child's vaginal area.

      **This image was put on the SD card on 08/18/2015, but no EXIF data as far as when actual image created.**

j.    **File name:** 10859.jpg
      **SHA1 Hash Value:** 1998D943A31EA7A335CFA44996AB9D06
      **Description:** Partially nude pre-pubescent male child lying on his back. An adult woman, wearing a robe and partially exposing her breasts is seen with the child's penis in her mouth as she performs oral sex on said child.

      **This image was put on the SD card on 08/18/2015, but no EXIF data as far as when actual image created.**

39.   I personally viewed the 235 images/videos of suspect LONNY DITIRRO located on said SD card and confirmed said images to be that of suspect LONNY DITIRRO, thus providing proof of ownership of said SD card as many of the images was "selfies" taken by LONNY DITIRRO himself. In addition, LONNY DITIRRO video recorded numerous videos of having sex with probable unidentified underage girls (ages 13-15) and pictures with various young teenage girls. The suspect also had two folders that were titled, "Me" and "Me Restricted." The "Me" folder contains dozens of "selfie" type images of himself. The "Me Restricted" folder contains nude images of the suspect LONNY DITIRRO. Both of these folders show additional ownership of said SD card. The suspect LONNY DITIRRO also had his "Resume" saved to the SD card that also provided proof of ownership.

00143

**SER 0211**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 214 of 229

40.     On April 12, 2016, Investigative Specialist Lisa Rowe served an Administrative Subpoena on Facebook, Inc. for all customer records pertaining to user account: www.facebook.com/lonny.j.ditirro.

41.     On April 13, 2016, Facebook, Inc. responded that user account: www.facebook.com/lonny.j.ditirro, resolves to Lonny Joseph Ditirro, IP address of 76.3.155.54, cell phone of ████████, email addresses of guardian_angel_l@hotmail.com and lonny.ditirro@gmail.com, and a profile picture that matches suspect LONNY DITIRRO images found on SD card. The last login date was 03/17/2016.

42.     Upon doing a routine record check on LONNY DITIRRO, he was further identified as Lonny Joseph Ditirro, DOB ████████, SSN ████████, Suspended Nevada Driver's License #████████.

43.     Based on my training and experience, I know that micro SD cards can store images, videos and other digital files. I know users can store files to a SD card by capturing images and videos utilizing their cellular phone or a computer to download files from the internet, and transferring these digital files to the SD card.

44.     Because LONNY DITIRRO has previously used an electronic device such as a Smartphone or computer to upload numerous images/videos of child pornography to said SanDisk Micro Secure SD Card, there is probable cause to believe that evidence of a crime involving the sexual exploitation of a child may be found on the computers or other digital devices located at the residence of LONNY DITIRRO.

...

00144

**SER 0212**

## RETURN AND REVIEW PROCEDURES

45.     Rule 41 of the Federal Rules of Criminal Procedure provides, in relevant part:

(e) Issuing the Warrant.

(2) Contents of the Warrant.

(A) Warrant to Search for and Seize a Person or Property. Except for a tracking-device warrant, the warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned. The warrant must command the officer to:
(i) execute the warrant within a specified time no longer than 14 days;
(B) Warrant Seeking Electronically Stored Information. A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

(f) Executing and Returning the Warrant.

(1) Warrant to Search for and Seize a Person or Property.

(B) Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. . . . In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.

46.     Pursuant to this Rule, I understand and will act in accordance with the following:

a.     Pursuant to Rule 41(e)(2)(A)(iii), an agent is required to file with the Court an inventory return; that is, an itemized list of the property seized, within fourteen (14) days of the execution of the warrant.

24

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 216 of 229

1          b.          Pursuant to Rule 41(e)(2)(B), Rule 41(e)(2)(A) governs the time within which

2    the electronically stored information must be seized after the issuance of the warrant and copied

3    after the execution of the warrant, not the "later review of the media or information" seized, or the

4    later off-site digital copying of that media.

5          c.          Under Rule 41(f)(1)(B), the inventory return that is to be filed with the court

6    may be limited to a description of the "physical storage media" that was seized or copied, not an

7    itemization of the information or data stored on the "physical storage media."

8          d.          Under Rule 41(f)(1)(B), I may retain a copy of that information for purposes

9    of the investigation.  The government proposes that the original storage media plus a full image copy

10   of the seized media be retained by the government.

11          e.          If the person from whom any electronic media was seized requests the return

12   of any information on the electronic media that is not set forth in Attachment B, that information

13   will be copied onto a hard drive and returned to the person from whom the information was seized.

14   ...

00146

SER 0214

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 217 of 229

1

## CONCLUSION

2       47.     Based on the foregoing, I have probable cause to believe that LONNY DiTIRRO

3   committed the offenses involving child sexual exploitation, including violations pertaining to the

4   travel with intent to engage in illicit sexual conduct in violation of Title 18 Sections 2251(a),

5   2252A(a)(2) and 2423(b), and that contraband, evidence, fruits and instrumentalities of those

6   offenses, as more fully described in Attachment B, are presently located at ███████████

7   ███████████████, Las Vegas, Nevada 89169 which is more fully described above and

8   in Attachment A. I therefore request that the court issue a warrant authorizing a search of the

9   premises described in Attachment A for the items listed in Attachment B, and the seizure and

10   examination of any such items found.

11

12                        /s/

13                     SCOTT S. MILLER
                  ICAC Task Force Officer
                  Federal Bureau of Investigation

14

15   Subscribed and sworn to before me this ___ day of June, 2016.

16   C.W. HOFFMAN, JR.

17   _____
    United States Magistrate Judge

18

19

20   I hereby attest and certify on _____
that th. .............. du. ...........
21   copy of the original on file in my office, and in my legal
custody.

22              C.W. HOFFMAN JR.
           U.S. MAGISTRATE JUDGE
           DISTRICT OF NEVADA
23   By _____ Deputy
                   Secretary

24

00147

**SER 0215**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 218 of 229

1

ATTACHMENT "A"

2

**Property to Be Searched**

3      The **SUBJECT PREMISES** is located inside the Siegel Suites Apartment Complex, at the

4   address of ███████████████████ Apartment ██████, Las Vegas. Nevada 89169.

5   which is further described as a 3-story light tan stucco apartment building with brown accents.

6   Apartment ██████ is located on a 1st floor and there is a complex gated pool directly in front of

7   ████████". Front door of Apartment ██████ faces south and is red in color, with a gold

8   ██████ affixed to the top center of door. ████████' sits on the northeast corner of the

9   property and a brown ████████ is affixed on the southwest corner of the building, just above the 1st

10  floor. The only access point to get to ████████ is located via a metal gate on the first floor,

11  southwest corner of ████████'.






12

13

14

15

16

17

18

19

20

21

22

23

24

00148

**SER 0216**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 219 of 229

## ATTACHMENT B
## LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

This affidavit is in support of application for a warrant to search the property known as a ████████, in Las Vegas, Nevada, which is more specifically identified in the body of the application and in Attachment A, that can be used to store information and/or connect to the Internet, for records and materials that are fruits, evidence, or instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A. These records and materials are more specifically identified as:

1. Any and all computers, computer system and related peripherals, cellular telephones, gaming consoles, personal digital assistants, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, tape systems and hard drive, terminals (keyboards and display screens) and other computer related operation equipment, in addition to computer photographs, digital graphic file formats and/or photographs, slides or other visual depictions of such digital graphic file format equipment that may be, or are used to visually depict child pornography, information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession, or receipt of child pornography, or information pertaining to an interest in child pornography.

2. Any and all material depicting child pornography, any sexual conduct regardless of whether it is between adult(s) and children, or between children, child erotica; any images, visual recording, digital imagery, sketches, drawings, or other media depicting or portraying lewd or lascivious exhibition of children's genitalia; sexually suggestive poses involving children; or any type of sexually explicit conduct involving children, as defined in Title 18, United States Code, Section 2256(8). Any and all audio recordings involving children engaging in sexual acts, whether alone, with another child or children, or with an adult or adults.

3. Any and all computer software, including programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

4. Any computer-related documentation, which consists of written, recorded, printed or electronically stored material that explains or illustrates how to configure or use computer hardware, software or other related items.

00149

**SER 0217**

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 220 of 229

5.      Any and all records and materials, in any format and media (including, but not limited to, envelopes, letters, papers, e-mail, chat logs and electronic messages), pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

6.      In any format and media, all originals, copies and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

7.      Any and all cameras, camera equipment, photography equipment or any other digital device capable of recording or storing sexually explicit images of minors in negative, digital or other format.

8.      Any and all records and materials, in any format and media (including, but not limited to, envelopes, letters, papers, e-mail, chat logs and electronic messages) identifying persons transmitting through interstate or foreign commerce, including via computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

9.      Any and all records and materials, in any format and media (including, but not limited to, envelopes, letters, papers, e-mail, chat logs, electronic messages, other digital data files and web cache information), bearing on the receipt, shipment or possession of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

10.     Records of communication (as might be found, for example, in digital data files) between individuals concerning the topic of child pornography, the existence of sites on the Internet that contain child pornography or who cater to those with an interest in child pornography, as well as evidence of membership, subscription or free membership, in online clubs, groups, services, or other Internet sites that provide or make accessible child pornography to its members and constituents.

11.     Evidence of any online storage, e-mail or other remote computer storage subscription to include unique software of such subscription, user logs or archived data that show connection to such service, and user login and passwords for such service.

12.     Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

13.     Records, in any format or media, evidencing ownership or use of computer equipment and paraphernalia found in the residence to be searched, including, but not limited to, sales receipts, registration records, records of payment for Internet access, records of payment for access to newsgroups or other online subscription services, handwritten notes and handwritten notes in computer

00150

SER 0218

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 221 of 229

manuals.

14.     Any and all buddy lists, correspondence, or text messages in whatever media and format pertaining to Group E-Mails which relate to child exploitation or child pornography.

15.     Images and videos of children in non-sexually explicit poses or scenes, located in electronic, digital, or printed formats, which are necessary for comparison purposes of any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

16.     Any and all records, in any format, relating to or showing use of peer-to-peer filing sharing programs and software.

17.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     Evidence of the lack of such malicious software;

d.     Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.     Evidence of the times the COMPUTER was used;

g.     Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

18. Any safes, key-lock strong boxes, suitcases, boxes, containers and other instruments closed and/or secured by combination and/or key locks of various kinds that may contain items described in the above paragraphs of this Schedule, and their contents.

30

00151

**SER 0219**

# EXHIBIT I

# Redacted by the FPD for personal identifiers

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 222 of 229

# EXHIBIT I

SER 0220

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 223 of 229

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# OFFICER'S REPORT

Event #: __150910-2991__

SUSPECT INTERVIEW

SUBJECT

| DIVISION REPORTING: | ISD | DIVISION OF OCCURRENCE: | ISD |
|---|---|---|---|
| DATE & TIME OCCURRED: | 06/17/2016  0802 hours | LOCATION OF OCCURRENCE: | ██████ Las Vegas, NV 89169 |

NARRATIVE:

This case has been approved federally under FBI #: 305I-LV-7950929 for Possession of Child Pornography.

**Suspect:**  Lonny Joseph Ditirro Jr.
DOB: ██████  SSN: ██████
WMA, 6'04" / 250 lbs., brown hair and brown eyes

**Officers:**

| | |
|---|---|
| Scott Miller | PN 6507 |
| SA Sue Flaherty | FBI |
| Sean Taylor | PN 8718 |
| Brandonn Trotter | HPD |
| Achim Brunette | HPD |
| SA  Mari Panovich | FBI |
| SA Nick Bugni | FBI |
| SA Chris McPeak | FBI |
| SA Colin Congo | FBI |
| SA Steven Baxter | FBI |
| SA Aaron Ingalls | FBI |
| SA Warrant Burke | FBI |
| SSA Joe Perez | FBI |
| SOS Kellie Badalucco | FBI |
| Shawna Partridge | FBI |

**Evidence:**  Packaged and processed accordingly by SA Mari Panovich of the FBI.

| | | | |
|---|---|---|---|
| Date and Time of Report: | 06/15/2016  0900 hours | Officer: Detective Scott Miller | P#: 6507 |
| Approved By: Sgt. R. Spencer, P#7598 | | Officer: | P#: |
| | | SIGNATURE: ___6507 | |

LVMPD 82 (Rev.8/01) • WORD 2010

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 224 of 229

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: _____ 150910-2991

**Synopsis:**
Officers served a Federal search warrant reference Child Sexual Exploitation at ████████████
Las Vegas, Nevada ████ An interview was conducted with Lonny Ditirro. Several items related to child pornography were seized from the residence. Lonny Ditirro was arrested on Federal arrest warrant.

**Entry:**
On June 17, 2016, at approximately 0700 hours, ICACTF, under the direction of SSA Joe Perez, having in possession a federal search warrant with the affiant being Scott Miller and signed by U.S. Magistrate Judge Carl W. Hoffman on June 16, 2016, for the property located at ████████████████Las Vegas, Nevada ████ executed said warrant at said location without incident by FBI SWAT officers. Officers were attired in clear law enforcement identifiers. FBI SWAT officers announced and challenged the residence and Lonny Ditirro exited the residence without incident. FBI SWAT officers then made entry and conducted a safety sweep of the residence while continuing to call for other potential occupants to exit the residence.

**Custody / Interview Phase:**
Suspect Lonny Ditirro was placed in to federal custody by myself for Federal Complaint, 2:16-mj-00431-NJK, signed by U.S. Magistrate Judge Nancy J. Koppe on 06/10/2016, for Possession of Child Pornography. Lonny Ditirro was then transported to the FBI Office for processing. Detective Scott Miller and Special Agent Sue Flaherty of the FBI conducted a recorded interview with Lonny Joseph Ditirro Jr. at the FBI Office, located at the address of 1787 W. Lake Mead Blvd., Las Vegas, NV 89106. Ditirro was advised of his Miranda rights and Ditirro acknowledged that he understood his rights.

Ditirro stated that that he lives with his roommates James and Jake at listed address for the past year. Ditirro stated his current cell phone, with phone number ████████is a black LG flip phone (Cricket Wireless) that has no internet access and no password. Ditirro stated that he has had this phone for approximately 2 weeks since he has been on house arrest for State charges submitted under this event. Ditirro stated that his previous phone with same phone number was a black Android S6 (Cricket Wireless), but that he sold it to unknown subject for $100 after he was arrested and told he couldn't have the phone. Ditirro stated that conditions of his House Arrest was that he could have no internet access, or a device that could access internet, and no contact with minors.

Ditirro stated that he has email addresses of ████████████████████████, and ████████████ (PW: ████████████ He has a Facebook profile of Lonny Joseph Ditirro, Twitter handle of LDitirro, Instagram account, KIK account under Lonny Ditirro and a Meetme account.

Ditirro stated that he had no computers, notebooks, etc. Ditirro stated that he used to surf internet using his Android S6 smartphone. Ditirro stated he does view and download adult pornography and does masturbate while watching said pornography.

Ditirro stated that he gave his ex-girlfriend Rachel Saito an SD card because she didn't have one and needed it. He stated that his resume and several pictures of him were on said SD card. Ditirro stated that they did live together for almost a year and that they broke up in May or June of 2015.

Ditirro stated that he often feels lonely and that he needs a woman in his life. When asked about child pornography, Ditirro evoked his Miranda Rights and the interview was stopped accordingly. As Ditirro was getting processed at FBI Office, he spontaneously uttered that once went to New York to visit a girl he was in love with, but that she didn't want anything to do with him anymore and how sad that made him. No follow-up questions were asked and he made no other comments about this.

Ditirro was then booked accordingly in to U.S Marshal's for said federal arrest warrant.

**Securing Residence Phase:**
The residence was left in the care of said roommates James and Jim.

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 225 of 229

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: _____ 150910-2991 _____

Copies of the search warrant, sealing order and return were left at residence.

# EXHIBIT J

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 226 of 229

# EXHIBIT J

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 227 of 229



Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 228 of 229

# EXHIBIT K

# EXHIBIT K

UNCLASSIFIED

FD-1035 (REV 2016-05-20)

# U.S. DEPARTMENT OF JUSTICE/FEDERAL BUREAU OF INVESTIGATION

# SUBPOENA

Subpoena number: **311400**   When responding please reference this subpoena number.

**In the matter of case number(s):** 305I-LV-7950929

TO:     MeetMe, Inc
        Legal Team

**TELEPHONE:** 215-862-7829

**ADDRESS:** 100 Union Square Drive
            New Hope, PA 18938

**FAX:**   215-862-1109

## GREETING:

By the service of this subpoena upon you by **Kellie Beth Badalucco**, who is authorized to serve it, you are hereby commanded and required to disclose to **Kellie Beth Badalucco**, a representative of the FBI, the following information Customer or subscriber name, address of service, and billing address; Length of service (including start date and end date); Records of session times and duration for Internet connectivity; Telephone or Instrument number (including IMEI, IMSI, UFMI, and ESN) and/or other customer/subscriber number(s) used to identify customer/subscriber, including any temporarily assigned network address (including Internet Protocol addresses) which may be relevant to an authorized law enforcement inquiry, involving the following: meetme.com/members/31048861 (Lonny DiTirtrro)

Please see the attached page explaining some terms that may be used in this demand. All time values are in the US/Eastern time zone, unless otherwise indicated.

**THE INFORMATION SOUGHT THROUGH THIS SUBPOENA RELATES TO A FEDERAL CRIMINAL INVESTIGATION BEING CONDUCTED BY THE FBI.**

**YOUR COMPANY IS REQUIRED TO FURNISH THIS INFORMATION.**

**YOU ARE REQUESTED NOT TO DISCLOSE THE EXISTENCE OF THIS SUBPOENA INDEFINITELY AS ANY SUCH DISCLOSURE COULD INTERFERE WITH AN ONGOING INVESTIGATION AND ENFORCEMENT OF THE LAW.**

Compliance must be made by personal appearance or production of records no later than the 20th day of **July,** 2016 at 09:00 o'clock AM, at John Lawrence Bailey Bldg, 1787 West Lake Mead Boulevard, Las Vegas, NV 89106-2135. In lieu of a personal appearance, the information can be provided, via email, marked to the attention of **Kellie Badalucco,** at the following email: **kellie.badalucco@ic.fbi.gov.**

If you refuse to obey this subpoena, the United States Attorney General may invoke the aid of a United States District Court to compel compliance. Your failure to obey the resulting court order may be punished as contempt.

Issued under authority of Public Law No. 106-544, §5(a)
(18 U.S.C. §3486)
**ORIGINAL**
Signature: S/ Nicholas Bugni

Name: Nicholas Bugni
**Title:** Acting Supervisory Special Agent
Issued this 20th day of June, 2016

## UNCLASSIFIED

Case: 19-10250, 09/21/2020, ID: 11830255, DktEntry: 30, Page 229 of 229